UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                  :

STEPHANIE LODATI, ET AL.,         :

                     :   Civil Action No.

             Plaintiffs,   :   21-cv-3875 (ENV) (AYS)

                     :

             v.        :   **DECLARATION OF ATTORNEY**

                     :   **MICHAEL J. VOLPE IN**

FRIENDS ACADEMY, ET AL.,   :   **SUPPORT OF DEFENDANTS'**

                     :   **MOTION TO DISMISS THE**

            Defendants.   :   **AMENDED COMPLAINT**

                     :

---------------------------------------------------------------x

I, **MICHAEL J. VOLPE,** declare under penalty of perjury that the following is true and correct:

1.     I am an attorney admitted to practice before this Court, and I am a partner with the law firm Venable LLP, counsel for Defendants Friends Academy ("Friends"), The Board of Trustees of Friends Academy, Andrea Kelly, Mark Schoeffel, Carolyn Skudder-Pocius, Jozeph Herceg, Ron Baskind, and Pamela Martocci (collectively, "Defendants") in the above-captioned matter (the "Action"). I am familiar with the facts, circumstances, and proceedings set forth herein. I submit this Declaration, together with the accompanying exhibits and Memorandum of Law, in support of Defendants' Motion to Dismiss the Amended Complaint pursuant to Sections 12(b)(1) and (6) of the Federal Rules of Civil Procedure.

2.     On or around December 7, 2021, Plaintiff Stephanie Lodati ("Plaintiff") filed the Amended Complaint in the Action, on behalf of herself and as parent and natural guardian of John Doe and Jane Doe. A true and correct copy of Plaintiff's Amended Complaint is attached hereto as **Exhibit A**.

3.      Previously, on or around April 5, 2021, Plaintiff filed a complaint in the Supreme Court of the State of New York, County of Nassau, on behalf of herself and as parent and natural guardian of John Doe, against Friends Academy, The Board of Trustees of Friends Academy and its members in their individual and official capacities, and Andrea Kelly, Mark Schoeffel, Carolyn Skudder-Pocius, Jozeph Herceg, and Ron Baskind in their individual and official capacities.  A true and correct copy of Plaintiff's state court complaint is attached hereto as **Exhibit B**.

4.      A true and correct copy of Friends' Student and Parent Handbook is attached hereto as **Exhibit C**.

5.      A true and correct copy of John Doe's enrollment contract with Friends is attached hereto as **Exhibit D**.

6.      A true and correct copy of Jane Doe's enrollment contract with Friends is attached hereto as **Exhibit E**.

7.      On February 17, 2022, Andrea Kelly, Head of School at Friends, swore to an affidavit in support of Defendants' Motion to Dismiss.  A true and correct copy of Ms. Kelly's affidavit, with its supporting exhibit, is attached hereto as **Exhibit F**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on February 18, 2022 in New York, New York.

Dated:  New York, New York
        February 18, 2022

Respectfully submitted,

Michael J. Volpe
VENABLE LLP
1270 Avenue of the Americas, 24th Floor
New York, New York 10020
Tel.: (212) 307-5500
mjvolpe@venable.com
***Attorneys for Defendants***

2

# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| STEPHANIE LODATI, as Parent and Natural Guardian of JOHN DOE, an infant, STEPHANIE LODATI, as Parent and Natural Guardian of JANE DOE, an infant, and STEPHANIE LODATI, individually;<br><br>                  Plaintiffs,<br><br>v.<br><br>FRIENDS ACADEMY, THE BOARD OF TRUSTEES OF FRIENDS ACADEMY, ANDREA KELLY, individually and in her official capacity, MARK SCHOEFFEL, individually and in his official capacity, CAROLYN SKUDDER-POCIUS, individually and in her official capacity, JOZEPH HERCEG, individually and in his official capacity, RON BASKIND, individually and in his official capacity, and PAMELA MARTOCCI, individually and in her official capacity;<br><br>                  Defendants. | **CASE NO. 2:2021-cv-03875**<br><br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT FOR VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT, VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973, UNFAIR AND DECEPTIVE TRADE PRACTICES UNDER NEW YORK GENERAL BUSINESS LAW, BREACH OF CONTRACT, BREACH OF EXPRESS WARRANTY, NEGLIGENCE, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS, ASSAULT AND BATTERY,**<br><br><br>      <u>**JURY TRIAL DEMANDED**</u> |

NOW COME Plaintiffs, STEPHANIE LODATI, as Parent and Natural Guardian of JOHN DOE, an infant, STEPHANIE LODATI as Parent and Natural Guardian of JANE DOE, an infant, and STEPHANIE LODATI individually, by and through their attorneys, The Law Office of Keith Altman, and for their First Amended Complaint against Defendants, hereby state the following:

## **BACKGROUND**

1.     This is an action seeking damages for Defendants' violations of Plaintiffs' rights under Title III of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, New York General Business Law, Breach of Contract, Breach of Express Warranty, Negligence, Negligent Infliction of Emotional Distress, Assault and Battery, and Slander.

## **PARTIES**

2.     Plaintiff Stephanie Lodati ("LODATI") is an adult individual and is the mother and natural guardian of Plaintiff JOHN DOE and JANE DOE.

FIRST AMENDED COMPLAINT                    2                    CASE NO. 2:21-CV-03875

3.     Plaintiff JOHN DOE is an infant who attended FRIENDS ACADEMY and was dismissed without just cause for alleged misconduct. JOHN DOE has been diagnosed with several mental health including Generalized Anxiety Disorder ("GAD"), Obsessive-Compulsive Disorder ("OCD"), Anorexia Nervosa, and Attention Deficit Hyperactivity Disorder ("ADHD").

4.     JANE DOE is an infant who attended Friends Academy until she was dismissed, without just cause, in retaliation for JOHN DOE'S lawsuit concerning his dismissal.

5.     At all times hereinafter mentioned, Defendant FRIENDS ACADEMY ("FRIENDS") was, and still is, a co-ed day school for Play Group to 12th, at 270 Duck Pond Rd, Locust Valley, NY 11560.

6.     At all times hereinafter mentioned, Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY ("BOARD OF TRUSTEES"), was, and still is, the board entrusted with the power to make decisions on behalf of Defendant Friends Academy with their principal place of business at 270 Duck Pond Rd, Locust Valley, NY 11560.

7.     At all times hereinafter mentioned, Defendant ANDREA

KELLY was and is still employed by Defendant FRIENDS ACADEMY as the Head of School and was always acting in such capacity during the time relevant herein.

8.  At all times hereinafter mentioned, Defendant MARK SCHOEFFEL was and is still employed by Defendant FRIENDS ACADEMY as the Principal of Upper School and was always acting in such capacity during the time relevant herein.

9.  At all times hereinafter mentioned, Defendant CAROLYN SKUDDER-POCIUS was and is still employed by Defendant FRIENDS ACADEMY.

10.  At all times hereinafter mentioned, Defendant JOZEPH HERCEG was and is still employed by Defendant FRIENDS ACADEMY as a Teacher and was always acting in such capacity during the time relevant herein.

11.  At all times hereinafter mentioned, Defendant RON BASKIND was and still is employed by Defendant FRIENDS ACADEMY as the Director of Students and was always acting in such capacity during the time relevant herein.

12. At all times hereinafter mentioned, Defendant PAMELA MARTOCCI was and still is employed by Defendant FRIENDS ACADEMY as a Play Group Teacher and was always acting in such capacity during the time relevant herein.

13. The Defendants, other than FRIEND'S ACADEMY and the BOARD OF TRUSTEES OF FRIENDS ACADEMY shall be known through this complaint as the "Individual Defendants."

14. The Individual Defendants, and each of them acted, at times, in a manner that exceeded the scope of their duties in their official capacities. At other times, the Individual Defendants and each of them acted, at times, in a manner that was within the scope of their duties in their official capacities.

15. Each Individual Defendant was aware of the role that the other Defendants played in the incidents and through their actions or inactions, approved of the others' conduct.

16. At all times, the BOARD OF TRUSTEES was aware of the incidents forming the basis of this complaint and approved and ratified the actions of the other Defendants.

# JURISDICTION & VENUE

17.    This action arises under the laws of the United States, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

18.    This action arises under the following federal statutes: The Americans with Disabilities Act of 1990 (ADA), Pub.L. No. 101-336, 104 Stat. 327 (1990), 42 U.S.C. §§ 12101 et seq., amended by the Americans with Disabilities Amendments Act (ADA-AA) with an effective date of January 1, 2009, which, at Title III of the ADA, prohibits discrimination in the provision of public services. Section 202 of the Act, 42 U.S.C. §12132 (Supp.1991), the Rehabilitation Act of 1973, §§504 and 505, as amended, 29 U.S.C.A. §§794 and 794a, including the conforming amendment of the ADA-AA which changes the definition of "disability" under §504 to conform to the definition of "disability" under ADA-AA. Both the ADA and §504 prohibit retaliation against persons with disabilities.

19.    In accordance with 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over Plaintiff's state law claims for Breach of Contract, Negligence, Negligent Infliction of Emotional Distress, Breach of Express Warranty, Assault and Battery, Violation of the NY GBL § 349, and Slander, because these state law claims are so closely related

to the federal question claims so as to form the same case or controversy under Article III of the United State Constitution.

20.     This Court properly exercises personal jurisdiction over Defendants on the grounds that they are residing and conducting business within the State of New York.

21.     Venue in this action is proper in the United States District Court for the Eastern District of New York because the events relevant to this action occurred primarily within the geographical confines of the Eastern District of New York. Furthermore, Plaintiffs are residents of the district and many of the Defendants, including Friends Academy, are located within the district.


## FACTUAL ALLEGATIONS REGARDING JOHN DOE

22.     JOHN DOE began attending FRIENDS in the ninth grade in September of 2019.

23.     During JOHN DOE's interview process, the faculty and administration of FRIENDS emphasized their culture of inclusivity and openness to learning differences. This can also be found in FRIENDS'

promotional materials and on the school's website.

24.     LODATI believed FRIENDS when they portrayed their values as a culture of inclusivity and openness to learning differences. This was especially important to her and JOHN DOE because JOHN DOE suffers from many health conditions.

25.     In particular, JOHN DOE suffers from GAD, OCD and ADHD.  These conditions cause JOHN DOE to suffer from an extremely high level of anxiety and feel self-conscious when he is "singled out" for unwanted attention.  Simple classroom activities such as being called on in class or having a teacher look over his schoolwork can cause JOHN DOE to shut down and leave the classroom.  These incidents cause serious interruptions to JOHN DOE's learning and cause him emotional distress.

26.     The self-consciousness that results from JOHN DOE's GAD, OCD, and ADHD also leads JOHN DOE to attempt to be a "clown" in an attempt to gain validation.  Because of JOHN DOE's GAD and OCD, he will often speak or act impulsively to appear humorous to his peers.

27.     During a Parent-Teacher conference in November of 2019,

JOHN DOE's Biology, English, Math, and Spanish teacher were made aware of JOHN DOE's GAD, OCD, and ADHD diagnoses. The teachers were asked specifically not to highlight or call attention to JOHN DOE while in class, so as not to trigger JOHN DOE's GAD, OCD, and ADHD. The teachers agreed to conform to these accommodations.

28. The English teacher JOZEPH HERCEG stated that he "understood" why such accommodations were necessary and agreed to abide by them. However, despite this assurance, JOZEPH HERCEG nonetheless singled out JOHN DOE in a manner that violated his previous commitment to JOHN DOE's accommodation.

29. During a Zoom class, JOZEPH HERCEG allowed a highly inflammatory email he was typing to be viewed by the entire class. The email stated that JOHN DOE had a "black eye" and had "missed class" due to "problems at home". This email, clearly insinuating domestic abuse involving JOHN DOE, was viewed by the entire class, causing several students to message JOHN DOE. This incident caused JOHN DOE extreme emotional harm.

30. During his enrollment, JOHN DOE was not welcomed into

FRIENDS as the school had promised. JOHN DOE was bullied and singled out by students from the beginning. A particular group of students took to bullying JOHN DOE every day.

31.     JOHN DOE's anorexia renders him extremely self-conscious about his physical appearance.  The bullies would daily subject JOHN DOE to humiliating and demeaning comments about his appearance and body. Furthermore, the daily bullying included physical attacks and having his money stolen.

32.     As a result of the daily bullying and harassment that JOHN DOE was subjected to, JOHN DOE suffered intense emotional distress which caused his GAD, OCD, and ADHD symptoms to intensify.

33.     FRIENDS, by and through its employees, including but not limited to ANDREA KELLY, MARK SCHOEFFEL, CAROLYN SKUDDER-POCIUS, JOZEPH HERCEG, and RON BASKIND should have been aware of the bullying and harassment of JOHN DOE because it was occurring daily. At no time did any FRIENDS employee intervene to stop the bullying.

34.     In the time immediately before the incident, JOHN DOE'S

mental health status was unstable, in part because of the actions and inactions of DEFENDANTS.

35.    The instability in his mental health required alteration of his medications.

36.    It is well established that alterations to psychoactive medications can lead to mood and behavioral disturbances.

37.    In or around September of 2020, JOHN DOE joined a FRIENDS Zoom class. He changed his name to "George Floyd" and said, "I can't breathe" ("The Incident").

38.    After The Incident, JOHN DOE was educated about George Floyd's death and the meaning of the "Black Lives Matter"-Movement. Once he received this information, he was deeply sorry for what he had said and expressed his remorse.

39.    JOHN DOE took the step of admitting his actions to MARK SCHOEFFEL to take accountability.

40.    After the incident, Andrea Kelly, Head of School, drafted and distributed an inflammatory and prejudicial email to the entire FRIENDS community, condemning JOHN DOE's behavior and shaming him publicly. This occurred without talking to JOHN DOE or LODATI

in private about the incident.

41.    In response to the letter, JOHN DOE received multiple death threats from his classmates.  Because of the imminent danger of physical harm to JOHN DOE caused by Andrea Kelly's letter, LODATI had to inform law enforcement of the events.

42.    Meanwhile, LODATI had to fear protestors outside her house and had to inform her neighbors. This was also in direct response to the public email Andrea Kelly sent out.

43.    LODATI suffered from extreme emotional anguish caused by the campaign at FRIENDS against her son JOHN DOE, causing her to suffer nightmares and fluctuations in weight, as well as other mental health issues.

44.    JOHN DOE himself suffered extreme emotional anguish caused by the campaign at FRIENDS against him. He had to undergo intense counseling and treatment to cope with the animus shown towards him by FRIENDS' agents and employees.

45.    The campaign against JOHN DOE ended in a per se dismissal from FRIENDS, without giving the child or his parent an opportunity to

tell his version about the events or any other due process.

46. The Board of Trustees were always aware of the school's conduct and, by their actions or inactions, approved this conduct.

## FACTUAL ALLEGATIONS REGARDING JANE DOE

47. In November through December of 2019, JANE DOE, age 3, was a student in the Play Group within the Early Childhood Division at Friends Academy in Locust Valley, New York.

48. The headteacher, Defendant MARTOCCI, advised LODATI, that JANE DOE was "W" sitting. "W" sitting refers to a position where an individual sits on theirbuttocks with each leg bent back which resembles the letter 'W".

49. LODATI was advised that this was due to weak core strength and could cause JANE DOE to have an uneven stride and a lack of balance, among other things.

50. Defendant MARTOCCI expressed concern for JANE DOE. She told LODATI that she frequently reminded JANE DOE to sit properly.

51. In November of 2019, Defendant MARTOCCI told LODATI

that during circle time, where the children sit down in a circle on the floor, she tied JANE DOE's legs together with a ribbon so she would be unable to move them. Thisprevented JANE DOE from sitting in the "W" position.

52.     JANE DOE did not like it and cried to Defendant MARTOCCI the next day asking her to 'please not tie my legs together again".

53.     MARTOCCI is neither a physician nor an occupational therapistand did not have the knowledge, skill, training, or experience to prescribe or provide remedies such as tying JANE DOE'S legs together using ribbon.

54.     . JANE DOE's parents brought her to their Pediatrician in January of 2020. They discussed what the teacher had said regarding JANE DOE's sitting posture. The doctor was perplexed because she had been treating JANE DOE since she was born and had never detected any problem with her core strength.

55.     After performing numerous tests on JANE DOE, the doctor determined that there was no core weakness exhibited by JANE DOE, who showed no signs of weakness and had strong balance. The doctor was concerned that JANE DOE's legs had been tied together by a

teacher. She told LODATI that she should discuss this with the school because it was highly improper behavior.

56.    The doctor was upset with how this was handled and that expressed the opinion that it would have been traumatic for  JANE DOE. The doctor told LODATI that she had never heard of any therapy that would involve tying a child's legs together for any reason.

57.    LODATI brought this matter to the attention of the Head of Early Childhood, Kristin Minuto. Mrs. Minuto expressed dismay and apologized for what MARTOCCI had done to the child. Ms. Minuto assured LODATI that these actions would never happen again.

58.    The Principal of Lower School, Dot Woo, Kristin Minuto and Pamela MARTOCCI had a meeting to discuss the incident. The parents of JANE DOE were not told what transpired at the meeting. The incident was not brought up again after that meeting. No apology was forthcoming from the school or from the teacher.

59.    LODATI filed a lawsuit against FRIENDS and their agents and employees because of their actions towards JOHN DOE. Soon after, in direct response to the lawsuit filed by LODATI, JANE DOE was

dismissed from FRIENDS without any justification whatsoever.

## Respondeat Superior and Agency

60.     Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

61.     Under federal and New York law, an employer may be vicariously liable for an employee's actions when they are acting within the scope of their employment on behalf of the employment.

62.     At all times relevant to this action, Defendants ANDREA KELLY, MARK SCHOEFFEL, CAROLYN SKUDDER-POCIUS, JOZRPH HERCEG, RON BASKIND AND PAMELA MARTOCCI were employed by FRIENDS. The acts and omissions of these employees relevant to this action were undertaken within the scope of their employment with FRIENDS. Furthermore, these actions were approved and ratified by the BOARD OF TRUSTEES.

## FIRST CAUSE OF ACTION
## Violation of Title III of The Americans with Disabilities Act
## (Against Defendant FRIENDS and HERCEG)

63.     Plaintiffs incorporate by reference every preceding allegation

as if specifically set forth herein.

64.    JOHN DOE is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2). He was diagnosed with many health issues including GAD and OCD.

65.    JOHN DOE's GAD OCD, and ADHD cause him to experience anxiety and self-consciousness that shuts down his ability to adequately take in new information.  These conditions also lead JOHN DOE to act impulsively for the sake of gaining validation from his peer to cope with the intense feelings of anxiety.  These conditions thus substantially impair his ability to undertake the normal life activities of learning, reading, concentrating, thinking, and communicating.

66.    Upon information and belief, FRIENDS is a private school receiving federal funds. It is subject to the Americans with Disabilities Act because the Act defines a public accommodation as an "[…] elementary, secondary, undergraduate, or postgraduate private school". 42 USCA § 12181 (7)(J).

67.    The ADA and its implementing regulations require that alternative services and modifications be made to qualified individuals

with a disability.

68.     JOHN DOE has been denied reasonable accommodations for his documented health problems.

69.     In November of 2019, JOHN DOE's teachers were made aware of JOHN DOE's GAD, OCD, and ADHD. Specifically, they were asked not to highlight or call attention to JOHN DOE so as not to trigger JOHN DOE's GAD, OCD, and ADHD. The teachers agreed to conform to these accommodations.

70.     In particular, Defendant HERCEG stated that he "understood" why such accommodations were necessary and agreed to abide by them.

71.     However, Defendant HERCEG went on the violate this accommodation as follows:

> a. During a Zoom class, JOZEPH HERCEG allowed a highly inflammatory email he was typing to be viewed by the entire class. The email stated that JOHN DOE had a "black eye" and had "missed class" due to "problems at home." This email, clearly insinuating domestic abuse involving JOHN DOE, was viewed by the entire class,

causing several students to message JOHN DOE. This incident caused JOHN DOE extreme emotional harm.

72.    The Incident of September 2020 was a manifestation of JOHN DOE's disabilities. JOHN DOE acted impulsively when he changed his name to "George Floyd" in the Zoom session and stated, "I can't breathe".  These actions were induced by JOHN DOE's disabilities because they were undertaken out of a misguided attempt to gain validation to deal with the intense anxiety that he experiences moment to moment.

73.    Following The Incident of September 2020, Defendant FRIENDS further violated JOHN DOE's accommodation as follows:

    a. ANDRE KELLY, Head of School, drafted and distributed an inflammatory and prejudicial email to the entire FRIENDS community, condemning JOHN DOE's behavior and shaming him publicly. This occurred without talking to JOHN DOE or LODATI in private about the incident.

    b. This action is in direct violation of JOHN DOE's disability accommodation not to "singled out" by FRIENDS staff.

c. Either JOHN DOE's teachers failed to ensure that KELLY was aware of JOHN DOE's accommodation or KELLY ignored it.

d. Rather than attempt to work constructively with JOHN DOE and take his disabilities into account, FRIENDS took the most drastic action available, and dismissed JOHN DOE from FRIENDS.

74. Defendants' inobservance of the law is ongoing and continuous, requiring declaratory and injunctive relief appropriate employing 42 U.S.C. § 12182, as well as Fed. R. Civ. P. 57, and 28 U.S.C. § 2201.

75. As a direct and proximate result of Defendants' unlawful discrimination and refusal to provide reasonable accommodations, Plaintiff JOHN DOE has sustained and continues to sustain injuries and damages.

## SECOND CAUSE OF ACTION
### Violation of Section 504 of the Rehabilitation Act of 1973
### (Against all Defendants other than MARTOCCI)

76. Plaintiffs incorporate by reference every preceding allegation

as if specifically set forth herein.

77.     Section 504 of the Rehabilitation Act, 29 U.S.C§ 794, bars all federally funded entities (governmental or otherwise) from discriminating based on disability. Section 504 states, in relevant part:

> No otherwise qualified individual with a disability
> in the United States ... shall, solely by reason of his
> or her disability, be excluded from the
> participation in, be denied the benefits of, or be
> subjected to discrimination under any program or
> activity receiving Federal financial assistance or
> under any program or activity conducted by any
> Executive agency or by the United States Postal
> Service. 29 U.S.C. § 794(a).

78.     Upon information and belief, FRIENDS is a private school receiving federal funding and is therefore subject to Section 504 of the Rehabilitation Act of 1973.

79.     JOHN DOE is a disabled individual who was diagnosed with many health issues including GAD, OCD, and ADHD.  JOHN DOE's GAD, OCD, and ADHD cause him to experience anxiety and self-consciousness that shuts down his ability to adequately take in new information.  These conditions also lead JOHN DOE to act impulsively for the sake of gaining validation from his peer to cope with the intense

feelings of anxiety. These conditions thus substantially impair his ability to undertake the normal life activities of learning, reading, concentrating, thinking, and communicating.

80.    Given that JOHN DOE was accepted to FRIENDS, he was otherwise qualified to continue school at FRIENDS.

81.    The Rehabilitation Act and its implementing regulations require that Defendants administer programs/activities in the most integrated setting appropriate to the needs of qualified handicapped/disabled persons. 28 C.F.R. § 41.51 and 45C.F.R § 84.4.

82.    In November of 2019, JOHN DOE's teachers were made aware of JOHN DOE's GAD, OCD, and ADHD. Specifically, they were asked not to highlight or call attention to JOHN DOE so as not to trigger JOHN DOE's GAD, OCD, and ADHD.   The teachers agreed to conform to these accommodations.

83.    In particular, Defendant HERCEG stated that he "understood" why such accommodations were necessary and agreed to abide by them.

84.    However, Defendant HERCEG went on the violate this accommodation as follows:

FIRST AMENDED COMPLAINT                 22              CASE NO. 2:21-CV-03875

85.     During a Zoom class, JOZEPH HERCEG allowed a highly inflammatory email he was typing to be viewed by the entire class.  The email stated that JOHN DOE had a "black eye" and had "missed class" due to "problems at home." This email, clearly insinuating domestic abuse involving JOHN DOE, was viewed by the entire class, causing several students to message JOHN DOE. This incident caused JOHN DOE extreme emotional harm.

86.     The Incident of September 2020 was a manifestation of JOHN DOE's disabilities. JOHN DOE acted impulsively when he changed his name to "George Floyd" in the Zoom session and stated, "I can't breathe".  These actions were induced by JOHN DOE's disabilities because they were undertaken out of a misguided attempt to gain validation to deal with the intense anxiety that he experiences moment to moment.

87.     Following the September 2020 incident, Defendant FRIENDS further violated JOHN DOE's accommodation in the follow ways:

88.     ANDRE KELLY, Head of School, drafted and distributed an inflammatory and prejudicial email to the entire FRIENDS community,

condemning JOHN DOE's behavior and shaming him publicly. This occurred without talking to JOHN DOE or LODATI in private about the incident.

89.   This action is in direct violation of JOHN DOE's disability accommodation not to be "singled out" by FRIENDS staff.

90.   Either JOHN DOE's teachers failed to ensure that KELLY was aware of JOHN DOE's accommodation or KELLY ignored it.

91.   Rather than attempt to work constructively with JOHN DOE and take his disabilities into account, FRIENDS took the most drastic action available, and dismissed JOHN DOE from FRIENDS.

92.   As a direct and proximate result of Defendants' unlawful discrimination and refusal to provide reasonable accommodations, JOHN DOE has sustained and continues to sustain injuries and damages.

### THIRD CAUSE OF ACTION
**Breach of Contract
(Against Defendant FRIENDS)**

93.   Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

94.   Plaintiffs and Defendant FRIENDS entered into a contract by

which Defendant FRIENDS offered admission to Plaintiff JOHN DOE on specified terms.

95. Plaintiffs accepted FRIENDS' offer and JOHN DOE attended FRIENDS pursuant to the terms of the agreement between the parties.

96. There was a mutual exchange of consideration between Plaintiffs and FRIENDS by which JOHN DOE attended the school, involving payments and expenditure of time and FRIENDS made its services available to Plaintiffs, including educational opportunities.

97. Part of the contract included the existence of policies set forth by FRIENDS. Included within those policies were terms concerning the duty of FRIENDS to a fair evaluation process in case of offenses.

98. According to the terms, in the case of "minor offenses," FRIENDS was obligated to talk with the student to understand their intention and self-awareness (FRIENDS' Handbook, XVIII. I. 1.). In the case of a "major offense", the Handbook stated under XVIII. I. 2. that an immediate communication between student, parents, and school had to take place.

99. Neither of these things happened in JOHN DOE's case.

FRIENDS violated their obligations under their own Handbook policies.

100. As a result of FRIENDS' breach of the contract, Plaintiffs JOHN DOE and LODATI suffered severe emotional harm. Plaintiffs were also forced to expend financial resources to seek education elsewhere and to pay for intensive therapy. Furthermore, JOHN DOE was denied the ability to attend the school of his choice and suffered further from having to enter classes at a new, different school.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (Against Defendant FRIENDS)

101. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

102. During JOHN DOE's interview process, the faculty and administration of FRIENDS emphasized their culture of inclusivity and openness to learning differences. This can also be found in FRIENDS' promotional materials and on the school's website.

103. LODATI believed FRIENDS when they portrayed their values as a culture of inclusivity and openness to learning differences.

This was especially important to her and JOHN DOE, because JOHN DOE suffers from many health conditions.

104. LODATI'S decision to enroll JOHN DOE at FRIENDS was greatly influenced by the statements and representations made by FRIENDS faculty and administration to LODATI that stressed FRIENDS commitment to inclusivity of learning differences.

105. The statements and representations made by FRIENDS faculty and administration to LODATI that stressed FRIENDS commitment to inclusivity of learning differences were express warranties made to LODATI by FRIENDS.

106. The statements and representations present on FRIENDS promotional material and website that stressed FRIENDS commitment to inclusivity of learning differences were express warranties made to LODATI by FRIENDS.

107. FRIENDS' failure to accommodate JOHN DOE's disability constitutes a breach of their express warranties to LODATI that they would be inclusive of learning differences such as those suffered by JOHN DOE.

108. As a result of Defendant FRIENDS's breach of warranty, Plaintiffs John DOE and LODATI suffered harm, including emotional distress.

## FIFTH CAUSE OF ACTION
### Negligence
### (Against all Defendants other than MARTOCCI)

109. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

110. When JOHN DOE was attending Friends, FRIENDS owed JOHN DOE a duty of care as in loco parentis.

111. As a school, DEFENDANTS owed a duty to JOHN DOE to see that he was educated in a safe, secure manner free of bullying and harassment. Furthermore, DEFENDANTS had a duty to provide JOHN DOE with proper accommodations reflective of his significant disabilities. At all relevant times, DEFENDANTS were aware of these disabilities.

112. DEFENDANTS breached their duties, including but not limited to, in the following ways:

a. Failing to protect JOHN DOE from being bullied even

though the bullying took place on a daily basis in a manner that DEFENDANTS should have been aware of.

b. Failing to properly provide JOHN DOE accommodations commensurate with his disabilities.

113. Given that the bullying against JOHN DOE took place every day and was taking a severe emotional toll on JOHN DOE, DEFENDANTS should reasonably have been aware of the bullying that was being perpetrated against JOHN DOE.

114. As a direct result of Defendant's negligence, Plaintiff JOHN DOE suffered severe emotional harm and had to undergo therapy at Plaintiffs' own expense.

115. It was foreseeable to Defendants that in not protecting JOHN DOE from abuse, as they were required to do, JOHN DOE would suffer harm. Furthermore, it was foreseeable that in not providing JOHN DOE with the necessary accommodations, JOHN DOE would suffer harm.

## SIXTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### (Against all Defendants other than MARTOCCI)

116. Plaintiffs incorporate by reference every preceding allegation

as if specifically set forth herein.

117. DEFENDANTS owed JOHN DOE a duty of care as in loco parentis.

118. As a school, DEFENDANTS owed a duty to JOHN DOE to see that he was educated in a safe, secure manner free of bullying and harassment. Furthermore, DEFENDANTS had a duty to provide JOHN DOE with proper accommodations reflective of his significant disabilities. At all relevant times DEFENDANTS were aware of these disabilities.

119. Defendants knew or should have known, should have known that their failure to prevent the bullying of JOHN DOE would result in Plaintiff JOHN DOE's serious emotional distress.

120. Furthermore, in dismissing JOHN DOE without considering his disabilities and in a manner that was arbitrary and capricious, DEFENDANTS cause severe emotional distress to JOHN DOE.

121. Defendants' conduct was extreme and outrageous. The frequency with which the bullying occurred, and the fact that DEFENDANTS did nothing to help JOHN DOE at any time, went

beyond all possible bounds of decency.

122. Defendants' actions proximately caused Plaintiff JOHN DOE's emotional injury, including severe emotional anguish.

## SEVENTH CAUSE OF ACTION
### Negligence
**(Against Defendants FRIENDS, by and through its employees, including but not limited to ANDREA KELLY, and PAMELA MARTOCCI )**

123. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

124. When JANE DOE was attending Friends, Defendants owed JANE DOE a duty as in loco parentis.

125. As a school, DEFENDANTS owed a duty to JANE DOE to see that she was educated in a safe, secure manner.

126. In November through December of 2019, JANE DOE, age 3, was a student in grade Play Group in the Early Childhood Division at Friends Academy in Locust Valley, New York.

127. The head teacher, Defendant PAMELA MARTOCCI, advised LODATI, the mother of JANE DOE, that JANE DOE was "W" sitting. "W" sitting refers to a position where an individual sits on their

buttocks with each leg bent back which resembles the letter 'W".

128.   LODATI was advised that this was due to weak core strength and could cause JANE DOE to have an uneven stride and a lack of balance, among other things.

129. Defendant MARTOCCI expressed concern for JANE DOE. She told LODATI that she frequently reminded JANE DOE to sit properly.

130. In November of 2019, MARTOCCI tied JANE DOE's legs together with a ribbon so she would be unable to move them. This prevented JANE DOE from sitting in the "W" position.

131.   JANE DOE did not like it and cried to Defendant MARTOCCI thenext day asking her to 'please not tie my legs together again".

132. MARTOCCI is neither a physician nor an occupational therapist and did not have the knowledge, skill, training, or experience to prescribe or provide remedies such as tying JANE DOE'S legs together using ribbon.

133. JANE DOE's parents brought her to their Pediatrician in January of 2020. They discussed what the teacher had said regarding

JANE DOE's sitting posture. The doctor was perplexed because she had been treating JANE DOE's since she was born and had never detected any problem with her core strength.

134. After performing numerous tests on JANE DOE, the doctor determined that there was no core weakness exhibited by JANE DOE, who showed no signs of weakness and had strong balance. The doctor was concerned that JANE DOE's legs had been tied together by a teacher. She told LODATI that she should discuss this with the school because it was highly improper behavior.

135. The doctor was upset with how this was handled and that expressed the opinion that it would have been traumatic for JANE DOE. The doctor told LODATI that she had never heard of any therapy that would involve tying a child's legs together for any reason.

136. Defendant MARTOCCI breached the duty of care to JANE DOE by tying her legs together without the knowledge, skill, training, or experience to support such an action. MARTOCCI was well aware that she did not have the requisite knowledge training and experience.

137. Defendant FRIENDS and Defendant KELLY owed a duty to

FIRST AMENDED COMPLAINT 33 CASE NO. 2:21-CV-03875

JANE DOE to supervise Defendant MARTOCCI.

138. FRIENDS and KELLY failed to properly supervise MARTOCCI.

139. As a result of FRIENDS', KELLY'S, and MARTOCCI'S actions, JANE DOE suffered physical pain and emotional distress.

140. It was foreseeable to FRIENDS, KELLY, and MARTOCCI that their actions and/ or inactions with respect to JANE DOE could cause harm of the nature suffered by JANE DOE. More specifically, without the proper knowledge, training, and experience, MARTOCCI should have known that tying JANE DOE'S legs together could cause her physical pain and emotional distress.

## EIGHTH CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
### (Against Defendants FRIENDS, by and through
### its employees, including but not limited to
### ANDREA KELLY, and PAMELA MARTOCCI )

141. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

142. DEFENDANTS owed JANE DOE a duty of care as in loco parentis.

143. As a school, FRIENDS owed a duty to JANE DOE to see that she was educated in a safe, secure manner.

144. Defendants knew or should have known, that tying JANE DOE'S legs together with ribbon was likely to cause severe pain and distress.

145. Furthermore, in dismissing JANE DOE without considering in a manner that was arbitrary, capricious, and retaliatory DEFENDANTS cause severe emotional distress to JANE DOE.

146. Defendants' actions proximately caused Plaintiff JANE DOE's emotional injury, including severe emotional anguish.

## NINTH CAUSE OF ACTION
### Assault and Battery
### (Against Defendants FRIENDS, by and through its employees, including but not limited to ANDREA KELLY, and PAMELA MARTOCCI )

147. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

148. JANE DOE did not wish to have her legs tied together by Defendant MARTOCCI. This action caused JANE DOE a great deal of emotional harm.

149. While tying JANE DOE's legs together with a ribbon, Defendant MARTOCCI put JANE DOE in immediate apprehension of unwanted and improper physical contact.

150. By tying JANE DOE's legs together with a ribbon, Defendant MARTOCCI intentionally undertook unwanted and improper physical contact.

151. .JANE DOE was upset with Defendant MARTOCCI's actions to such an extent that, the next day she asked Defendant MARTOCCI to "please not tie my legs together again".

152. Defendant MARTOCCI therefore intentionally undertook unwanted physical contact with JANE DOE.

## **TENTH CAUSE OF ACTION**
**Breach of Contract**
**(Against Defendant FRIENDS)**

153. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

154. LODATI and FRIENDS entered a contract by which FRIENDS offered to admit LODATI'S daughter, JANE DOE, on specified terms.

155.   LODATI accepted FRIENDS' offer, and JANE DOE attended FRIENDS pursuant to the terms of the agreement between the parties.

156.   There was a mutual exchange of consideration by which JANE DOE attended the school, involving payments and expenditure of time and FRIENDS made its services available to LODATI, including educational opportunities for JANE DOE.

157.   A part of the contract was the existence of policies set forth by FRIENDS. Included within those policies were terms concerning the duty of FRIENDS to abide by the terms of their own handbook. LODATI agreed to enroll JANE DOE at FRIENDS on the understanding that FRIENDS would comply with their own handbook.

158.   JANE DOE was a student at the FRIENDS "lower school" at the time of her dismissal.

159.   FRIENDS had offered to admit JANE DOE through her mother, LODATI, who had accepted continued admission of her daughter to FRIENDS for the Fall of 2021.  LODATI tendered the required deposit which was accepted by FRIENDS.

160.   The FRIENDS's Handbook repeatedly stresses that the goal

of disciplinary measures in the lower school is not retribution, but rather to empower students to learn from their mistakes.

161. Section XVII. H of the handbook states:

> In the Lower School, we use the Responsive Classroom approach, which is aligned with our Quaker tenets. The goals of this approach are to assure that children:
> - Feel physically and emotionally safe in school so that they can learn their best.
> - Learn the skills for working and learningcollaboratively with others.
> - Identify and practice strategies to alter andimprove choices moving forward.

162. Section XVII. H. of the handbook goes on to list examples of potential disciplinary responses. None of the examples involve the outright dismissal of a student from the school. Furthermore, all of the examples involve focusing on the student's conduct that resulted in the disciplinary measure.

163. LODATI sued FRIENDS and their agents and employees because of their behavior towards her son, JOHN DOE. Soon after, in a direct response to the lawsuit, JANE DOE was dismissed from FRIENDS without any explanation whatsoever.

164. Completely contrary to their own handbook, FRIENDS

dismissed JANE DOE without even the mere pretext that JANE DOE had misbehaved. Furthermore, FRIENDS actions towards JANE DOE were intended as retaliation against LODATI for filing the instant case, and for complaining about the actionable conduct described in the Seventh and Eighth Causes of Action herein, rather than any kind of conduct or failure on the part of JANE DOE.

165. FRIENDS violated their obligations under their own Handbook policies, thereby constituting a breach of contract on the part of FRIENDS.

166. As a result of Defendant FRIENDS's breach of the contract, Plaintiffs JANE DOE and LODATI suffered damages in an amount to be determined.

<u>**ELEVENTH CAUSE OF ACTION**</u>
**Unfair And Deceptive Trade Practice Under New YorkGeneral Business Law
(Against Defendant FRIENDS)**

167. Plaintiffs incorporate by reference every preceding allegation as if specifically set forth herein.

168. Defendants have a statutory duty to refrain from unfair or deceptive acts or practices in consumer-oriented communications or acts

like the advertising and description of their school.

169. Defendants engaged in a systematic scheme to deceive Plaintiffs and all others interested in obtaining admission to FRIENDS. Staff, Board Members, and faculty emphasize their culture of inclusivity and openness to learning differences, and their handbook and advertising material state the same.

170. Despite the fact that LODATI enrolled her children in FRIENDS for these reasons, both children were dismissed under circumstances that were in stark contrast to the statements made in the admission process.

171. In retaliation for JOHN DOE seeking redress for his unwarranted dismissal and, because LODATI complained about the bizarre conduct of a teacher, FRIENDS also dismissed JANE DOE from the school without any legitimate basis, despite having already contractually agreeing to JANE DOE attending FRIENDS in the Fall of 2021.

172. Defendants' conduct was deceptive, misleading, and undertaken in conscious disregard of, and with reckless indifference to,

Plaintiffs' rights and interests.

173. Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of N.Y. Gen. Bus. Law § 349 et seq.

174. Plaintiffs are entitled to recover actual, consequential, monetary, and punitive damages, equitable and declaratory relief, any statutory allowable amounts and costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court grant them relief as follows:

(1) Issue a permanent injunction prohibiting Defendant FRIENDS from enforcing either of Plaintiff's per se dismissals;

(2) Compensatory damages for financial loss, damage to reputation, humiliation, mental anguish, and emotional distress;

(3) Punitive damages against the defendants;

(4) Attorneys' fees;

(5) Costs of the suit;

(6) Injunctive relief; and

(7) Such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues stated in this action.

Date: December 7, 2021

Respectfully Submitted,

*/s/Keith Altman*
Keith Altman (*pro hac vice to be applied for*)
The Law Office of Keith Altman
33228 West 12 Mile Road - Suite 375
Farmington Hills, Michigan 48331
Telephone: (248) 987-8929
keithaltman@kaltmanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 7, 2021, I electronically filed the above document with the clerk of the Court using CM/ECF, which will send electronic notification of such filing to all registered Counsel.

/s/ Keith Altman

Case 2:21-cv-03875-SVW-AXS Document 25-2 Filed 02/07/22 Page 46 of 189 PageID #:1248

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NASSAU

-------------------------------------------------------------------------------X         Index No.:

STEPHANIE LODATI, as Parent and Natural Guardian
of JOHN DOE, an infant, and STEPHANIE LODATI,                                  **COMPLAINT**
individually.

                                        Plaintiffs,

                        - against -

THE BOARD OF TRUSTEES OF FRIENDS ACADEMY,
FRIENDS ACADEMY,
FRANK INGRASSIA, individually and in his official capacity,
ANDY MENZIN, individually and in his official capacity,
DAVID GELFAND, individually and in his official Capacity,
RAJ SING, individually and in his official capacity,
DANIEL BYSTROM, individually and in his official capacity,
THOMAS GIBIAN, individually and in his official capacity,
RACHEL ETESS GREEN, individually and in her official capacity,
GREGORY JASKE, individually and in his official capacity,
JEANNINE LOSTRITTO, individually and in her official capacity,
JED MOREY, individually and in his official capacity,
CAROLYN MOTT, individually and in her official capacity,
JOE PODBELA, individually and in his official capacity,
DAVID SEELER, individually and in his official capacity,
CRAIG WHITE, individually and in his official capacity,
STEPHEN WITTHUHN, individually and in his official capacity,
JOHN GAMBLING, individually and in his official capacity,
ANDREA KELLY, individually and in her official capacity,
MARK SCHOEFFEL, individually and in his official capacity,
CAROLYN SKUDDER-POCIUS, individually and in her official capacity,
JOZEPH HERCEG, individually and in his official capacity, and
RON BASKIND, individually and in his official capacity.

                                        Defendants.

-------------------------------------------------------------------------------X

        Plaintiffs, STEPHANIE LODATI, as Parent and Natural Guardian of JOHN DOE, an

infant, and WILLIAM BROWN, individually. (collectively "Plaintiffs"), by their attorneys

Mound Cotton Wollan & Greengrass LLP, as and for their Verified Complaint against

-1-

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 49 of 189 PageID #: 221

Defendants THE BOARD OF TRUSTEES OF FRIENDS ACADEMY, FRIENDS ACADEMY, FRANK INGRASSIA, ANDY MENZIN, DAVID GELFAND, RAJ SING, DANIEL BYSTROM, THOMAS GIBIAN, RACHEL ETESS GREEN, GREGORY JASKE, JEANNINE LOSTRITTO, JED MOREY, CAROLYN MOTT, JOE PODBELA, DAVID SEELER, CRAIG WHITE, STEPHEN WITTHUHN, JOHN GAMBLING, ANDREA KELLY, MARK SCHOEFFEL, CAROLYN SKUDDER-POCIUS, JOZEPH HERCEG, and RON BASKIND respectfully set forth and allege, upon information and belief, that:

## INTRODUCTION

1.     This is an action for money damages on behalf of the Plaintiffs STEPHANIE LODATI, as Parent and Natural Guardian of JOHN DOE, an infant, and STEPHANIE LODATI, individually (hereinafter referred to as "Plaintiffs") who was caused to be injured due to the Defendants' intentional acts, including, but not limited to, negligence, negligent infliction of emotional distress, libel, slander.

## THE PARTIES

2.     Plaintiff Stephanie Lodati, is over twenty-one (21) years of age and is the mother and natural guardian of Plaintiff JOHN DOE.

3.     At all times hereinafter mentioned, Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY ("BOARD OF TRUSTEES"), was, and still is, the board entrusted with the power to make decisions on behalf of Defendant FRIENDS ACADEMY with their principal place of business at 270 Duck Pond Rd, Locust Valley, NY 11560.

-2-

4.      At all times hereinafter mentioned, Defendant FRIENDS ACADEMY, was, and still is, a co-ed day school for Play Group to 12th, at 270 Duck Pond Rd, Locust Valley, NY 11560.

5.      At all times hereinafter mentioned, Defendant, FRANK INGRASSIA, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

6.      At all times hereinafter mentioned, Defendant ANDY MENZIN, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

7.      At all times hereinafter mentioned, Defendant DAVID GELFAND, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

8.      At all times hereinafter mentioned, Defendant RAJ SING, was and still is an active member Defendant of THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

9.      At all times hereinafter mentioned, Defendant DANIEL BYSTROM,  was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

10.      At all times hereinafter mentioned, Defendant THOMAS GIBIAN, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

-3-

11.    At all times hereinafter mentioned, Defendant RACHEL ETESS GREEN, was and still is an active member Defendant of THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

12.    At all times hereinafter mentioned, Defendant GREGORY JASKE, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

13.    At all times hereinafter mentioned, Defendant JEANNINE LOSTRITTO, was and still is an active member Defendant of THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

14.    At all times hereinafter mentioned, Defendant JED MOREY, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

15.    At all times hereinafter mentioned, Defendant CAROLYN MOTT, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

16.    At all times hereinafter mentioned, Defendant JOE PODBELA, was and still is an active member Defendant of THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

17.    At all times hereinafter mentioned, Defendant DAVID SEELER, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

-4-

18.     At all times hereinafter mentioned, Defendant CRAIG WHITE, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

19.     At all times hereinafter mentioned, Defendant STEPHEN WITTHUHN, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

20.     At all times hereinafter mentioned, Defendant JOHN GAMBLING, was and still is an active member of Defendant THE BOARD OF TRUSTEES OF FRIENDS ACADEMY and was acting in such capacity at all time relevant herein.

21.     At all times hereinafter mentioned, Defendant ANDREA KELLY, was and  is still employed by of Defendant FRIENDS ACADEMY as the Head of School and was acting in such capacity at all times relevant herein..

22.     At all times hereinafter mentioned, Defendant  MARK SCHOEFFEL,  was and  is still employed by of Defendant FRIENDS ACADEMY as the Principal of Upper School and was acting in such capacity at all times relevant herein.

23.     At all times hereinafter mentioned, Defendant CAROLYN SKUDDER-POCIUS, was and  is still employed by Defendant FRIENDS ACADEMY.

24.     At all times hereinafter mentioned, Defendant JOZEPH HERCEG, was and  is still employed by Defendant FRIENDS ACADEMY as a Teacher and was acting in such capacity at all times relevant herein.

-5-

25.     At all times hereinafter mentioned, Defendant RON BASKIND, was and still is employed by Defendant FRIENDS ACADEMY as the Director of Students and was acting in such capacity at all times relevant herein.

**VENUE**

26.     Venue is set in the County of Nassau, State of New York, as it is the situs of the incidents alleged herein, as well as the primary place of business of Friend Academy.

**FACTUAL BACKGROUND**

28.     Friends Academy is a Quaker, coeducational, independent, college preparatory day school.

29.     During JOHN DOE's interview process, the faculty and administration of Friends Academy emphasized Friends Academy culture of inclusivity and openness to learning differences.

30.     Plaintiff believing Friends Academy Website and promotional materials emphasizing Friends Academy's philosophy of calling members of the community to strive to be their best selves, did apply for was accepted into Friends Academy.

31.     JOHN DOE began attending Friends Academy in the ninth grade.

32.     However, instead of a welcoming atmosphere grounded in the Quaker tradition, Friends Academy, by and through its agents and employees, began a pattern and practice of bullying and singling-out JOHN DOE.

33.     Additionally, upon information and belief Friends Academy, allowed and was aware and supervised an atmosphere where other students could and did bully and intimidated JOHN DOE on a regular basis.

-6-

34.     Upon information and belief Friends Academy was aware of least one incident where another student threatened physical harm to JOHN DOE and no consequences or repercussions befell said student.

35.     Upon information and belief Friends Academy Faculty, Staff and Administration were aware that as part of a pattern of bullying and intimidation wherein, several students routinely stole funds from JOHN DOE during school hours and extra-curricular activities.

36.     Upon information and belief Friends Academy Faculty, Staff and Administration were aware that as part of a pattern of bullying and intimidation wherein, several students routinely, intentionally and with malice commit assault and battery on JOHN DOE as part of a hazing ritual.

37.     JOHN DOE suffers from many health conditions.

38.     At all times relevant, Friends Academy was aware of JOHN DOE's health conditions.

39.     At all times relevant, Friends Academy failed to provide proper accommodations to JOHN DOE in light his various health diagnosis.

40.     Upon information and belief, Friends Academy, by and through its agents and employees, including but not limited to MARK SCHOEFFEL, CAROLYN SKUDDER-POCIUS, JOZEPH HERCEG, and RON BASKIND, attempted to induce terror and panic in JOHN DOE by consistently placing JOHN DOE into situations where his health diagnosis would be caused to manifest.

41.     Friends Academy, by and through its agents and employees, began a pattern

-7-

and practice of not maintaining the confidentially of JOHN DOE's various health issues.

42.     Upon information and belief, in non-confidential settings and in a manner intended to demean JOHN DOE, Friends Academy agents and employees verbally and in writing expressed skepticism toward JOHN DOE's diagnoses health issues.

43.     Upon information and belief, in non-confidential settings and in a manner intended to demean JOHN DOE, Friends Academy agents and employees verbally and in writing suggested that JOHN DOE's might be suffering from physical abuse at home. .

44.     Upon information and belief, Friends Academy, by and through its agents and employees attempted to terrorize and frighten Plaintiffs by making unfounded accusations of plagiarism.

45.     In a continuation of its pattern and practice of arbitrary and capricious actions towards JOHN DOE, Andrea Kelly did draft and distribute to the public out an inflammatory and prejudicial email to the entire Friends Academy community.

46.     Upon information and belief, after said email to the public from Andrea Kelly, JOHN DOE did receive multiple death threats via electronic and telephonic means from classmates at Friends Academy.

47.     Upon information and belief, Stephanie Lodati did have to inform local law enforcement authorities of the potential of imminent harm to JOHN DOE and her extended family members.

48.     Upon information and belief, Stephanie Lodati did have to inform her neighbors of the potential for protestors or other individuals to come to her home and cause physical harm or disturb the peace of the neighborhood.

-8-

49.     Upon information and belief, Stephanie Lodati did suffer from extreme emotional anguish due to the actions and actives of the employees of Friends Academy.

50.     Upon information and belief, JOHN DOE did suffer extreme emotional anguish due to the actions and activities of the employees of Friends Academy.

51.     Upon information and belief, JOHN DOE did undergo intense counseling and treatment to deal with the emotional anguish due to the actions and actives of the employees of Friends Academy.

52.     Upon information and belief, JOHN DOE did suffer nightmares and fluctuations in weight and mental health due to the due to the actions and actives of the employees of Friends Academy.

53.     Upon information and belief, Stephanie Lodati did suffer nightmares and fluctuations in weight and mental health due to the due to the actions and actives of the employees of Friends Academy.

54.     In a continuation of its pattern and practice of arbitrary and capricious actions towards JOHN DOE, Friends Academy did dismiss JOHN DOE without a proper review or due process.

55.     In a continuation of its pattern and practice of arbitrary and capricious actions towards the Plaintiffs, Friends Academy gave Plaintiffs less than 24 hours to leave the school or be expelled with no right of review or due process.

56.     Friend Academy did not follow its own policies and procedures with regards to how it handled JOHN DOE discipline, as is described in its Parent & Student Handbook.

57.     As a result of the foregoing. Plaintiffs suffered serious, severe and extreme

-9-

emotional distress and damages. .

## AS AND FOR A FIRST CAUSE OF ACTION FOR NEGLIGENCE ON BEHALF OF PLAINTIFFS AGAINST ALL DEFENDANTS

58.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

59.     Defendants were negligent, careless and reckless in their treatment, conduct and actions towards Plaintiffs.

56.     Said negligence, carelessness, and recklessness was the sole and proximate cause of Plaintiffs' injuries incurred.

57.     Said injuries were caused solely and wholly by reason of the negligence and carelessness of defendants with no fault or culpable conduct on the part of the plaintiffs contributing thereto.

58.     As a result of defendants' negligence as aforesaid. Plaintiffs was severely injured both internally and externally, that plaintiff became sick, sore, lame, disabled, and has suffered  shock and mental anguish and will continue to suffer for a long time to come and, upon information and belief, has been permanently injured; that by reason of the foregoing, Plaintiffs have been obligated to and did necessarily employ medical aid and medicines in an attempt to cure said injuries, all to plaintiffs' damage in a sum which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

## AS AND FOR A SECOND CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST ALL DEFENDANTS

59.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the

-10-

preceding paragraphs with the same force and effect as if fully set forth herein.

60. Said conduct by Defendants caused Plaintiffs severe emotional distress.

61. Said conduct by Defendants constituted negligent infliction of emotional distress in that Defendants negligently and wantonly brought about Plaintiffs' severe emotional distress.

62. Said harms perpetrated by defendants are a proximate cause of Plaintiffs' injuries and damages.

### AS AND FOR A THIRD CAUSE OF ACTION FOR LIBEL ON BEHALF OF STEPHANIE LODATI AGAINST DEFENDANTS MARK SCHOEFFEL, CAROLYN SKUDDER-POCIUS, JOZEPH HERCEG, and RON BASKIND

63. Plaintiffs repeat, reiterate and reallege each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

64. Defendants published comments stories slurring Plaintiffs good name and reputation, including but not limited to allegations of child abuse.

65. These statements are libelous on their face.

66. Further, because the offending statements imply that Plaintiff committed a crime, namely, child abuse, they are libelous *per se*.

67. The offending statements are reasonably susceptible of a defamatory meaning, as they imply that Plaintiff routinely abuses children.

68. The offending statements intentionally insinuated that Plaintiff abuses or neglects her child, all of which is false.

69. Defendants obviously knew the fallacy of the statements, or had good reason to doubt the truth of such allegations.

70. As a result of Defendants' defamation. Plaintiff sustained damages to her

-11-

character and reputation as well as shame and embarrassment.

71.     Solely by reason of the foregoing the Plaintiffs have sustained damage.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR SLANDER ON BEHALF OF STEPHANIE LODATI AGAINST DEFENDANTS MARK SCHOEFFEL, CAROLYN SKUDDER-POCIUS, JOZEPH HERCEG, and RON BASKIN

72.     Plaintiffs repeats, reiterates and realleges each and every allegation contained in the preceding paragraphs with the same force and effect as if fully set forth herein.

73.     Upon information and belief, Defendants made repeated oral comments and statements slurring Plaintiffs good name and reputation.

74.     The offending statements are slanderous on their face.

75.     Further, because the offending statements imply that Plaintiff committed a crime, namely, child abuse, they are slanderous *per se.*

76.     The offending statements are reasonably susceptible of a defamatory meaning, as they imply that Plaintiff routinely abuses children.

77.     The offending statements intentionally insinuated that Plaintiff abuses his child.

78.     Defendants obviously knew the fallacy of the statements, or had good reason to doubt the truth of such allegations.

79.     As a result of Defendants' defamation. Plaintiff sustained damages to her character and reputation as well shame and embarrassment.

## JURY TRIAL

80.     Plaintiff demands a trial by jury of all issues in this action that are so triable.

-12-

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 60 of 189 PageID #: 232

**WHEREFORE**, Plaintiffs demands judgment on their first, second, third, and fourth, causes of action against the Defendants for the sum of Court deems appropriate, plus interest and attorney's fees, together with the costs and disbursements of this action and such other and further relief as this Court shall deem just and proper.

Dated: New York, New York
      March 31, 2021

               MOUND COTTON WOLLAN & GREENGRASS LLP

               By _____s/ Vander Beatty __ _____
                   Michael Koblenz, Esq.
                   Vander Beatty, Esq.
                   *Attorneys for Plaintiffs*
                   One New York Plaza, 44 Floor
                   New York, New York 10004
                   212-804-4200

-13-

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 61 of 189 PageID #: 233

**Addresses of Defendants:**

The Board of Trustees of Academy
Friends Academy
270 Duck Pond Rd,
Locust Valley, NY 11560

Friends Academy
270 Duck Pond Rd,
Locust Valley, NY 11560

Daniel Bystrom
151 Horseshoe Road
Mill Neck, New York 11756

Jed Morey
53 Viola Drive
Glen Cove, New York 11542

Frank Ingrassia
95 Feens Lane
Lattingtown, New York 11560

Andrea Kelly
270 Duck Pond Rd,
Locust Valley, NY 11560

Mark Schoeffel
270 Duck Pond Rd,
Locust Valley, NY 11560

Ronald  Baskind
102 Knollwood Drive
Carle Place, New York 11514

Carolyn Mott
8 La Colline Drive
Mill Neck, New York 11765

Jeannine Lostritto
64 McCoons Lane
Glen Head, New York 11545

-14-

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 62 of 189 PageID #: 234

Craig White
55 Clinton Avenue, Apt. 308
Rockville Centre, New York 11570

Carolyn Scudder-Pocius
1207 Cork Road
Victor, New York 14564

Jozeph Herceg
1164 Echo Road
Vestol, New York 13850

John Raymond Gambling
273 Osprey Point Drive
Osprey, Florida 34229

Stephen Witthuhn
177 Cover Road
Oyster Bay, New York 11771

Raj Singh
1242 Moores Hill Road
Laurel Hollow, New York 11791

David Gelfand
30 Deer Run
Old Brookville, New York 11545

Rachel Etess Green
165 Linden farms Road
Locust Valley, New York 11560

Thomas Gibian
1602 L Street N.W., 6th floor
Washington, DC 20036

Dr. Andrew Menzin
300 Community Drive
Manhasset, New York 11030

Gregory Jaske
666 Third Avenue
New York, New York 10017

-15-

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 63 of 189 PageID #: 235

Joe Podbela
230-59 International Airport Center Blvd.
Jamaica, New York 11413
(718) 656-7430

Craig Seeler
50 Montauk Highway
Amagansett, New York 11930

-16-

**VERIFICATION**

STATE OF NEW YORK )

COUNTY OF NASSAU )

STEPHANIE LODATI, being duly sworn, deposes and says that:

I am the Plaintiff of the within action; I have read he foregoing SUMMONS and VERIFIED COMPLAINT and know the contents thereof and that the same is true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and that as to those matters, I believe them to be true.

_Stephanie Lodati_
STEPHANIE LODATI

Sworn to before me this
26 day of March, 2021

_Gary M. Orkin_
NOTARY PUBLIC

Gary M. Orkin
Notary Public, State of New York
No. 4761045
Qualified in Nassau County
Commission Expires Jan. 31, 2023

-17-

# Exhibit C

Welcome to Friends Academy. This *Handbook* is designed to provide general information on school practices and guidelines as well as specific information for each division of the school. It is not meant to preclude telephone calls about special questions, concerns, and situations.

A student's and family's presence in the school and their signatures on the enrollment form signify their acceptance and willingness to abide by the guidelines set forth in this Handbook.  **The school reserves the right to alter its policies at any time without prior notice.** Students and parents signify acceptance of a change in guidelines by remaining members of the school community after notice of the change is given.

## I.  Mission

Founded in 1876 by Gideon Frost for "the children of Friends and those similarly sentimented," Friends Academy is a Quaker, coeducational, independent, college preparatory day school serving students from age three through the twelfth grade. The school's philosophy is based on the Quaker principles of integrity, simplicity, patience, moderation, peaceful resolution of conflict, and a belief that the silence and simple ministry of the "gathered meeting" brings the presence of God into the midst of busy lives.  Friends Academy is committed to developing a diverse community whose members value excellence in learning and growth in knowledge and skill, a genuine commitment to service and ethical action, and a realization that every life is to be explored, celebrated, and enjoyed in the spirit of the Religious Society of Friends.

## II.  Teaching and Learning for Today and Tomorrow: Habits of Mind and Heart

Seeing Possibility
Listening Actively and Reflecting
Inquiring Deeply
Asking, Exploring, and Revising Questions
Collaborating and Constructing Ideas and Designing Flexible Solutioons
Demonstrating Understanding Through Performance
Thinking Purposefully to Act Ethically

## III.  Meeting for Worship

The Meeting House is a place of worship for members of the Friends Academy community.  One morning each week, students, faculty, and staff sit together in reflective silence in Meeting for Worship in the manner of Friends. This is considered the most important appointment of each week, and its spirit, in the Quaker tradition of acceptance, transcends the various religions of those present at the Meeting. It is a time for reflection, community, and respectfully listening to others who are moved to speak. Visitors are always welcome in the Matinecock Meeting House.

All students in second through twelfth grades attend weekly divisional Meeting
for Worship. Please check with your divisional office for days and times.

## IV.  Chain of Communication for Questions or Concerns at Friends Academy

## V.  Fundamental Standards for Citizenship

Friends Academy fundamental standards for citizenship are grounded in the Friends Academy Quaker Mission and call members of the community to strive to be their best selves, **to make decisions rooted in integrity and empathy,** and to uphold and model the Quaker testimonies. When students are unable to behave in accordance with Friends Academy's fundamental standards for citizenship and code of conduct, whether on or off the FA campus, the school will meet with the student to discuss, and logical and timely consequences may occur. Whenever a potential breach in fundamental standards occurs, Friends Academy will consider *intent, context, impact, relationships, and pathways forward* when determining fair and equitable consequences with the purpose to evoke learning, growth, and better future decision-making.

**A. Code of Character**

Friends Academy seeks to nurture strong minds and kind hearts through the wisdom of the Quaker testimonies so that our students can make the world a better place through their good works. Ethical citizenship forms the foundation of all we do. We expect all members of the community to strive to respect and model these expectations.

1.  **Live with integrity,** tell the truth, and act truthfully, regardless of what others
may do or say, and encourage integrity in others. Students are expected to show integrity.  Students are expected to be accountable for their choices.

Examples of violations (not all inclusive or of equal value):

- Theft, vandalism, or other abuse of school property
- Lying, covering the truth, cheating, plagiarism
- Misbehavior in class, including incessant disruption and improper language
- Possession or use of tobacco, alcohol, marijuana, or other non-prescription substances
- Disrespect in Meeting for Worship

2.   **Treat everyone with kindness,** compassion, and respect, and cultivate kindness in others.  Students are expected to respect individuals and their opinions. Students are expected to cooperate and collaborate as team players, both on and off the field. Students are expected to respect the classroom community and the overall learning environment of their classmates.

Examples of Violations (not all inclusive or of equal value)::
- Tardiness to class or unexcused absence from classes, study halls, lunch, Meeting for Worship, or athletics
- Running or making excessive noise in the hallways
- Violation of individual classroom rules and expectations
- Improper use of technology, including cell phones, as outlined by the required by the Acceptable Use Policy

3.   **Employ empathy and peaceful resolution of conflict** as key lenses and tools through which to see and interact with  the world.

Examples of Violations (not all inclusive or of equal value):
- Use of disrespectful language towards or about another community member
- Physicality
- Use of technology – text, social media, etc as a hurtful or malicious tool

4.   **Help to build an inclusive community** by standing up to prejudice, bullying, and intimidation and stepping in when others need help.  Students are expected to identify and value the gifts, talents, and light in every member of the FA community.

Examples of Violations (not all inclusive or of equal value):
- Bullying, in-person or online
- Intentional exclusive behavior towards an individual or a group of individuals
- Expressing opinions or making statements that are degrading or offensive to individuals or groups based on differences, even when the intent is "to joke"

5.   **Care for our environment,** including our shared spaces and resources, and encourage others to do the same.

Examples of Violations (not all inclusive or of equal value)::
- Chewing gum
- Dress Code violation
- Improper behavior in the commons and lunchroom
- Creating disorder in shared community spaces

**B. Behaviors that are Strictly Prohibited and Illegal:**

**Possession of a Weapon:**  Students may not possess a weapon of any type – or intend to use another object as a weapon – at school or a school function.

**Possession and/ or use of alcohol, tobacco or illegal substances:**  No student may use, sell, distribute, manufacture, dispense, possess, promote the use or be under the influence of alcohol, tobacco in any form including E-cigarettes/vaping devices or any illegal drug or misuse any legal or prescribed drug at school, in school vehicles or at a school sponsored function.

**Gambling:**  A key Quaker tenet bears testimony against betting, gambling, and lotteries. Participating in or promoting any form of gambling constitutes a violation of this standard.

**Harassment:**  Friends Academy is committed to providing a safe learning environment for all students and community members. Harassment of any kind which includes bullying, hazing, or any other victimization of students (including sexual harassment), based on any of the following actual or perceived traits or characteristics: age, color, ethnicity, race, religion, sexual orientation, gender identity, physical attributes, ability or disability, political beliefs, socioeconomic status, or familial status is prohibited.

**C.  Disciplinary Response:**  A student found to have violated a Fundamental Standard of the school will be referred to an appropriate administrator and will face disciplinary consequences in accordance with school guidelines. A student's age, overall record,

truthfulness, and general attitude will affect the school's response to any disciplinary situation. Additionally, the willingness of the student and his or her family to abide by the consequences set by the school will contribute to the school's assessment of whether the student may remain at Friends Academy. In all cases, the school reserves the right to judge the seriousness or impropriety of any behavior and determine the appropriate disciplinary response.

For details of disciplinary responses within each division, please see the following sections:

| Lower School | Section XVI |
| Middle School | Section XVII |
| Upper School | Section XVIII |

*Parents and students must be aware that the commission of an act which constitutes a crime may be reported to the appropriate authorities.*

## VI.   School Calendar and Hours

### A.  Yearly Calendar

The school calendar has been carefully planned to provide a balance between instructional days and vacation time.  It is very important for all Friends Academy families to adhere to the published school calendar (see calendar on inside front cover) in making plans for the year.  **Accordingly, all absences for the purpose of extended or additional vacations will be unexcused and may result in academic consequences as established by each division.**  Occasionally, due to unusual circumstances and with prior notification to the appropriate Principal, a student will be granted permission to miss school at a time other than a vacation period.

### B.  Religious Holidays

In keeping with the Quaker belief in the unique worth of each individual, we respect any member of our community who wishes to fulfill a religious obligation while school is in session. On days that we anticipate a significant number of students will be absent for a religious holiday, our faculty will conduct purposeful classes, but will not cover material that will later be evaluated and thereby put those observing the religious holiday at a disadvantage. Similarly, tests and quizzes are not given on those days nor the day following the holiday.

For absence due to any religious observation, it is the student's responsibility to discuss those absences with his or her teachers, in advance, so together they can plan a reasonable time-frame for completion of homework assignments (at the discretion of the teacher) that will not be compromised by the holiday observance.

### C.  School Hours

Academic Day.............. .............8:05 a.m. to 3:20 p.m.
Reception Desk Frost Hall ............7:30 a.m. to 6:00 p.m.
School Offices .............. .............8:00 a.m. to 4:00 p.m.
Business Offices ........... .............8:00 a.m. to 4:00 p.m.
The Learning Commons ............7:30 a.m. to 5:30 p.m.  (*until 4 p.m. on Fridays*)
Athletic Office .............. .............8:00 a.m. to 4:00 p.m.
Athletics & Activities  ... ............3:20 p.m. to approximately 5:30 p.m. or later when there are games or extended practices.

Students may be dropped off no earlier than 7:30 a.m. in the lower school lobby.  At 8 a.m., students K - 5 will head to their classrooms.  Students walk to their classrooms on their own; parents do not walk their child(ren) to class.  However, there is an exception for students in Kindergarten.  Parents may walk their child to his/her Kindergarten class.  We will help kindergartners work toward traveling to their classrooms independently later in the school year. Classes start at 8:05 a.m..

**Early Childhood** meets from 8:30 a.m. to 2:45 p.m. Doors open at 7:45 a.m. Students are dropped off either at the classroom or the Lower School lobby at 7:45 a.m. and picked up in front of the Early Childhood parking lot entrance at 2:45 p.m. Six parking spots will be reserved for morning drop-off and afternoon pick-up.

**Kindergarten through 2nd grade** students are dismissed from the doors outside of their classrooms at 3:10 p.m.  Please refrain from going up to the classroom door before this time.  This way, students do not become distracted as the teacher helps them end their day as a class community.

**Grades 3 - 5** are dismissed at 3:20 p.m. by the entrance/exit that leads out to the parking lot.

**NOTE:**  *The Lower School Office should be notified of a change in transportation routine, including the day and date of the change to car or bus pick-up.  When you pick your child up early, sign out on the sign out form in the hallway outside of the Lower School Office.*

*If there is no note or phone call, a child will be sent home by the usual procedure.*

**Middle School —** The building is open at 7:45 a.m. Students are expected to arrive at school by **7:55 a.m.** and be in their classes by **8:05 a.m.** Car pickup for Grade 6 is at 3:20 p.m. in front of the Middle School. Car pickup for Grades 7 and 8 is at 3:30 p.m. in front of the Middle School. Middle School students who have a Lower School sibling must report to the Lower School parking lot for pick up. Parents are not permitted to pick up students on Duck Pond Road.

**Upper School** — The building is open at 7:45 a.m. Students are expected to arrive at school by 7:55 a.m. and be in their class meetings by 8:05 a.m.

*Before 7:45 a.m. and after 3:30 p.m. there is no supervision of students except for those who are on campus for a school activity such as athletics, theater, after school Enrichment programs or Lower School Extended Day. Additionally, the library is open late for Middle and Upper School students who need a place to work or quietly socialize after school until 5:30 p.m. After that time, all students must either be picked up or head to the Frost Hall Reception lobby. Middle School students must sign up in advance on the Middle School bulletin board outside the principal's office. When arriving to the library, students must sign in at the main desk not later than 3:45 p.m.*

## VII.   Emergency Management and Safety

Emergency management is overseen by the Head of School with support from the Incident Command Team (ICT), which is comprised of several people, including the Directors of Athletics, Communications, Facilities, Finance, and Technology. ICT has taken proactive steps to protect the safety of the FA community. ICT is responsible for all planning, training, and drills related to emergency management. ICT works in collaboration with local and federal first responders and emergency agencies to update protocols and training methods as best practices guidance changes. Training is provided to all faculty and staff prior to the start of the school year. Training for all students is delivered at the start of the school year. ICT holds eight fire drills and four lockdown drills each year.

### 1. Unauthorized Recreational Vehicles

Self-balancing scooters, more popularly known as hoverboards, are not permitted on campus or in any Friends Academy-owned building. Hoverboards include self-balancing scooters, battery operated scooters, and hands-free segways. This restriction also extends to All-Terrain Vehicles, skateboards, heelys and drones.

### 2. Door Access Control Card Policy for MS/US Students

Friends Academy issues door access control cards to students in the Middle and Upper Schools to permit them to enter school buildings. To enter a building, simply place your card in front of the reader (small white box with a red light next to the door) and wait for the audible beep, which indicates the door is unlocked. These cards will only unlock the following doors and only during regular school hours:

**For MS students:**
Middle School front and side doors
Athletic Center main lobby and mudroom doors
KW Learning Commons main entry
Dolan Center doors to the atrium and green room
Frost Hall entry from the quad

**For US students:**
Frost Hall quad entry and front doors
Athletic Center main lobby and mudroom doors
KW Learning Commons main entry
Dolan Center doors to the atrium and green room

It is important for the security of our campus that the following rules are understood and adhered to:
- Keep the card on your person at all times while on campus. Keep it in a safe and easily accessible place.
- Do not lend your card out to others. Each card has a distinct number specific to each student.
- Do not permit people that you don't recognize to enter school buildings with you. Visitors should be directed to enter and check in at the reception desk in Frost Hall. Notify the nearest faculty or staff member if you have a concern about a stranger on campus.
- Do not prop open exterior doors.
- If you lose your card, please immediately notify Chris Semlies, Facilities Director via email chris_semlies@fa.org, so your lost card can be deactivated. A replacement card will be issued for a $20 fee.
- All cards will be collected at the end of the year. A $20 fee will be assessed for a lost Card.

3. Off-Campus Food Delivery

Ordering food or beverage delivery is prohibited, unless managed by a teacher for a special activity. In this case, the teacher must order the food and meet the delivery person.

E.   Emergency Closings

In the event of inclement weather, Friends Academy generally follows the lead of the Locust Valley, Glen Cove, and North Shore School Districts. Announcements of school closings will be posted on the Friends Academy Website, www.fa.org, and broadcast on Channel 12 Cablevision and Fios. Each family will also receive an automated phone call (see below) alerting them to the closure. While we expect that students will be in attendance on the days school is open, we also understand that weather conditions vary across Long Island and that the final judgment rests with each family in determining if driving conditions permit travel to school.

It is highly unusual for school to close early. However, in the event of an unexpected early dismissal, all Lower School parents will be notified by telephone, and no Lower School student will be released until parents or contact person have been contacted unless we have specific instructions on file. No Middle School students will be permitted to leave school on district buses or with a sibling or friend unless we have specific instructions on file. No Upper School student will be permitted to go home without specific notification if the student's school district sends a bus to pick them up.

Students who drive to school are expected to remain in attendance until school is officially closed and no student will be permitted to leave early without specific parental permission. Under no circumstances should students themselves call home to be picked up. Parents who have concerns about the weather during the day should call the appropriate office for additional information.

Friends Academy utilizes an automated calling system to announce school closings and convey other urgent information.  We utilize an emergency call system for contacting parents in the event of a school closing, early dismissal or other important announcements or emergencies.  Please note that the dismissal procedures above remain in effect and the automated call is simply an additional source of information for parents.  To insure the effectiveness of our automated calling system, please make sure your contact numbers are accurate by updating your Contact Information using your My BackPack login or by calling the appropriate division office.

F.   General Attendance Guidelines – All Divisions

As a Quaker school, one of the essential components for a healthy and supportive community is open and honest communication between parents and school. We are partners, working together on behalf of the student. This partnership is a critical element in the safety and overall success of the student.

The school believes firmly that classroom and daily attendance are essential requirements that support the student's learning experience.  Friends Academy's attendance guidelines are based on the principle that regular attendance maximizes the student's interaction with teachers and peers, and correlates to academic success. Consistent attendance helps students develop responsible work and study habits and prepares them for the demands of college and the working world beyond. Students who develop a pattern of poor attendance (absences/late to class/late to school/early excused) undermine their relationships with teachers, their course work, and their ability to participate in the life of the school.

Successful implementation of attendance guidelines requires the cooperation of all members of the educational community, including parents, students, teachers and administration. Under the New York State Education Law, parents are responsible for the regular attendance of their children. Parents and students may view the student attendance record at any time on My BackPack.

*NOTE: Lower, Middle, and Upper school guidelines related to school attendance are taken seriously and should be carefully reviewed. Please refer below to section XVI for Lower, XVII for Middle and XVIII for Upper School related guidelines.*

1.  Notifying School When Your Child is Absent

If your child is absent from school, please report the absence before 8:30 a.m. on the morning of the absence by emailing or calling your child's divisional office.

**Lower School:** Email: lsattendance@fa.org or call 516-393-4230
**Middle School:** Email: msattendance@fa.org or call 516-393-4239
**Upper School:** Email: usattendance@fa.org or call 516-393-4296

For either email or voicemail, parents should provide their name, their child's name and grade, and a specific reason for the child's absence, tardiness, or early dismissal.  Students may NOT report their own absences to the school.

2.  Explanation of Absence Notes

In addition to calling the school, we ask parents to send an email explaining the reason or the absence of their child, preferably no later than 8:30 a.m. The office will not mark an absence "excused" until an e-mail from a parent is received. A e-mail avoids misunderstandings. In order to verify a student's absence and ensure the continuing safety of the children within our care, you can also expect follow-up telephone calls from the divisional administrative assistants if the parent did not call in the absence. In the e-mail, please include the date, the reason for absence and the child's name.

**3.  Excused and Unexcused Absences, Lateness to School and Early Dismissal**

As educators and parents, we must be role models. While we will always respect your parental decisions,  we ask that you avoid sanctioning absences for inappropriate reasons. Additionally, New York State law specifies that students may only miss school for very specific reasons.

The following categories are considered excused absences, lateness to school and early dismissal in accordance with New York State School Law:

- School-sponsored or sanctioned trips or activities
- Personal Illness
- Court Appearance
- Death in family and/or Funeral
- Religious observances
- Driver's License test (DMV)

**In addition, Friends Academy considers the following as excused absences:**

- 12th Grade approved college visits (3) must be pre-approved
- Suspension or Day of Reflection

**Unexcused absences, lateness to school and early dismissal include, but are not limited to:**

- Extended family vacations outside of the school calendar
- Appointments that can easily be made after school hours
- Oversleeping, missing the bus
- Studying for a test

If a student misses school for more than two school days for any reason other than listed under excused absence, the parent must contact the school nurse for medical issues and the Principal  to discuss the nature of the absence and determine how this will affect the child's class work.

Students who are absent are responsible for meeting with their teachers and setting up a plan to make up homework, tests, or quizzes that were missed. Students should check the Website, consult syllabi, email teachers, or call classmates for assignments. For an extended illness and upon request, the administrative assistant can collect homework for a student. Parents should contact the Principal if the student will be absent for more than five (5) days to ensure continuity of instruction.  Students who leave early or arrive late are responsible for meeting with teachers of classes missed that day.

**4. Procedure when Late to School**

Students arriving late (after 8:05 a.m.) must check in with the divisional administrative assistant. For students who are late, parents must call or email the divisional assistant, explaining the reason for lateness.

**5. Extra Curricular Policy**

Students arriving after 9 a.m. are ineligible to participate in after school or evening events. This includes practices or rehearsals. If a student is sick and unable to attend school, we would ask that the student make getting well a priority and we would not expect the student to attend any after school events or programs.  In cases where there are extenuating circumstances, the student and/or parent may contact the division Principal or in the Upper School the Director of Student Affairs to receive an exemption to participate.

**6. Procedure for early dismissals**

If a student must leave school during the school day, the student must follow the procedures outlined below. Any student who requests to be released from school early for a medical appointment, religious observance, or other reason must provide a parental note of request to the main or attendance office prior to leaving school. Parents of Middle School students must come into the office to sign their child out. Upper School students must swipe out in the attendance office. The school strongly encourages that all medical appointments be made after school hours or during vacations. In the case of an emergency medical appointment (dealing with illness), a note from the doctor's office will be required.

**G.  Illness During School**

When a student becomes ill during the day or has an accident that requires medical attention, the school nurse will be consulted. The nurse, in conjunction with the divisional administrative assistant or faculty person in charge, will notify the family and request that the student is picked up. Under no circumstances should students themselves call home to be picked up. Students requiring emergency care will be transported by ambulance to an appropriate hospital or medical facility. Parents will be immediately notified.

**NOTE:** *It is very important that we have on file the current phone numbers of those to contact in case of illness or accident.*

### H.   Students Entering or Leaving During the School Day

If a student enters school after morning attendance, the student must sign/swipe in at the attendance office. If a student must leave school during the school day, the student must follow the procedures below:

1. Any student becoming ill during the day is to report to the nurse's office and must          sign out with the nurse in order to leave school.
2. LS and MS parents must sign out their child at the appropriate divisional office for a medical appointment, religious observance, or any other reason prior to leaving school.
3. US Parents may request that their child be released from school for a medical appointment, religious observance, or any other reason by contacting the US Attendance office prior to leaving school.
4. Students and parents should inform teachers of classes that will be missed.

## VIII.   Student Support Services

Students at Friends Academy are provided academic and personal support in a variety of ways throughout the three divisions. Our faculty members understand and appreciate the importance of balancing a commitment to scholarship with an attention to the personal development and growth of each student. Through grade level teams and individual advisors, the structure of the school promotes an in-depth understanding of each student.

### A.   Academic and Social Advising

Friends Academy considers itself to be a nurturing community whose members work closely with students to support their academic and social lives and who value the inherent worth of every individual. The academic and social advisory function of the school is robust and built upon the idea that positive relationships between students and caring adults lies at the heart of a quality education. Specific approaches and programs in each division of the school address each student's needs in developmentally appropriate ways.

### B.   Learning Services

Friends Academy provides support services to a diverse population of capable students within the regular academic program. We seek to celebrate the unique worth of each learner and to understand the learning needs of our students at an early age and provide them the necessary support through early intervention strategies. Encouraging students to become more self-aware while helping them to build their skills, develop critical thinking skills, and learn to compensate for their learning differences, the ultimate goal of the program is to help students move toward independence throughout their time at Friends Academy.  The program aims to educate the parents, students, and teachers, about learning differences, and to nurture a partnership between the home and school where open communication and clear planning is focused on the individual needs of the student.

In the Lower, Middle and Upper Schools, the goals are to identify learning differences, recommend and provide early intervention strategies, and to begin to help students better understand their learning challenges and strengths. As students move into the Middle and Upper Schools, the goals are to continue to support students as needed, to help them to develop compensatory strategies, better understand their strengths and challenges, and become independent learners by learning to develop self-advocacy skills, and to achieve academic self-reliance.

A full-time Learning Specialist in each division, along with the School Psychologists, supports students with learning differences and helps teachers employ strategies to meet the needs of diverse learners. The Learning Specialist integrates with the regular program and works closely with the classroom teachers.  A child study team in each division composed of the division Learning Specialist, School Psychologist, the division Principal, and team leaders or class deans meet regularly to discuss students of concern. These groups recommend teaching strategies, identify appropriate accommodations, and devise approaches to support students who are having difficulty academically. All accommodations and services are designed to help students meet with success within the regular academic program. In some cases, students may be recommended for achievement and/or psycho-educational testing, and the child study team will monitor this process and help to interpret evaluations for teachers and parents. *(Please refer to section XVI for Lower, XVII for Middle and XVIII for Upper School student support guidelines.)*

### C.  Policy for Granting 504 Accommodation Plans to Students

A student with a significant disability has certain rights under Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act, to reasonable accommodations that reduce the effects of their disability on their academic functioning. Though Friends Academy attempts to support all students with disabilities, as a non-public institution, it is neither required nor able to provide all accommodations that a student might require.

### 504 Eligibility:

All children who have a physical or mental impairment which **substantially** limits a major life activity, have a record of such impairment, or are regarded as having such impairment, are eligible to apply for a Section 504 plan.

**Major life activities** include, but are not limited to, seeing, walking, hearing, learning, working, performing manual tasks, or self-care.

**Substantial limitations are defined as:**
- The student is unable to perform a major life activity that the **average** student of approximately the same age can perform
  OR
- Significantly restricted as to the condition, manner or duration under which a particular life activity is performed as compared to the average student of approximately the same age. The impairment must be substantial and somewhat unique, rather than commonplace, when compared to the average student of approximately the same age.

**Application Procedure:**

1. A parent or guardian, who suspects that their child may have a 504 level disability, may initiate a referral to determine eligibility by submitting a letter to the school psychologist. This letter must outline the parental concern and which accommodations are being sought. In addition, the parent should provide appropriate evidence of the negative impact of the suspected disability upon academic functioning.

2. Upon receipt of the above information from the parent, the school psychologist, as the official 504 Coordinator, will convene a division 504 Committee meeting. The 504 committee is comprised of the division; head, learning specialist, and an academic teacher, as deemed necessary and appropriate. The committee will review all of the information and determine whether the student meets the criteria for an accommodation plan. The committee may request/gather additional information (i.e. student work samples, teacher reports, academic records, and an up to date psycho-educational evaluation before a decision is finalized. An official decision regarding approval must be finalized within 60 academic days.

3. If a student is granted accommodations, a meeting will be set up with the family and student to discuss implementation of the plan. A written accommodation plan will be developed by the 504 committee.

4. All subject teachers will be made aware of the decision of the 504 committee. Each teacher will be helped to fully understand the accommodation plan in order to best support the student.

5. Once a 504 plan is established, it will be reevaluated at the end of each year to determine whether accommodations are still appropriate.

6. A re-evaluation may be necessary if any significant changes to the accommodation plan are sought.
**If there is evidence that the limitation may rise to the level of a state classifiable learning disability.**

The 504 Committee may determine after reviewing all materials that the student's impairment may rise to the level of a state classifiable learning disability. In that case, the family will be referred to the local public school district to determine whether a learning disability exists. If a student is classified as "learning disabled" by the district, an IEP (individualized educational plan) will be created. This plan will determine what special education services and accommodations may be required.
**PLEASE NOTE:**
All outside materials provided by the parents must:
1. Be valid to assess the area of the suspected limiting condition
2. Be administered by trained independent personnel
3. Be related to the condition in question.

- A "lower than expected" subtest score on an aptitude, intelligence, or achievement test, in isolation, is **not** sufficient evidence of a significant limitation

- A physician's report may be required for certain conditions. However a physician's note alone is **not** sufficient for determining a learning impairment.

- A diagnosis alone (i.e. ADHD) does not necessitate that there is a significant limitation requiring accommodation

**If a student is denied a 504 plan, as their impairment is not seen as substantially limiting their performance, the family may, at a later date, ask that the decision be revisited. Additional evidence must be presented for an appeal to be granted.**

**D. Deadline for Registration for Students with an Individualized Education Plan (IEP)**

For all students newly enrolling in Friends Academy, who already possess an IEP through a public school district other than the Glen Cove City School District; **You must register your child's need for special education services with the Glen Cove School District, no later than June 1 prior to the upcoming academic year** or your child will not be able to access services for the imminent school year.

**E.   Counseling Services**

The School Psychologists (the counselors) provide consultation with students and parents to address social and emotional issues that may arise throughout the calendar year.  The counselors maintain daily hours for student and faculty "walk in consultations."  In addition to offering general information and ongoing support, the counselors provides short-term individual counseling for students, runs counseling groups as needed, and makes referrals to appropriate therapeutic resources. The Lower School receives additional services of a part-time school psychologist provided by Nassau County BOCES.

**F.   Other Professional Support**

BOCES provides Friends with a part-time speech/language professional and a full-time nurses.  A certified athletic trainer is also on staff.

**IX.   Dress Code**

The dress code reflects our respect for the traditions and mission of the school.  All clothing should be clean, comfortable, and appropriate.  Our Quaker mission asks that we honor the equality and dignity of every community member. As Quakers believe in leading lives of material simplicity and peace, we ask that community members please refrain from wearing either overtly expensive items (including clothing or jewelry drawing attention to expense, brand names, or slogans) or any clothing that symbolizes or advocates for violence in any form. We hope following the guidelines below and keeping dress code in perspective can help guide us in avoiding distraction from what is truly important.

**1. Upper School Protocols:**

Dress Code is enforced by the Class Deans and advisors and throughout the day by teachers and administrators. A student who chooses to attend school wearing clothing listed on our "not permitted" list will be considered "out of code" and may be issued a written warning, parents may be contacted, and upon an established pattern, may not be permitted to attend class, put on a disciplinary status, and/ or asked to join a focused round table meeting. *Please see specific guidelines in Upper School Guidelines, on page 48.*

**2.   Middle School Protocols:**

Advisors will check the student's dress each morning during attendance, and special area teachers will be vigilant about observing adherence to the dress guidelines throughout the day.  If a student is found to be out of code, he or she will be asked to rectify the problem immediately, and the advisor may call the parent.   If the student is unable to resume appropriate dress, he or she will be reported to the Middle School student's advisor. Continued concerns in this area would result in parent and student meeting with the Student Life Dean or Principal, a focused round table meeting, and/ or the student being placed on a disciplinary status. *Please see specific guidelines regarding the Middle School Dress Code and the Disciplinary Policy section on page 35.*

**3.   Lower School Protocols:**

The classroom teacher checks the student's dress each morning. If the student is out of code and is unable to resume appropriate dress, the parent will be notified. Continued concerns in this area would necessitate a parent meeting with the Student Life Dean and/ or the Principal. *Please see specific guidelines in Lower School Guidelines, on page 27.*

**X.   Textbook Ordering Procedures**

Your public school district provides textbooks to students residing in the district, even if they attend non-public schools. Upper School students will be able to pick up their textbooks in late August when books are delivered to Friends Academy and schedules are completed. E-mails will be sent out as to the day and time that US students may pick up their books. LS and MS students will get their books when they return to school in September.

Procedure for Students who reside in:

A.  For students served by Suffolk County and all of Nassau County **EXCEPT Sewanhaka, Farmingdale, and Oceanside,** it is not necessary to submit a book order form; your books will be provided through the school.

B.  If you live in Sewanhaka, Farmingdale, and Oceanside school districts, please contact your school district for instructions on their textbook ordering process.

C. If you live in a **borough of New York City,** a few of your books may be provided by the city.  Typically, families receive very few books through this system due to budgetary constraints and a cumbersome process. We try to provide books from our inventory for these students.

## XI.  <u>Homework</u>

While the amount of homework varies from grade to grade, parents should help establish a routine and make certain there is a quiet, well-lit place for students to study.  Parents may help students get started by reading directions together or discussing a writing assignment but should avoid becoming too involved. Students need to learn to work independently, to "self-start" and, at times, to work through material slowly and with considerable effort. Parents who are concerned about a student should write the teacher a note or make an appointment to pursue solutions.

## XII.  <u>Personal Property and Security – Lockers, Cubicles, Desks, Etc.</u>

Each of us has an obligation to protect our own personal belongings and protect and respect the belongings of other members in the community.  At the start of each school year students in the Middle and Upper schools are assigned lockers in the school building and in the gym locker room to be used to safeguard personal belongings and school materials. While we remind students to refrain from bringing in valuable and expensive items, we strongly encourage students to secure all possessions, especially laptops, cell phones, calculators, personal music devices, jewelry, and money in locked lockers or ask an administrator or teacher to secure the items for the day. Students who play musical instruments are also provided a locker or secure storage space in the music area.

### A.  School Access

There are certain areas that are considered school property such as lockers, cubicles, desks, and similar storage areas. The school reserves the right to examine any or all of these areas, including personal property brought to campus, at its discretion. Every effort will be made to sustain a climate of trust and respect with regard to these areas.

## XIII.  <u>Libraries</u>

The mission of the Friends Academy libraries is to function as the intellectual heart and information center of the school. To fulfill this mission, the libraries provide curriculum support, research guidance, enrichment through literature appreciation, and other learning experiences to the students, faculty, administration, staff, and parents of the school community.

The school's Textbook Central repository is located on the top floor of the library.

All library material must be returned by the end of the school year.  The school will bill families for lost or damaged items.

*The Lower School Library* serves students in Play Group through grade 5 and is available to students during regular school hours.

*The Kumar Wang Learning Commons* serves students in grades 6-12 and is open and staffed Monday - Thursday from 7:30 a.m. - 5:30 p.m. and Fridays from 7:30 a.m. - 4:00 p.m.

Food is not allowed in the library except for special events or advisory period.  Beverages are permitted if they are in a covered container.

Students are expected to use their time productively, i.e., study, read, work on projects, or do research or homework.

- In order to maintain an atmosphere conducive to study, students should speak quietly and be courteous and respectful to others.
- Library computers are for academic use only.
- As a service to others, students should clean up their work area upon leaving.
- All library materials should be treated with respect.
- All school guidelines regarding dress code, cell phones, etc. apply in the library.

**After school guidelines:**

**The Library is open Mon-Thurs until 5:30 p.m., and until 4 p.m. on Friday.**

The library is open late for Middle and Upper School students who need a place to work after school.  Middle School students must sign up in advance on the Middle School bulletin board outside the principal's office. When arriving to the library, students must sign in at the main desk not later than 3:45 p.m.  Middle School students should settle down to work when they arrive and stay in the building until they are ready to leave campus whether being picked up by a parent or walking to the bus area. All school guidelines and rules regarding student behavior remain in effect.

## XIV.  <u>Transportation</u>

Friends Academy students arrive and leave by a variety of methods of transportation. A detailed explanation on the transportation guidelines, including pick-up and drop-off, will come from your division head.

Students wishing to go home with another student on his or her bus must receive permission from the bus driver or company. Please note that the school cannot give permission for a student to ride another student's bus. Parents are responsible to organize this with the bus company.

Should there be a concern about bus transportation, the specific school district's Transportation Office or bus company should be notified. If the problem persists, the Lower, Middle or Upper School offices should be contacted.

## XV. Role of the Parent

### A. Parent Conduct and Integrity

Friends Academy believes that a positive and constructive working relationship – grounded in our Quaker values and Fundamental Standards – between the school and a student's parents (or guardian) is essential to fulfilling the mission of providing for the intellectual, artistic, athletic, social, moral, ethical, and spiritual development of each student.  Mutual respect and kindness; direct and honest communications; patience; trust; and civil and well-mannered resolution of disagreements must govern all interactions between parents and the faculty, staff, and administration. This cooperative and reciprocal relationship between families and the school creates a welcoming and healthy learning environment for all, but especially for students.  At all times and in all places, parents and faculty, staff, and administrators should model the Quaker spirit of Friends Academy in their actions and words.

The School welcomes constructive feedback from families about the experience of their child or children. In the Quaker spirit of plain speaking, parents best support a school climate of trust and respect by communicating concerns directly and honestly to the teacher or administrator closest to the issue. The school will insure a just, fair, timely, and confidential process for addressing parent concerns and, in each case, will delineate lines of responsibility and communication.

While parents may not agree with every decision by the school, in most cases, we believe that we can find common ground and continue a mutually respectful and trusting relationship. In the extreme case, an impasse may make it difficult for the parent to remain a constructive member of the community. In such cases, both the parent and school should consider whether another school would be a better match for the family.

Friends Academy reserves the right not to continue enrollment of a student if the school reasonably concludes that the actions of a parent (or guardian) undermine the school's expectations about conduct, make a positive and constructive relationship impossible, and seriously interfere with the school's ability to fulfill Friends Academy's educational purpose and mission.

### B. The Parent Council

The purpose of the Parent Council is to promote the welfare of Friends Academy by maintaining a close working relationship among parents, faculty, administration, staff, and trustees.  All parents of current students are automatically members and are encouraged to attend the two Parent Council general meetings. All officers of the Parent Council are interested in parent opinions. Volunteers are always welcome to help with the many events organized by the Parent Council. Those interested in helping with any of the Council's functions should call the specific chairperson.  See *Parent Council Guide to our Quaker School* on FA Website.

### C. Separated and Divorced Parents

In families in which parents are separated or divorced,  Friends Academy will  treat each parent equally. Unless prohibited by a court order, a certified copy of which must be provided to Friends Academy, each parent is welcome at school events, functions, and conferences. In addition, unless prohibited by a court order, a certified copy of which must be provided to Friends Academy, each parent will be sent report cards and student evaluations, and each parent will receive school publications, assuming the school has received notice of an appropriate address.

Although difficulties between parents may exist, the school cannot permit personal differences between spouses or former spouses to interfere with the student while at Friends.  We are sensitive to the rights of parents, but we must put the interests of the student first. There may be instances in which  joint custody of a student is modified by court order. In such an instance, Friends Academy is obligated to, and will abide by, the terms of the applicable court order.  It is incumbent upon the parent claiming a modification of joint custody to provide the school with a court certified copy of the applicable order as soon as it becomes available so that it may be reviewed by the school's attorneys and administration.

### D. Parent-Sponsored Activities

On occasion, parents sponsor and/or organize off-campus activities that are not officially sanctioned by the school. Official, school-sanctioned activities are announced to families through mail sent directly from the school on school letterhead, in school publications, or sent electronically from the school network. Parents should exercise judgment when allowing their child(ren) to participate in any off-campus activities that are not officially sanctioned by the school  and understand that the school does not have authority over these activities.

### E. Facilities Usage Guidelines

Requests for the use of any athletic facility outside of a scheduled and organized Friends Academy activity must be made to the Director of Athletics.  An application for facility usage must be executed prior to the event, by fully completing and submitting the Application for Facility Usage Form, including proof of insurance and all required support documentation.  If approved, these programs must also be supervised by an employee of Friends Academy.  It is not acceptable for any individual member or members of the community to access the facilities at any time without prior approval or without proper supervision.

### F.  Behavior Outside of School

Students and their families should recognize that along with the privilege and opportunity to attend Friends Academy goes the responsibility of representing the school positively in the community at large. When the school becomes aware that a student has violated its Fundamental Standards (violation of Integrity and/ or Empathy) outside of school, the Directors of Student and Academic Affairs, Principals, or Head of School will notify the parents and discuss with them ways in which the school and parents can work together to address the student's behavior. A student's behavior outside of school and the parents' willingness to work with the school to address that behavior may affect the school's decision to continue the student's enrollment.

Specifically with regard to off-campus, private, social functions involving Friends Academy students, parents should always be present.  Parents should feel neither guilty nor embarrassed about setting their own rules and insisting that they be respected. Students should understand that they are guests and behave accordingly.

**Special Note: Alcohol or other drugs should never be served to students.  Parents who choose to ignore this understanding place themselves at extraordinary legal risk and jeopardize their child's safety and continued enrollment at Friends Academy. Friends Academy reserves the right not to re-enroll a student should that student engage in or should the parents allow or ignore this warning concerning the use of alcohol or other drugs at off campus private social functions.**

### G.  Student Social Activities Outside of School

Friends Academy considers the supervision of students' lives outside of school to be the responsibility of their parents. However, we do recommend that school nights be used for study rather than social events.

When planning social gatherings for students in the Lower and Middle Schools, parents are encouraged to:

1.   Schedule events on weekends.
2.   Mail invitations rather than hand them out in school or post on social media
3.   Provide adequate supervision for the safety and security of the children.

Since Lower School children do not always live in the same community and need unstructured play settings, families are encouraged to make an extra effort to arrange reciprocal play dates, including transportation.

In planning a social event, it is important to remember the school's emphasis on moderation and the need for careful, active supervision.

### H.  Annual Fund

The Annual Fund is the single most significant fundraiser for the school and Friends Academy anticipates and expects all parents to support the school through contributions to the Annual Fund. Since tuition does not cover the entire cost of educating a student at Friends Academy, funds from our Annual Fund support the operating budget, helping to bridge the gap between tuition and the cost of educating each student. These funds are also used to enable the school to offer financial aid, to offer competitive salaries to our faculty, and to provide the many programs that make a Friends Academy education distinctive and life-changing. Your gifts are fully tax deductible, and you have until June 30th to make a gift for the current academic year.

Leadership gifts from the core of our Annual Fund and provide a major portion of the total. However, each and every gift is important and demonstrates a tangible commitment to Friends Academy and to our dedicated faculty and staff. Families are encouraged to give generously according to their means. Please join your fellow parents in supporting the Annual Fund. Your gift matters – we are all in this together!

Please do not initiate any independent fundraising for individual projects or purposes. Multiple appeals beyond the current school-sponsored fundraisers can overwhelm our parents. **Before asking parents, alumni or friends to contribute to a cause, please contact the Development Office to discuss your ideas.** Well-intentioned efforts sometimes detract rather than enhance community support if not put in the context of the overall school vision. Although we may consider fundraising initiatives that will complement our current mission, we are also mindful that parents and other constituents give generously of their resources. We must be conservative in soliciting our community so that the interests of Friends Academy remain the top priority. Please contact our Development Office well in advance of any perspective fundraising activity so that we can thoughtfully work toward a possible solution.

### I.  Gifts to Faculty and Staff

We understand the desire of parents to acknowledge and thank faculty and staff with gifts at holidays or the end of the year. We ask that gift giving is in keeping with our Quaker principles of simplicity, moderation, and equality.

## XVI.   Health and Medical Forms

Friends Academy now uses Magnus Health, an electronic storage system for student health records. All NEW students need the Vital Health Record, a current Physical Exam form and an immunization record completed and then scanned and uploaded to the Magnus site by Aug.1st. All returning students entering grade EC, K, 2, 4, 7, 8, and 10 must update their Physical Exam and immunization record. All students need to have the Vital Health Record completed by the parent annually. However, please note that ALL students in Middle School and Upper School MUST have a physical examination by a private physician as well as a parent/student consent form completed each year in order to participate in interscholastic athletics. All forms should be scanned

and uploaded to the Magnus website before the beginning of school or pre-season practice. Forms are available for downloading on the FA and Magnus websites.

### A. Administration of Medication

The New York State Department of Education has established guidelines for the administration of medication during school hours. In accordance with those regulations, any child who needs to take medication of any kind (**including over-the-counter medication and vitamins**) cannot carry or take the medication on their own. In addition, no student may receive medication (even over-the-counter) from the school nurse *without* a written doctor's order and parent permission.  If your child might require Tylenol or other over-the-counter medication please have the medication forms filled in, signed by you and your healthcare provider, and return the form to the Nurse's office. Over-the-counter (OTC) medications must be in the original manufacturer's container/package with the student's name affixed to the container.

 It is against Friends Academy guidelines for any student to carry medication (except for documented need for an inhaler and/or EpiPen). Please help your student comply with these guidelines by providing a physician's order for any medication your child might require during the school day.

**1.  Daily Medications:** To dispense any daily medication to a student, a parent and prescriber's authorization form must be on file in the student's medical record. A form is available on the Magnus website.  The medication order must be renewed annually.

**2.  Antibiotics:** If a child must take an antibiotic drug during the school day, a parent and prescriber's authorization is needed. If the antibiotic is three times a day, unless otherwise directed, this means, morning, after school, and bedtime. If the antibiotic must be administered during the school day, the medication must be delivered by a parent or guardian in a properly labeled pharmacy bottle with the permission slip and doctor's order. Medication should not be transported daily to and from school. Parents should ask the pharmacist for two containers, one to remain at home and one at school.

**3.  Allergies:**  If your child has allergies, please make sure it is noted on his/her medical record.  If the allergic reaction is severe (for example a food allergy to peanuts) and your healthcare provider requires that an Epi-pen and Benadryl be on hand in the Nurse's Office at all times, please make sure you send in the medication with the required doctor's order and parental permission form. This form is on the FA and Magnus websites for your convenience.  Please make sure your child's medical record reflects accurate medical condition information.

If you have any questions or concerns about your student's health, the Nurse's office number is 516-393-4221.

### B.  Privacy of Health Information

The Nurse's Office, School Counselor, and Athletic Trainer maintain the personal health information of students. Consistent with the operation of a school community, this information is shared on a need-to-know basis among the staff of Friends Academy and with outside medical service providers. While Friends Academy is not a covered entity under HIPAA, it makes every reasonable effort to maintain the privacy of the personal health information of its students. If you have any questions or concerns about this issue, please contact the Head of School or the Director of Finance.

### C.  Guidelines on Controlling Nut Products on Campus

Friends Academy strives to be a nut-free campus. Because we are an open campus with many people coming and going, and even though we make every effort to eliminate nut products and raise awareness about this issue, we cannot insure that our campus is nut-free.

Peanut butter and nut products have been eliminated from our food service, campus, and school-sponsored events and activities. In addition, we ask that families refrain from sending peanut or other nut-based foods to school. Families of those children with severe food allergies are asked to work closely and cooperatively with our school nurse to clarify the exact nature of the medical condition. Classroom teachers and divisional Principals will be informed of the details and will establish protocols for our response if a severe allergic reaction does occur. Allergic students and the faculty who teach them have ready access to epinephrine auto-injectors in the event of anaphylaxis.

## XVII.   Lower School Guidelines

### A.  Lunch

Children in Early Childhood bring their lunch and eat in the Early Childhood Center with their teachers. Grades K-5 have a choice of hot lunch, sandwiches, salad bar, soup and assorted side offerings in the dining Commons. The teacher and school nurse should be informed of any dietary restrictions.

### B.  Daily Attendance, Absences and Illness
**1.  Absences**

The statements about attendance in the General Attendance Guidelines section apply to all Lower School students. When parents remove children from school prior to its official ending, they must sign out in the Lower School Office. If students are absent for more than three days, please inform the school nurse of the nature of the illness or tell the Office and we will contact the nurse.

If parents do not call the Lower School Office to tell why the student is out, the school will call to get a reason for absence by the end of the school day. The Lower School Principal will send a letter to the parents alerting them of excessive absences from school. A conference may also be called with parents to better understand the situation from all points of view.

### 2. Unexcused Absences

If a student has multiple unexcused absences during the year, a parent conference will be called by the Lower School Principal.

### 3. Lateness

Teachers are charged to take attendance at exactly 8:05 a.m., and after that time your child will need to stop in the office to get a late slip.

### 4. Early Dismissal and Play Dates

When students are picked up early, parents must report to the Lower School Office where they will sign the student out for the day or for a particular time. If students have a playdate, both the sending and receiving parent must send a permission note to school.

### 5. Absences from Field Trips and Concerts

Lower School students are required to participate in all school functions including field trips, overnight trips as well as evening and day musical concerts. Students who miss these important events for unexcused reasons are required to be present in school. Additionally, because concerts are the culminating activity of the music curriculum and any absence will be recorded on the final report card. The LS Music Teacher should be notified a minimum of seven days prior to the concert if through extenuating circumstances a student will be unable to participate.

### 6. Unexcused Absences, Tardiness and Early Departures:

Any absence, tardiness or early departure is considered unexcused if the reason for the absence does not fall into the excused categories (see above – excused). Examples of unexcused absences could include but are not limited to family vacation, sports or dance lessons, sleeping in late, babysitting, haircut, oversleeping, or staying home to rest for an extracurricular activity.

## C. Lower School Dress Code

The dress code reflects our respect for the traditions and mission of the school. All clothing should be clean, comfortable, and appropriate. Our Quaker mission asks that we honor the equality and dignity of every community member. As Quakers believe in leading lives of material simplicity and peace, we ask that community members please refrain from wearing either overtly expensive items (including clothing or jewelry drawing attention to expense, brand names, or slogans) or any clothing that symbolizes or advocates for violence in any form. We hope following the guidelines below and keeping dress code in perspective can help guide us in avoiding distraction from what is truly important.

## 1. Daily Dress Code

**Acceptable Pants:** dress or casual dress pants, chinos, khakis, or colored denim (not blue).

*Not acceptable:* Blue jeans, sweatpants, exercise or spandex pants, shorts, overalls, or leggings worn without a dress over them.

**Acceptable Shirts or Tops:** dress shirts with or without collars, polo shirts, rugby shirts, blouses, turtlenecks, and sweaters/sweater-vests. Shirts and tops can be long sleeve, short sleeve or sleeveless. Solid or patterned designs are acceptable. Shirts should also be of appropriate fit and length.

*Not acceptable:* Tank tops, spaghetti-strapped tops, "cold shoulder cutouts", cropped tops, halter tops, T-shirts, plunging necklines, baggy shirts, sequined shirts, and casual hooded or brand name sweatshirts.

**Acceptable dresses, skirts:** All items should be chosen with attention to the appropriate fit, length, and coverage to avoid exposing undergarments during their daily activities. Skirts and dresses may not be above the knee, without appropriate leggings worn underneath. Crew neck or collared dresses are acceptable with long or short sleeves or sleeveless.

*Not acceptable:* Mini-skirts, mini-dresses or dresses/skirts that have spaghetti-strapped tops, "cold-shoulder cutouts," cropped tops, halter tops, or plunging necklines that reveal undergarments.

**Acceptable footwear:** All walking shoes, sneakers, casual dress shoes, boots, and flats can be worn as footwear.

*Not Acceptable:* High heels, sandals, flip-flops and slippers are not acceptable.  (Snow or rain boots in inclement weather are fine).

**Headwear:** Hats and tops with hoods are not appropriate in school buildings, though head coverings required for religious purposes or to honor cultural tradition are allowed.

**2.   Special Dress Codes**
**Special Event Dress** - 5th grade Moving Up Final Meeting for Worship in June -     faculty and students should wear formal apparel: jackets, ties, dress pants and dress shoes; semi-formal dresses or pant-suits and dress shoes.  For regular weekly meeting for worship, jackets are optional.

**Warm-Weather Dress code** is honored in September and May/June. Warm-weather         guidelines include allowances for dress shorts of modest length (not cargo shorts) Athletic sneakers or sandals with backs are acceptable.

**Dress Down Days** are  announced by the Principal throughout the school year. In keeping with the core tenets of the dress code policy, students must keep in mind that simplicity and modesty must continue to inform choice in dress. All clothing choices should be clean, comfortable, and appropriate.
        • **Acceptable clothing:** Leggings with a shirt that reaches at least to the top of the thigh, blue jeans, tee shirts (with acceptable language or message), sweatshirts, modest         length shorts (mid-thigh or longer).
        • **Unacceptable clothing:** military style clothing, spandex, ripped clothing

**D.   Academic Concerns**
        **1.   Homework**
        In the Lower School we place value on the entire student experience. Children work hard throughout the day and in order to support play time and downtime in after school hours we do not begin formal homework until grade 2. In grades 2-5 we want homework to serve as an authentic connection between school and home learning. It is also an opportunity to hone independent skills. If your child is struggling with homework please let the classroom teacher know in a timely fashion.

        **2.   Student Support Services**
        In the Lower School each team member and all the special teachers are aware of each child's progress. Regularly scheduled team meetings often focus on how to help a student succeed academically or adjust socially. Whenever an unusual concern surfaces, the Principal contacts parents and a conference is held. Occasionally, the school psychologist and/or learning specialist are asked to evaluate the student, and the school nurse is involved if there is a possible health issue.
        Guidance, educational, and counseling issues are reviewed by the Lower School Child Study Team. The team meets with faculty and parents. The team makes recommendations for support strategies for the student in the classroom, at home, or through work with other professional tutors and counselors. The Child Study Team can also recommend support to students who want a confidential atmosphere in which to discuss any problems they may have. Appointments may be made through the Lower School Administrative Assistant or The Child Study Team might ask parents to attend a meeting. When teachers identify a student's academic difficulty, they work with the child individually or in small groups and keep the parents informed of plans and progress. They develop a strategy with the parents, other teachers, and the learning specialist to overcome the concern. If the needs of the child continue to suffer, the Child Study Team is advised by way of a referral. If a formal evaluation is recommended by the school, the School Psychologist or Lower School Principal arranges a meeting with the parents, the tester, and the teacher to review the testing and discuss further action.

**E.   The Referral Process**
        1.        Teacher or parent identifies child as experiencing ongoing academic and/or social/emotional/behavioral issues.
        2.        Teacher develops classroom intervention/s or round table meeting.
        3.        Teacher shares concerns with parents to determine if they are aware of the                         concerns and if there is anything going on in the home affecting school
                performance. Furthermore, teacher documents meeting in Record of Conversation.
        4.        Teacher brings child to the attention of the Administration, Learning Specialist, and School Psychologists by completing a Child Study Team Referral Form.
        5.        Learning Specialist and/or School Psychologists do a classroom observation of the student of concern.

6.        Child Study Team meets and reviews the student of concern, making a          team decision based on evidence.

### F.   Standardized Testing

The Educational Records Bureau (ERBs) CTP V assessment is given to all students in grades 3, 4, and 5 in late-spring. Results are shared when they are received. The test is used to inform the Friends Academy curriculum.

### G.   Reports to Families

Formal written reports are submitted to parents twice a year (February and June) in all grades. *Goal Setting Sheets*, goals jointly set by teachers and parents, will be given to parents at the end of the Fall Conference.  Parent conferences take place twice a year in October and February. However, teachers are always available by appointment. A parent or teacher can request a conference at the time of the Spring Report. Dates for conferences will be announced at Back-to-School Nights and in mailings.

### H.   Behavioral Expectations

In the Lower School, we use the Responsive Classroom approach, which is aligned with our Quaker tenets. The goals of this approach are to assure that children:

- Feel physically and emotionally safe in school so that they can learn their best
- Learn the skills for working and learning collaboratively with others
- Identify and practice strategies to alter and improve choices moving forward

Responsive Classroom calls students and teachers to co-construct classroom rules and norms at the beginning of the school year. Adults take the time to model and guide expectations.  Students have the opportunity to practice positive behaviors.

When children have difficulty managing positive behavior, the adults respond in a timely and logical manner. The first step is to stop the misbehavior quickly and simply (with a word or gesture). The teacher then empowers the child with strategies to regain self-control, fix any problem caused by his or her mistake, and return to productive learning.

As with any situation at Friends Academy, lower school teachers consider *intent, context, impact, relationships, and pathways forward* when determining fair and equitable consequences with the purpose to evoke learning, growth, and better future decision-making.

Examples of possible responses/ strategies to mistake making:

- Simply give the child a reminder or redirect the child to do something different.
- Have the child sit closer to the teacher (often just being closer to an adult helps children remember what they're supposed to do.)
- Use "take a break" (the child goes to a distraction free place in for room for a little while to regain self-control.
- Limit the choice of activities.
- Guide the child in fixing problems caused by his or her mistake – logical consequences (for example, helping the custodian clean up if the child made a mess          in the bathroom.)
- Use a buddy teacher take a break (the child goes to distraction free space in another teacher's room to gain self-control).
- Use private take a break for a short or longer period of time (the child goes to  a supervised non-classroom space such as the library or the LS conference room.
- Facilitate a Friendship Agreement (used to help with conflict resolution or difficulties with peer relationships).
- Facilitate a Round Table Meeting (used to empower the child with strategies to alter behavior moving forward with the support of caring adults).
- Have the child spend a Day of Reflection at home ((s)he spends the day thinking          about the misbehavior and how to make it right with those involved. This may          include a written component).

*When a child has a day of reflection, a parent must accompany the child to school the next day for a re-entry meeting with the teacher and principal. This meeting is typically held within the first hour of school.

In the Lower School, we strongly believe that children want to and can meet expectations. We value partnering with parents to help students do well and feel good about going to school.

### I.   School Trips

Whenever students leave campus, whether for a few hours or for a one night overnight, parents are asked to sign a permission slip which will include the date(s), times of departure and return, destination, and purpose of the excursion. For class trips, the core teacher will pick up medication from the school nurse.

**J.  Car Seats**

State law requires that all children under the age of four years be restrained in a car seat when being transported in any motor vehicle, including school buses or vans.  Accordingly, parents of children under four years old must provide a car seat for their child on any day their child will participate in a school trip.  If the parent fails to provide a car seat, the child will not be allowed on the bus or van.

**K.  Before School ARRIVAL**

**Early care begins in the Lower School Lobby at 7:30 a.m. There is no supervision for children arriving in the Lower School lobby before 7:30 a.m.** If you are unsure of the time you are dropping off, it is suggested that parents wait with their children until the teachers come on duty at the assigned time.

**Note:  The parking lot is primarily meant for drop off and pick up.  Parents are discouraged from walking the older children into the building because it ties up the drop off in the morning.**

**L.  Playground AFTER HOURS**

Lower School students are allowed to play after school under the *watchful supervision* of their parents. Once a child is handed over to the parent or child caregiver, the parent or caregiver is responsible for the child's safety.

Please remember that classroom and school behavioral guidelines and game rules remain in place while children are on the Friends Academy Campus. Tackle games and contact sports are not allowed on the Lower School playground during school or during after school play.

Lower School children may not wait in the Kumar Wang library without a tutor, parent, teacher or older MS or US sibling.

**M.  After School Program**

The After School Care program gives students an opportunity to continue the socialization aspects of their day by engaging in activities, and they will also have the option to complete their daily homework with the help of responsible adults. On good weather days, they will have outdoor time. The After School Program will run each day that Lower School classes are in session from 3:30-6:00 p.m. As with the Enrichment Program, the students will be dismissed from their classrooms at the end of the regular school day, and escorted to the areas where the program will be running. We have added a drop-in guideline for emergency After School Care.  Please call Carline Folkes at 516-393-4245, if you want to exercise this option.

During After School Care, students will choose which "activities" they will participate in each day and the activities will be scheduled and planned in advance according to highest levels of interest. Examples of choices include: arts and crafts, fun with lanyards, play dough, cooking/baking and outdoor time on the playground.  Additionally, homework help is also offered. The After School Care Program will run in close collaboration with the exciting Enrichment Program.  Students can do either or both programs. Families will be notified ahead of time in the event a rare occurrence changes this time frame.

**N.  Lower School Enrichment Program**

The Lower School Enrichment Program runs from Monday through Thursday in the fall and again in the spring and offers a wide variety of programs such as: chess, debate, yoga, science, arts and more.  These programs are taught by experienced Friends faculty and professional instructors. The sessions are designed to broaden students experience, deepen their understanding of certain subjects and/or develop specific skill sets. To accommodate the varied learning levels, there are three sections: K-1st, 2nd-3rd, and 4th-5th.

Enrichment programs are Monday-Thursday from 3:30-4:30. All participating students are escorted from their classrooms directly to the enrichment studios/classrooms at dismissal. Snacks and water are provided.

All students must be enrolled to attend enrichment. The number of students per session is limited. To ensure all students access to the programs, each individual student will be limited to generally two programs during the fall and spring sessions (i.e. Chess K-2 and Story Theater). Enrollment will be done via email and programs will close as they reach their enrollment maximums. There will be no exceptions made. Please note that sessions may be offered again in the future. Confirmations will be sent out to the email address used to register. Classes may be canceled due to insufficient enrollment.

**Note:  When there is an emergency closing or early dismissal day, neither program will be in session.**

*Behavior expectations for after school programs match the expectations listed under Lower School Behavior in this document, see section G.*

**P.  Birthday Party Suggestions**

• Please mail or email all invitations instead of having your child give them out in the classroom.

• Please consider inviting the entire class or a small group of friends to mixed gender parties. If your party is single gender, please invite everyone of that gender.

• Avoid gathering the partygoers after school for transport to the party.  Even though this may be easier, it is much better to have the children arrive at the party on their own.

• Children should not bring sleeping bags or other items to school that signal to others they have been invited to a party.  This can cause distractions and hurt feelings.

- Please refrain from posting, or letting your child post, pictures from the party on                social media if the entire class was not invited to the party. (It is very easy to feel left                out when you see others celebrating.) Some families may also request their child's                      picture not be posted.

**Please note: Classroom teachers and students have a specific way of celebrating birthdays in the classrooms. (Please reach out to your child's teacher for more information.) Once a month the kitchen provides a celebratory snack. Summer birthdays are celebrated in June.**

## Q. Cell Phones

Friends Academy respects that families have differing views regarding their child and the possession and use of a cell phone. Cell phones can be distracting for a variety of reasons which is why cell phones, including Apple watches that function like cell phones, are not permitted to be used during the school day.  These items must be kept in the child's backpack or they will be collected by a teacher.  If necessary, the device may be collected by the Lower School Principal.  If a child brings a phone to school, FA is not responsible for the loss or damage of the phone.  Please refrain from texting or calling your child on his/her cell phone during the day.  Any necessary communication should be directed to the Lower School Administrative Assistant, Gail Lucidi, at extension 230.

## XVIII.   <u>Middle School Guidelines</u>

### A. Absence, Lateness and Early Dismissal

Please review the statement about attendance in the General Attendance Guidelines section as this applies to all Middle School students.  It is particularly important to be aware of what constitutes an excused absence or lateness to school. Unexcused absences due to extended family vacations outside of the regular school calendar may cause a student to miss important class discussions and assessments and ultimately may affect the student's semester grade. Parents need to recognize that late arrivals and early dismissals from school interrupt the student's routine and puts the student at risk for missing important class work, assessments, and announcements.

#### 1. Absence Reporting Procedure

Parents are expected to notify the Middle School Office by email (msattendance@fa.org) or phone (516-393-4239) by 8:30 am the reason for the absence. If parents do not contact the office, the school will call home to get a reason for absence by the end of the school day. Students who are absent from school are responsible for making up homework, quizzes, or tests that were missed. Students may check the school website or call a classmate for information regarding assignments. Upon returning to school, the student is expected to speak to each teacher to determine what needs to be made up and the time frame.  The school nurse must be contacted if the student will be absent due to illness for more than a few days and also call the Middle School office.  For extended illness, the office or advisor can assist in collecting any materials that would need to be sent home to assist the student.

#### 2.  Lateness Reporting Procedure

Students should arrive on time to school ready to participate in the school day.  A student arriving late to school must sign in at the Middle School office and receive a late pass to class. Unless the lateness is due to a late bus, the student should have a written note explaining the lateness or the parent must e mail the office with an explanation. A student who arrives late to school by car without a valid reason (note, email or phone call from parent) is considered unexcused.

#### 3.  Early Dismissal Procedure

Students who need to leave school before regular dismissal at 3:20 p.m. must bring a note or have their parents send an email to the Middle School office explaining the reason and noting the pick-up time. The parent must meet the student in the Middle School lobby and sign him/her out in the office.  Routine medical appointments should be arranged whenever possible for after school or on scheduled vacations. In all situations, permission for early dismissal due to sickness must be approved by the school nurse. If a parent must inform their child about an unanticipated early dismissal, communication must occur before 2 pm that day to insure the message regarding dismissal plans is communicated to the student.

#### 4.  Excessive and Unexcused Absences and Latenesses

As stated in the General Guidelines, absence for illness, a family emergency or for a religious observance is excused. Any missed work or assessments during this time can be made up without penalty.  If a student is going to be absent for other reasons, parents should inform the Principal prior to the absence. Students must speak to teachers in advance of an unexcused absence and make arrangements to make up work. Teachers should not be expected to prepare work packets in advance or provide extra help for missed work. The teachers will inform the student of any missed assessment during the absence and the student should expect to take it immediately upon return.

Patterns of lateness, absenteeism or early dismissal can result in an intervention by the school to correct the behavior. Student attendance is tracked through the Friends Academy database.  If a student is frequently late, absent, or removed from school early, whether excused or not, they will be identified by the student's advisor. The Middle School Principal will send a letter to the parents

alerting them of excessive absences  or latenesses to school. A conference may also be called with parents to better understand the situation from all points of view.

## B. Middle School Dress Code

The dress code reflects our respect for the traditions and mission of the school.  All clothing should be clean, comfortable, and appropriate.  Our Quaker mission asks that we honor the equality and dignity of every community member. As Quakers believe in leading lives of material simplicity and peace, we ask that community members please refrain from wearing either overtly expensive items (including clothing or jewelry drawing attention to expense, brand names, or slogans) or any clothing that symbolizes or advocates for violence in any form. We hope following the guidelines below and keeping dress code in perspective can help guide us in avoiding distraction from what is truly important.

### 1.  Daily Dress Code

**Acceptable Pants:** dress or casual dress pants, chinos, khakis, or colored denim (not blue).
> *Not acceptable:* Blue jeans, sweatpants, exercise or spandex pants, shorts, overalls, or leggings worn without a dress over them.

**Acceptable Shirts or Tops:** dress shirts with or without collars, polo shirts, rugby shirts, blouses, turtlenecks, and sweaters/sweater-vests. Shirts and tops can be long sleeve, short sleeve or sleeveless.  Solid or patterned designs are acceptable.  Shirts should also be of appropriate fit and length.   If desired, suit jackets and sport coats are also acceptable.
> *Not acceptable:* Tank tops, spaghetti-strapped tops, "cold shoulder cutouts", cropped tops, halter tops, t-shirts, plunging necklines, baggy shirts, and casual hooded or brand name sweatshirts.

**Acceptable dresses or skirts:** All items should be chosen with attention to the appropriate fit, length, and coverage to avoid exposing undergarments during their daily activities. Skirts and dresses may not be above the knee, without appropriate leggings worn underneath.  Crew neck or collared dresses are acceptable with long or short sleeves or sleeveless.
> *Not acceptable:* Mini-skirts, mini-dresses or dresses/skirts that have spaghetti-                strapped             tops, "cold shoulder cutouts", cropped tops, halter tops, or plunging neck                      lines that reveal undergarments.

**Acceptable footwear:** All walking shoes, sneakers, casual dress shoes, boots, and flats can be worn as footwear.
> *Not Acceptable:* High heels, sandals, flip-flops and slippers are not acceptable.                  (Snow or rain boots in inclement weather are fine).

**Headwear:** Hats and tops with hoods are not appropriate in school buildings, though head coverings required for religious purposes or to honor cultural tradition are allowed.

### 2.  Special Dress Code

**Special Event Dress** - 8th grade Moving Up Final Meeting for Worship in June -          faculty and students should wear formal apparel: jackets, ties, dress pants and dress                 shoes; semi-formal dresses or pant-suits and dress shoes.  For regular weekly meeting              for worship, jackets are optional.

**Warm-Weather Dress code** will be announced by Administrators, as needed. Typically, warm weather dress code is honored in September and May/June. Warm-weather guidelines include allowances for dress shorts of modest length (not cargo shorts) and short or long sleeve dress shirts or collared short-sleeve polo-style shirts. Athletic sneakers or sandals with backs are acceptable.

**Dress Down Days** are typically the first Friday of the month or as announced by    the Principal. In keeping with the core tenets of the dress code policy, students must keep in mind that simplicity and modesty must continue to inform choice in dress. All clothing choices should be clean, comfortable, and appropriate.
- **Acceptable clothing:** Leggings with a shirt that reaches at least to the top of the thigh, blue jeans, tee shirts (with acceptable language or message), sweatshirts, modest  length shorts(mid-thigh or longer).
- **Unacceptable clothing:** military style clothing, spandex, ripped clothing

**C.  Transportation**

Car pickup for Grade 6 is at 3:20 p.m. in front of the Middle School. Car pickup for Grades 7 and 8 is at 3:30 p.m. in front of the Middle School. Middle School students who have a Lower School sibling must report to the Lower School parking lot for pick up.

Parents are not permitted to pick up students on Duck Pond Road.

All buses leave from in front of the Dolan Center promptly at 3:35 p.m. every day.

Students who miss the bus must inform the Middle School teacher on duty and return directly to the Middle School office to contact the parent to arrange to be picked up at the Middle School. Students wishing to go home with another student on the district-provided bus must get permission from both families, the school and the bus driver, district or bus company. The school alone cannot give permission to ride another student's bus.**

*\*\*Most districts do not allow this.*

**D.  Supervision**

**1.  After School Guidelines**

The School takes the supervision and safety of each child as a primary responsibility in our work each day. Middle School students are supervised after 3:20pm by a teacher or coach only in organized after-school activities (i.e. extra help, athletics, clubs). Students are permitted to attend Upper School athletic events or do homework in the library without direct supervision; however, students who do so are expected to follow set protocols (see below) to ensure their whereabouts on campus is known and that there is clarity about when and how each student will go home. Students should not be on campus later than 5:30pm on a typical day.  If there is a special Middle School evening event, students who live a distance can sign up for "stay through" supervision (details below).

Any student staying to watch an athletic event, find a place to do homework, read, or quietly socialize in the library is required to use the sign-in board outside the Middle School principal's office, stating their location on campus, purpose, and pick-up time. The Library is open Mon-Thurs until 5:30 p.m., and until 4 p.m. on Friday.  Students planning to use the library must sign in again at the library's main desk by 3:45 p.m.  Upon arrival, students should settle down to work and stay in the building until they are ready to leave campus, whether being picked up by a parent or walking to the bus area. All school guidelines and rules regarding student behavior remain in effect.  Students are expected to communicate their after-school plans with a parent before leaving home in the morning.  Students are never permitted to leave campus unsupervised after school.  Students who do not comply with this policy will receive a disciplinary consequence.

Late buses begin arriving at approximately 5:00 p.m. It is the responsibility of the parent to ensure that their district provides late bus pick-up service. Students taking the late bus should report to the Dolan Center.  A Friends Academy teacher supervises late bus pick-up at the Dolan Center. Students who are being picked up by car may wait either in the Dolan Center or in the lobby of Frost Hall. Both locations have an adult supervisor present. **Students must be picked up no later\* than 5:30 p.m. from these locations or if pick-up is later than 5:30, should head to Frost Hall lobby. If for any reason a student cannot be picked up by 6:00 p.m., the parents must contact the Middle School Principal.**

(\*Occasionally students have late theater rehearsals or athletic games that extend beyond this time. Parents will be informed by the supervising teacher/coach.)

**2.  Stay-Through**

On several occasions throughout the school year, "stay-through supervision" will be provided for students who live a significant distance from Friends or who participate in another school-sponsored activity prior to an evening event. Students are informed during Monday morning assembly about a potential stay-through evening (i.e. music concert, theater performance, sports night). A Middle School teacher is assigned to supervise stay-through students and order pizza for dinner. (Students who cannot eat pizza are expected to bring their own dinner from home.)

They are to adhere to the following procedure:

- The parent must email Marian Tobia (marian_tobia@fa.org) and let her know the student intends to stay-through.
- Students must sign up on the GoogleDoc sent by the principal in advance of the stay-through.
- Students must report to the stay-through teachers on the day at 3:30 p.m. for attendance and instructions.

Students are expected to abide by these rules. If a student is found on-campus during a stay-through evening without permission from home, parents will be contacted immediately.  Students who live close to the school are encouraged to invite a friend who lives a distance from the school to their home on these occasions.  Arrangements to do this must occur prior to the  stay-through evening, and the student's parents must be informed of the plans. Students are not permitted to leave campus during stay-through. If there needs to be a change in the arrangements, the parent must contact the Principal.

**E.  Lunch**

All students have a choice of hot lunch, sandwiches, salad bar, soup and assorted side offerings in the dining Commons. The dining Commons is also open before school for students wishing to buy a snack or breakfast before classes begin. Occasionally,

students will go off campus for lunch with their advisory group. Parents will receive notification of this and will be asked to sign a permission slip. Students are not permitted to purchase snacks at times other than those designated.

**F.  Academic Program**

The Middle School program has been carefully constructed to provide a curriculum that meets the needs of the rapid physical, intellectual, social and emotional growth of early adolescence. The school community is built on trust and mutual respect. Each grade level in the Middle School is guided by a team of teachers who work together to provide a stable and supportive atmosphere. The academic program emphasizes the development of good organizational and study skills, a respect for diverse learning styles, experience in cooperative learning, and the acquisition of interdisciplinary skills. Most importantly, students are encouraged to wonder and take academic risks in a safe nurturing environment.

**1.  Homework**

In addition to the statements about homework in the General Guidelines section (IX), please note that in Middle School students should expect approximately 60 minutes of homework in grade 6, 70 minutes in grade 7 and 80 minutes in grade 8.  This time frame does not include independent reading. The purpose of homework is to provide students with an opportunity to practice newly-acquired skills, to prepare students for a subsequent class meeting, and to extend student learning beyond the classroom through individual and creative endeavors. Parents should help establish a routine and make certain there is a quiet, well-lit place for students to study.  Parents may help students get started by reading directions together or discussing a writing assignment but should avoid becoming too involved. Students need to learn to work independently, to "self-start" and, at times, to work through material slowly and with considerable effort. Parents who are concerned about a student should write the teacher a note or make an appointment to pursue solutions.

Homework should be directly related to the classroom instruction and consist of clear, purposeful, and engaging activities that are age appropriate.  Homework assignments will be evaluated or reviewed in class so students receive feedback on their work. Homework is posted each day on the student/parent portal. Students are also expected to use their planbooks as this provides them the practice needed to enter daily and long range homework assignments, upcoming tests, and other obligations such as athletic or theater rehearsals or other after school commitments. Some long-range projects may be assigned that have as part of their goal the development of planning, foresight, and time management. These projects should be done over time rather than in a frantic push the night before. Independent reading is seen as a long-term assignment.

Homework for weekends and vacations should be the equivalent of one night's homework. Students should not be assigned projects, papers or lengthy assignments just before the vacation to be due the day or two after the vacation. Students are encouraged to use vacation time to read.

**2.  Extra Help**

Extra help is available to all Middle School students, either by groups or individually, and is considered an invaluable way for students to formulate questions and develop their skills in determining what they do or do not understand. Generally, group help is offered during and after school. Each grade level has group help built into its weekly schedule. Students desiring individual extra help must arrange a time with their teacher before or after school. Through these sessions, teachers will better understand their student's specific strengths and areas needing support.

**3. Grade Reports to Families**

Unofficial mid-semester grades (not recorded on final transcripts) and brief comments for each course are posted in MyBackPack in November and March. Final semester grades are posted in MyBackPack at the end of January and in June along with course comments for students receiving a grade lower than a C." Advisors work with their advisees to set goals, review grades and comments and revise goals as needed. Parents are asked to have conversations with their child about their progress. In mid-November, after receipt of mid-semester grades and comments, all parents are invited to meet with their child's advisor to discuss academic, social, and behavioral goals and progress to date.

After mid first semester, end of first semester and after mid second semester, Middle School advisors discuss their advisees' academic, social, and behavioral growth.  Together, the team of teachers determines if the student is not progressing at the expected level. The advisor will invite the parents in to meet with the teachers and the principal to discuss the specific concerns and plan a course of action going forward to support the child. The advisor will continue to communicate with the parents regarding the child's progress associated with the plan.

**4. Grading**

Students beginning in Grade 6 receive grades on their quizzes, tests, projects, and on the report card.

QUANTITATIVE AND QUALITATIVE DEFINITION OF GRADES

A+   (97-100%)       Performance demonstrating excellent understanding                    A               (93-96%)
and application of concepts, high skill level, thorough

A-   (90-92%)                             assimilation of detail, originality of thought, and keen insight
into the subject.

B+   (87-89%)                    Performance demonstrating good understanding and application        B           (83-
86%) of concepts, good acquisition of skills, accurate application of           B-          (80-82%)            details,
and some original insight into the subject.

C+   (77-79%)                    Performance demonstrating basic understanding of the           C           (73-
76%) fundamental concepts of the subject and a consistent attempt          C-          (70-72%)            to apply
the details and skills taught.  In spite of occasional
                             conceptual misunderstanding,  or flawed or incomplete
                             knowledge, the performance indicates
                             satisfactory preparation to advance to the next level.

D   (65-69%)                         Performance demonstrating minimal understanding of the
                             fundamental concepts and a partial acquisition of the details and
skills taught.

F   (below 65%)     Performance that fails to demonstrate understanding of the
                             fundamental concepts of the subject and/or performance that
indicates pronounced lack of knowledge or skill.  Achievement is
                             inadequate to allow the student to advance to the next level.

INC   An "INCOMPLETE" will be given when the missing work in question                        is deemed by the teacher
to be an essential component in the term or                         course. (See below)

P   Indicates a "passing" or "having participated" grade.

### Guidelines on Incompletes

An "Incomplete" will be given when the missing work in question is deemed by the teacher to be an essential component in the course.  In the case of extenuating circumstances (extended illness, family emergency, etc.), the teacher and student, in consultation with the Middle School Principal, will determine the deadline for completing the work. No penalty in grading would be applied in this case.  If a student has not turned in work and it is determined that there were no extenuating circumstances, the student is expected to complete the work within one week of the end of the grading period. A penalty in grading may be applied. An Incomplete will remain on the transcript until the work is turned in. Once the work is turned in, the teacher will calculate the grade for the course and the Incomplete will be changed.

### Failure of a course

If a student receives a failing grade at the end of the year in a course, that student must either attend summer school or receive an approved number of hours of tutoring in that subject area.

### Academic Warning

Students who receive poor or failing grades (C- or below) at the end of the semester in two or more courses may be placed on academic warning. Students who pass all their courses but maintain a consistent profile of performance below grade level or who have demonstrated over time consistent problems getting work turned in on time may also be put on academic warning. Placing a student on "academic warning" is an indication that the school is intending to develop a plan of action in discussion with the parents to support the student. After a period of time if the student demonstrates consistent improvement then he or she will be taken off academic warning. However, if the student does not modify their academic performance, enrollment may be withheld until the end of the year when final grades are released.  When a student is placed on academic warning, the Middle School Principal will provide timely written communication to parents.

### Referral process for academic concerns

Upon identifying a student with an academic concern, the team of teachers may institute a number of support systems to try and provide the structure and routine necessary for a successful Middle School experience. The parents are invited in to discuss a suggested preliminary intervention action plan.

If the concern is not addressed after instituting the preliminary plan, the team, in cooperation with the learning specialist, school psychologist and principal may increase the measures of support within the school.  This may include: mandated  attendance at extra help, participation in the after school homework program, classroom accommodations, weekly parent feedback or a student contract.

Following the first two steps, if the student continues to struggle, the team of teachers, in cooperation with parents, learning specialist, school psychologist and school principal may institute a more formally scheduled plan of support.  This may include:

scheduled times to meet with the school learning specialist, in house testing accommodations, the initiation of informal or private screenings to inform areas of support.

After the steps listed above have been adequately explored and the student continues to struggle, the plan of action moving forward would involve formalized evaluation of the student which might include the involvement of the local school district to provide support services or accommodations. The school psychologist, learning specialist and/or principal would meet with parents to explain the evaluation process.

### Communication

Open communication regarding student academic progress is encouraged between classroom teachers, advisors, students, and parents.  A teacher or an advisor may email or call parents to inform them of any concerns and parents are also encouraged to communicate with the classroom teacher or advisor if there are any questions or concerns.  Email is the preferred form of initial communication with a teacher. Email should be used to elicit responses to brief questions.  Should the question be more substantive regarding student academic or social matters, the email should be used to establish a mutually convenient time for parent and teacher to speak by phone. All communication, either via email or by phone, should reflect the FA fundamental standard of kindness and respect.

For matters large and small, the proper channel to raise a concern or ask a question is to go to the most direct level first, that is, to the teacher, advisor, or coach most closely related to the issue and capable of addressing it. If not satisfied at that juncture, a parent should seek out the next level (division head, or other administrator). Faculty will make every effort to respond to emails or calls within a reasonable amount of time unless unavoidable circumstances make timely replies impossible; for example, calls that immediately precede a weekend, school holiday, or teacher absences.

## G. Student Support Services
### 1. Advising

All students are assigned an advisor who provides basic guidance and advice on academic and social issues. During the school year, the advisors check on their advisees' progress and make contact with parents when an issue arises or a conference is needed. As advocates for their advisees, the advisors work in partnership with the parents to resolve difficulties that a student may encounter and to celebrate each advisee's positive growth and achievement. The team of advisors meets regularly to review advisee progress. Advisors meet with their group of 10 to 12 advisees every morning at 8:05 a.m., in the afternoon before bus dismissal, and during a regularly scheduled period each week. Individual advisor/advisee meetings are scheduled on an as-needed basis.

For very specific academic concerns, the advisor may encourage the parent to speak directly with the teacher or arrange for the parent to meet with the teacher(s) to develop a plan of action to support the student. Along with the advisor and team of teachers, the school psychologist, the learning specialist, and school Principal provide academic and social emotional advising support for students and families. *(Please refer to all-school guidelines, section VI.)*

### 2. ACES (Academic Coaching for Educational Success)

Additional learning support services are provided to students through the ACES program. (Please read carefully the section VI on"Student Support Services" to understand the goals of the program.) In the Middle School, students who have demonstrated need, (through the referral process outlined in the previous section), but do not necessarily qualify for support through their local school district, can be scheduled to work with the learning specialist. The Middle School also supports a supervised after school "Homework Club" on Monday- Thursday. Students who struggle to complete homework and also demonstrate weak executive functioning skills are referred to the Homework Club by the team as a form of academic support.

### 3. Computer Use at Home

Students in grades 6, 7 and 8 will be issued a school-purchased Chromebook for educational use. This device will be assigned to the students at the beginning of the year, and returned at its conclusion. Students are expected to bring their Chromebook to school every day fully charged and ready for classroom use.  Parents are responsible for providing a wireless internet signal for home use and are responsible for loss or excessive damage to the device.  In addition to the Chromebooks, the MS maintains its own computer lab which is available to students throughout the day. In all situations, students are responsible for adhering to the Friends Academy technology use guidelines. *(Refer to the Friends Academy Guidelines on Academic Honesty, Appendix A and Guidelines on Technology Use, Appendix D.)*

### 4. Cell Phone Use at School

During the school day, from 7:45 a.m. – 3:20 p.m., we expect Middle School students to be focused on the challenges of their classes and activities. We therefore do not allow use of cell phones during the academic day. Upon arrival at school, students are expected to silence their cell phones and place them in their backpacks/book bags, or other teacher-designated location. If a parent needs to communicate an essential message to a student during the academic day, he or she should contact the Middle School office by email (marian_tobia@fa.org) or by phone (516-393-4239) not later than 1:00 p.m. **Parents are asked to refrain from texting messages to their children during the school day.** It is highly recommended that the parent and student discuss after school and/or pick-up arrangements in the morning before arriving at school as it is difficult to deliver messages to students when they have left the Middle School building and are in the theater or the gym at the end of the school day. School phones are available

to our students for necessary communication and may be used with adult permission. If a student is found using their phone during the day, it is confiscated and given to the principal and may be picked up at end of day and the student will receive a disciplinary consequence.

## H.  Standardized Testing

The Educational Records Bureau (ERB) CTP V assessment is given to all students in Grades 6 through 8 in the spring. The results of these tests are mailed home and, if desired, parents may request a follow up discussion with the Principal.

## I.  Behavioral Expectations

We assume that students intend to do their best in all areas of school life. Students and their parents are expected to willingly support and adhere to the philosophy, mission, and Fundamental Standards (See Section V)  of the school and to the school's standards of behavior and citizenship. Students are supported in understanding the norms of the community through the advising program, advisor and teacher interactions, interventions, and conversations.

Our discipline system is intended to help students understand how their choices can impact others and our community.  The goal is learning and growth. Through discussion, the advisor or teacher helps the child identify their mistake, understand the harm that poor decisions create and examine how they can make reparations through reflection, conversation, and serving an appropriate, logical and timely consequence to allow for learning. Parents are an essential partner in all disciplinary matters.

Friends Academy will consider *intent, context, impact, relationships, and pathways forward* when determining fair and equitable consequences with the purpose to evoke learning, growth, and better future decision-making.  A student's age, overall record, truthfulness, and general attitude will also affect the school's response to any disciplinary situation. Additionally, the willingness of the student and his or her family to abide by the consequences set by the school will contribute to the school's assessment of whether the student may remain at Friends Academy.  A student who violates a Fundamental Standard must be sure to maintain his or her good standing at Friends Academy thereafter. The school will continue to review the student's overall disciplinary record in determining whether continued enrollment is appropriate. In all cases, the school reserves the right to assess the seriousness or impropriety of any behavior and determine the appropriate disciplinary response.

**1.  Minor Offenses** are generally handled by a student's advisor and/ or the Student Life grade level Dean by implementing logical and timely consequences following a conversation to understand a student's intention and self-awareness.  Minor offenses are tracked by the Student Life Dean and reviewed throughout the year. Emerging patterns may call for a round table or other type of comprehensive support.  Students who do not respond to interventions put themselves at risk for more serious consequences, including disciplinary status, which can put their placement at Friends Academy at risk.

**2.  Major Offenses** include those in which a student violates a Fundamental Standard of the school, particularly related to integrity and empathy (See Section V).  Failure to abide by the Fundamental Standards including, but not limited to, bullying or cyberbullying, lack of respect for peers, teachers*, or property, disrespectful or derogatory language, repeated disruptive behavior, dishonesty, cheating, plagiarism, stealing, fighting, vandalism, use of weapons, drugs, alcohol, smoking or vaping will result in immediate communication between the student, advisor, the Principal, and parents.  Depending on the circumstances and the offense, the concern may be referred to the appropriate grade-level team of teachers to determine consequences or reviewed by a Council composed of the Principal, the Directors of Academic and Student Affairs, Director of Counseling to recommend consequences. Consequences may include a change to Disciplinary Status, a Day of Reflection (In or Out of School), Suspension, Dismissal or other response deemed appropriate. In all disciplinary recommendations pertaining to major offenses, the Director of Students Affairs and Head of School review the recommendations and approve or modify as needed.

*In all cases involving drugs, vaping, alcohol, or weapons, the school reserves the right to require that the student submit to professional evaluation to determine whether treatment or participation in an abuse assistance and awareness program is necessary. Such evaluation will come from a certified professional approved by the school. The Director of Student Affairs and the Head of School along with the Principal review the case, findings, and determine follow up disciplinary action.*

Examples of Consequences:
- Teacher-student conference
- Round Table discussion
- In-class disciplinary action including removal from class
- Parent/Advisory contact
- Counselor-student conference
- Loss of community lunchtime/ recess privileges
- In-school Day of Reflection/ Suspension
- Out of school Suspension***
- Removal from Class Trips
- Disciplinary Warning* or Probation** (in accord with a disciplinary action plan)
- Expulsion***

\*Disciplinary Warning: A student would be placed on disciplinary warning, and parents notified in writing, for disregard of community norms, either through an egregious act or through an established low level pattern of behavior.  Disciplinary Warning is seen as both a motivation to improve behavior and a possible indication that a student's status at the School may be in jeopardy.

\*\*Disciplinary Probation: A student would be placed on disciplinary probation when, in the opinion of the Student Life Team, s/he has not met the minimum behavioral requirements expected of them through the FA "Fundamental Standards." Disciplinary probation is seen as both a motivation to improve behavior and a clear indication that a student's status at the School is in jeopardy.

\*\*\*Suspension and Expulsion: Separation from the FA Community, either temporarily or permanently, occurs when a student's decision(s) has created a single pathway forward, whereby the student and the community benefits from separation.  The Director of Student Affairs, after consultation with the relevant student life team members and Principal, will make a recommendation to the Head of School, who will ultimately make a decision in these cases.

Please refer to the Appendices at the end of the Handbook to review guidelines for the following:

A – Academic Honesty

B – Hazing,Bullying and Harassment

C – Derogatory and Offensive Use of Language

D – Appropriate Use of Technology (including Social Media)

**3.  Dress Code Expectations**

The advisors check for dress code compliance each morning so that dress code infractions can be addressed immediately. If a student is "out of code," the advisor gives the student a warning for the first offense and the student is asked to correct the problem, and the advisor may call home inform a parent. Continued violations can result in parent communication and change in disciplinary status.

**J.  School Trips**

Outdoor Education, the community service program, and special cultural events involves trips to locations off-campus. Whenever students leave campus, whether for a few hours or for a three day Outdoor Education experience, parents are asked to sign a permission slip which will include the date(s), times of departure and return, destination, and purpose of the excursion. If a student forgets to return the permission slip by the day of the trip, the student will remain at school.

The required 6th, 7th and 8th grade trips provide an academic and social experience in an outdoor education environment. These trips also provide an opportunity for the many new entering students to meet new friends and transition socially to their class. Parents are invited to attend an orientation for each trip to learn about the program, supervision, and all related trip details. Annual trips to well established YMCA camps include the Grade 6 fall trip to Ashoken, the Grade 7 fall trip to Greenkill, and the Grade 8 winter trip to Frost Valley. These trips are part of the school's academic program and all students are expected to attend. If there are any concerns or questions, the parent should contact the advisor or principal.

**XIX.  Upper School Guidelines**

**A.  Daily attendance and absences**

The school day begins at 8:05 a.m. and ends at 3:10 p.m. Students missing all or part of the day must follow school procedures for absence or leaving school early. Leaving school early without permission is a violation of school rules and will result in disciplinary consequences. All students are expected to arrive promptly at 7:55 a.m. and to meet all scheduled appointments. Students are issued key cards and must swipe them at morning meeting or when they arrive to signify they are on campus.  Class meetings or science labs begin promptly at 8:05 a.m. and all students are required to attend.  Our system (using access cards to identify if a student is present or leaving) allows us to alert students and families when a student has not checked in using the access card.

**1.  Lateness**

Students "tap in" with their access cards to register their attendance at 8:05 a.m. in designated locations as soon as they arrive -- at class meetings, advisories, morning science labs etc. Should students tap in after 8:05 a.m., they are technically late and a conversation will ensue.  After 8:15 a.m. students will need to check in with the Upper School administrative assistant in the Upper School Office (room 302) before going to class.

**2.  Absences and Early Departure**

If a student is absent, a parent is expected to email usattendance@fa.org or call 516-393-4296 no later than 8:30 a.m. Parent(s) should report their name, their child's name and grade, and the specific reason for the absence, tardiness, or (if leaving early) an early dismissal.

In keeping with the principles of the school, we would expect direct and honest communication from the parent. Students who are absent from school must submit a written excuse (either a note or an email), signed by a parent/legal guardian, within three days of the student's return to school or their school attendance record will permanently reflect an unexcused absence after this time. (The excuse should indicate the reason for and the date(s) of the absence. Please also note that phone calls to the school

notifying staff of a student's absence that day do NOT replace the need for a written note when the child returns.) If the prolonged absence is for medical reasons, parents will also need to send a medical note to the school Nurse, Frances Dawes (frances_dawes@fa.org).

**3.   Class Attendance**

Class attendance is essential for any course. The Grade Level Dean of Students will send a letter to the parents alerting them of excessive absences from school and/or a course. A conference may also be called with parents, student, advisor, and teacher(s) to better understand the situation from all points of view.

**4. Denial of Course Credit**

Students may not be awarded course credit in a class if they miss more than twenty percent of class time due to excused or unexcused absences, tardiness, or early departures. Class attendance is taken on a period-by-period basis. The student and parents will receive a written warning notification from the principal prior to reaching the twenty percent.

## B.   Upper School Dress Code

The dress code reflects our respect for the traditions and mission of the school.  All clothing should be clean, comfortable, and appropriate.  Our Quaker mission asks that we honor the equality and dignity of every community member. As Quakers believe in leading lives of material simplicity and peace, we ask that community members please refrain from wearing either overtly expensive items (including clothing or jewelry drawing attention to expense, brand names, or slogans) or any clothing that symbolizes or advocates for violence in any form. We hope following the guidelines below and keeping dress code in perspective can help guide us in avoiding distraction from what is truly important.

**Standard Dress Code during regular school hours:**

Boys should wear ties with collared dress shirts, suitable pants with a belt and casual shoes; girls should dress in a comparably neat and presentable way, with each student following the guidelines below:

**1.   Daily Dress Code**

**Acceptable Pants:** Dress or casual dress pants, chinos, khakis, or colored denim (not blue).

*Not acceptable:* Blue jeans, sweatpants, exercise pants, shorts, overalls, or pants that are frayed or ripped; **Special Note:** Spandex pants or leggings must only be worn under a dress or skirt.

**Acceptable Shirts or Tops:** Dress shirts with or without collars, blouses and tunics, sweaters/sweater-vests, and turtlenecks. If desired, suit jackets and sport coats are also acceptable.

*Not acceptable:* Polo shirts, tank tops, spaghetti-strapped tops, cropped tops, halter tops, T-shirts, sweatshirts, rugby shirts, or tops with plunging necklines that reveal Undergarments.

**Acceptable dresses or skirts:** All items should be chosen with attention to the appropriate fit, length, and coverage to avoid exposing undergarments during their daily activities. Skirts and dresses should not be above the knee, without appropriate leggings worn underneath.

*Not acceptable:* Mini-skirts, mini-dresses, or spaghetti-strapped or cropped tops with plunging necklines that reveal undergarments.

**Acceptable footwear:** All walking shoes, casual dress shoes, boots, and flats can be worn as footwear.

*Not Acceptable:* Sneakers or running shoes with logos are not acceptable. High heels, flip-flops and slippers are not acceptable and are also not safe.  (Snow or rain boots in inclement weather are fine).

**Headwear:** Hats and tops with hoods are not appropriate in school buildings, though head coverings required for religious purposes or to honor cultural traditions are allowed.

**2.   Special Dress Codes**

**Special Event Dress** - days (ie: Fourth Day honors ceremony), announced in advance, when faculty and students should wear formal apparel: jackets, ties, dress pants and dress shoes; semi-formal dresses or pant-suits and dress shoes.  For regular weekly Meeting for Worship, jackets are optional.

**Warm-Weather Dress code** goes into effect when high heat and humidity arrive. Administrators will announce these days in advance.  Warm-weather guidelines include allowances for shorts of modest length (not cargo shorts) and short or long sleeve dress shirts or collared short-sleeve polo-style shirts, with ties and jackets optional.

**Dress Down Days** All clothing choices should be clean, comfortable, and appropriate.

**Minor Dress Code Infractions**

In cases when a student is found with a minor dress code violation (i:e: untucked shirts or dress that is too short) the student will be asked by adults to "fix" whatever is wrong. Violations will be tracked through Grade Level Deans and written warnings will be issued to the student.

**Major Dress Code Violation**

Friends Academy views adherence to dress code as part of our community obligations, teaching students the importance of being respectful and responsible to rules and expectations. A student who chooses to attend school wearing clothing listed on our "not permitted" list is considered "out of code" and may result in a written warning to student  (cc:d parents), inability to attend classes, and a change in disciplinary status.

- Students who are not in dress code in a given week will also lose the privilege to be in dress down attire for special occasions.

## C.  Transportation

Students who have a sibling attending Friends Academy should be dropped off and picked up at the location designated for the youngest sibling. Car drop off or pick up is never permitted in front of the Dolan Center. This is reserved for buses only.

Students who participate in after school activities must arrange for late bus pick up directly with their district transportation office. A teacher is on duty to supervise late pick up. The teacher in the Dolan Center will remain on duty until the late late bus arrives. After this time, there is no supervision. Students who do not use late bus service are expected to be picked up no later than 5:30 p.m. **Students are not permitted to leave campus without permission until after their last activity of the day.**

## D. Automobiles on Campus and Senior privileges

Seniors at Friends Academy are expected to demonstrate maturity and responsibility. Therefore we trust our students and recognize their ability by abide to the school rules, Friends Academy will allow students, under certain conditions, to drive to and from school, park on campus, and walk off campus for lunch as part of our Senior Conditional Privilege Program. These two privileges apply only to senior students  who qualify (see criteria below). One of these conditions is parental consent; we urge your careful consideration of the matter and that you review the school's expectations and conditions with your child. Only those students who have a signed permission slip on file will be allowed to drive to school and/or walk off campus to lunch. Parents may consent to both driving and off campus lunch, or to just one of these privileges, or not give consent to either. All of the school's fundamental rules for behavior apply to senior privileges.

**About Driving**

It is important for seniors and their parents to know that driving privileges are for driving to and from school only. While the school discourages parents from making doctor's appointments during the school day we accept that there may be circumstances that make that difficult. Therefore, your son or daughter must follow the school's protocol for leaving campus with permission. It is imperative for your child's safety that we are able to account for our students throughout the day.  We also ask that allowed appointments not extend into an off campus lunch excursion.  Conditional Privileges can and will be rescinded for students who violate school rules, protocols, or expectations. Therefore we strongly recommend parents develop a transportation plan in the event that your child's privilege is suspended or rescinded.

### 1.  Protocols for Leaving Campus During the School Day

Seniors must sign out to leave campus during the day. Seniors will sign-out in the attendance office if they have an allowed appointment or are walking off campus for lunch or through the Nurse's office if they are not feeling well.

- **Illness** – students **must** see the nurse for evaluation before leaving campus. If the                school nurse in consultation with a parent feels it would be best for the child to go                 home the nurse will notify the attendance office and send the child home

- **Permitted Appointments** – (medical appointment, DMV, funeral, college visit) –                 parent must call the attendance office prior to student leaving and upon their return                 the student **must submit documentation to** attendance office; otherwise absence                 will be considered unexcused and will result in a lunch detention.

### 2.  Driving and Parking on Campus

**Criteria for requesting driving permission**

In order for students to receive permission to drive and park a car on campus they MUST be seventeen years old and hold a valid New York State Driver's License (Class D) and have completed a **mandatory defensive driving course**. The defensive driving course must be DMV approved and a copy of the certificate of completion must be sent in along with the senior driving permission form before the opening of school. Students are not permitted to drive to school until they receive written permission through email. **Students who drive to school without proper permission or violate any of our driving rules will have their driving privileges rescinded.**

All student drivers must be covered by insurance. Students are not permitted to drive to Friends Academy with a junior license.

**3. School Parking Lots**

School Parking Lots are not security gated and we do not post a supervisor during the school day. Faculty and staff at times circulate through parking areas but only as part of their daily routines. While they are instructed to report behaviors or concerns to their building administrators we cannot assume cars are totally safe from vandalism or theft. We strongly suggest that students do not bring to school or keep in their cars large sums of money or expensive or highly personal items.

Seniors must park in designated parking lots and assigned spaces only, regardless of weather conditions or arrival time.
- Students are not permitted to go to the parking lots or their cars during the school          day without permission from the Principal, Dean of Students or their Class Dean.
  - The school does not monitor or supervise the use of cars during the school day.

**4. Driving Rules**

Senior status extends the privilege to drive and park at school but also carries with it a serious level of responsibility. We feel that our seniors, because of their age and experience, should be ready to accept this privilege. The school trusts that students will represent the school, their families and themselves well whenever they are using their cars on or off campus. **Violation of any of these driving rules or expectations will result in the immediate loss of privileges for one week.**

- Student drivers may only drive with one passenger in their car on campus at all          times including evening and weekend Friends Academy events. Parents may submit                   written request for additional passengers.

- A senior reported driving recklessly on or off campus.
  - o Using a Cell Phone – driving and using a cell phone to receive, make calls, with          out a hands-free device or texting is both a violation of our rules and against the                   law.
  - o Exceeding the speed limit of **3-5 mph** in all school parking lots.
  - o Ignoring directional markings or traffic signs on campus.

- **Track Parking Lot – Important Safety Rule: given the increased traffic during          Middle School after school pick up time, we do not open the parking lot gate          until 3:30.**
- Seniors may not use cars to go off campus during the day or for lunch. We ask that          students not extend an allowed appointment during the day to include a stop for          lunch.
- Seniors are not to exceed 10 unexcused latenesses to school.
- **Parents or students who choose not to sign driving permission forms must provide their children with another means of transportation to get to and from school.**

**5. Walking Off Campus to Lunch**

The senior "walking" off campus lunch privilege carries with it a serious level of responsibility, but we feel that our seniors, because of their age and experience, should be ready to accept this responsibility. The school trusts that our students will represent the school, their families and themselves well while they are off campus. Seniors are strongly encouraged to be accompanied by at least one other senior. **Violation of expectations or rules will result in the immediate loss of lunch privileges for one week.**

**Expectations:**
- Senior must be in good academic and citizenship standing.
  - o A senior with two grades of C- or below or two or more detentions will not          be granted the privilege.
- Seniors must enter and Exit ONLY from MAIN ENTRANCE.

**Rules:**
- Seniors may not leave campus before 11:45am.
- Seniors must arrive back on campus by 1:40pm.
- Seniors must have a free block before or after the lunch block in order to walk to          lunch.
- **Seniors may only walk into Locust Valley.**
- Seniors are allowed to walk to lunch only.  Students are not to use or get into a car
  (friends' car, parents' car, taxi, etc.), for any reason

- Students must manage their lunch time allotment well and not be late to class due      to lunch privilege
- Seniors cannot walk to their own home or a friend's house

### 6.  Loss of Senior Privileges
Parents and Students accept senior conditional privileges with the understanding that violation of rules, guidelines, protocols or expectations will result in loss of privileges. Response to the violation will depend on the level of seriousness and could include restorative conference, detention, days of reflection, change in disciplinary status or in the most serious cases a student meeting with the school's Judicial Council.  The12th Grade Class Dean will notify parents whenever driving privileges are rescinded or suspended.

- **A Student who loses privileges will not have their privileges reinstated until they have scheduled and met with the Assistant Class Dean and Class Dean.**
- A Student who loses privileges for more than one week can request reinstatement after the second week by having their parent/s email the Class Dean a written request to have their status reviewed. The process to restore senior privileges will include a student conference with the Director of Student Affairs, Class Dean, and Advisor. Prior to the conference the Class Dean will email faculty requesting academic and behavioral endorsement from the student's teachers and the 12th grade advising team.

## E. Juniors Driving During ISP
Juniors are not permitted to drive to school. If a student or family has an extenuating circumstance they may submit a request to the Class Dean for review. The Class Dean will meet with the student and review the school rules and criteria for granting this privilege and make a recommendation based on student's citizenship and academic record. A student who has received a Day of Reflection or suspension will not be granted privilege or have it rescinded if they have already been granted driving privileges. Junior Drivers must adhere to all driving rules as stated under Driving and Parking on Campus. Juniors may not use cars to leave campus during the school day unless leaving school early through the Nurse's office.

When seniors begin off campus Independent Service Projects, we do extend driving privileges (driving to and from school only) to juniors who are legally licensed (Class D) and in good academic and citizenship standing. Students can request driving privileges from the Class Dean. The Class Dean will review each request with the 11th grade advising team and make a recommendation based on student's citizenship and academic record. A student who in their junior year has accumulated two detentions or earned a Day of Reflection or suspension will not be granted driving privileges. Junior Drivers must adhere to all driving rules as stated under Driving and Parking on Campus. Juniors may not use cars to leave campus during the school day unless leaving school early through the Nurse's office.

## F.  Lunch
All students have a choice of hot lunch, sandwiches, salad bar, soup and assorted side offerings in the dining Commons. The dining Commons is also open before school for students wishing to buy a snack or breakfast before classes begin.

## G.  Academic Concerns
### 1.  Graduation Requirements
Upper School students are expected to carry five courses. A student may take six courses if they have previously applied and been approved by their course counselor and in rare circumstances they can take four courses with specific approval of the Principal.

We expect students to complete all course work successfully.  In the case of ninth, tenth, and eleventh graders, failure to do so may lead to placing the student on "academic warning" (see section 4)  or dismissal from Friends Academy.  In the case of seniors, failure to complete all course work successfully may delay or prevent the awarding of the diploma. The Independent Service Project may also be canceled or delayed. It has been customary that a student failing more than one major academic course not be re-enrolled for the following year.

Minimum requirements for a diploma are the completion of sixteen full-credit courses plus designated courses in religion, health, physical education, community service, outdoor education, and the arts.

Students who leave at the end of their junior year to attend an accredited college may receive a diploma from Friends Academy upon presenting evidence of the successful completion of their first year in college, including a full year's course in English.

**Minimum Requirements for Graduation:**
- **English (four years):** English 9; English 10; American Studies in grade 11;
  and two semesters of English in grade 12.

- **History and Social Studies (three years):** World History courses in both grades      9 and 10; American History or AP American History in grade 11. Electives are
  offered to seniors. Four years are recommended.

- **Mathematics (three years):** Algebra, Geometry and Algebra2/Trigonometry are

required. For seniors not taking another math course, College Algebra is recommended. Four years are recommended.

- **Science (three years):** Three years of sciences are required. It is expected that students complete Biology, Chemistry, and Physics. Four years are recommended.

- **World Languages and Cultures:** Three consecutive years of one world language is required. Four or more years of one language are recommended.

- **Arts:** One full credit of courses in the arts is required. Two or more years are Recommended.

- **Technology:** All students are required to take either one Computer Science course OR one Digital Arts course.

- **Physical Education (four years):** All students are required to take the Physical Education classes unless they are playing on an interscholastic team. All dance classes count toward Physical Education credit.

- **Health (two semesters):** Health courses in grades 9 and 11 are required.

- **Quakerism Practice Core (a semester in each of the following):**
  Quakerism in grade 9,  Service Learning in grade 10, and Senior Reflections in grade 12 are required courses. The following commitments are also required of all students:
    o **YSOP:** As part of the culminating experience for the grade 10 course, 10th graders take part in an overnight service experience in Manhattan.  If a student misses the trip in 10th grade, he/she must make it up in 11th grade.
    o **Work Program:** Every student is expected to take part in the daily work program on campus, cleaning classrooms and common areas.
    o **Weekly Quaker Meeting for Worship:** "The most important appointment of the week," all students are expected to attend Meeting for Worship on Thursday.
    o **Service Learning:** At all grade levels, students are expected to do volunteer work at local agencies.

**Independent Service Project (ISP)**
   The Independent Service Project (ISP) is a graduation requirement, designed to offer seniors the opportunity to do something personally meaningful and at the same time offer service to others through the Quaker testimonies of integrity, modesty, simplicity, and equality.

   Each student proposes a project of service, to be completed in the second half of May and early June. Students should anticipate a project that requires 25 hours of service a week for three weeks. It is important that students find a willing supervisor to oversee their efforts during the project, someone who will evaluate a student's contributions at the end of the ISP. In early June, students present their ISP projects to the senior advising team, faculty members, and their fellow students. **The awarding of a diploma will be delayed for a senior who has not completed this requirement prior to graduation.**

**Overnight Experiences**

   **Outdoor Education Trip:** This required ninth grade trip provides a social experience in an outdoor education environment. Students participate in outdoor activities on a three-day trip with Friends Academy teachers. This trip also provides an opportunity for the many new entering students to meet new friends and begin to transition socially to their class.

   **The Youth Service Opportunities Project (YSOP):**  For this required tenth grade trip, students spend an afternoon and a full day in volunteer work helping people who are poor, hungry and homeless.  Each trip has small groups of students together to serve homeless and hungry people in various settings.  By spending time away from home without the distraction of friends, TV or family, participants can focus their attention on service to others.  Students are chaperoned by Friends Academy faculty members.

   **Washington, D.C. Trip:** This required eleventh grade trip provides the students an opportunity to connect what they are learning in their courses (American Literature and History) with a visit to the nation's capital. The History and English departments developed a unique and exciting itinerary for the junior class.  They have an opportunity to see a play, visit historic sites in D.C. and begin to do some on-site research for a required assignment.  This trip also provides the opportunity for students to bond as a class.

**Senior Retreat:** Seniors spend one overnight and a full day at Camp DeWolfe in Wading River, L.I. within the first week of school in September. The senior class advisors plan activities and discussions to help seniors focus on their upcoming year. The students spend time reflecting on goals for their senior year and begin planning senior fundraising events.  The retreat site has a beach, pool and fields to allow for recreation time as well.  This trip serves as a bonding experience for the class and advisors.

**2.  Academic and College Counseling**

An Academic Counselor is available to students and their parents in the ninth, tenth, and eleventh grades. The counselor works in coordination with the college office, meets with students and parents to discuss course selection, reviews standardized tests (i.e. PSAT, SAT 2 tests), along with the Principal and class dean monitors the academic progress of the students and meets with students and their advisors to provide guidance and support as needed.

In January of the student's junior year, the academic counseling is shifted to the college counseling office.  At this time, students begin to meet and plan for their senior year.

Friends Academy offers a comprehensive college counseling program to every student. The Director of College Counseling and Associate Director of College Counseling meet individually several times with families, beginning in January of the junior year. These meetings are used to develop a list of colleges, choose which SAT II tests to take, discuss teacher recommendations, transcripts, college essays, financial aid, athletic recruiting, summer plans, co-curricular opportunities, and senior courses.

In addition, juniors and their parents are encouraged to attend College Night in January, and the annual *Inside College Admissions* program in April. Seniors are in touch with their college counselor regularly all year long to work on their essays, refine their college lists, and review their applications, among other things. The full-time College Office Associate is also an important resource for families.

**3.  Advising**

In the Upper School all students are assigned an advisor who provides basic advice on academic and social issues. During the school year, the advisors check on their advisees' progress and make contact with parents when an issue arises or a conference is needed. As advocates for their advisees, the advisors work in partnership with the parents to resolve difficulties that a student may encounter and to celebrate each advisee's positive growth and achievement. Advisors meet with their small group of 7 to 9 advisees during morning periods throughout the week. These "advisory groups" are organized by grade-level and are overseen by a Class Dean for each grade level. Along with the Class Deans, Director of Student Affairs, School Psychologist, and Upper School Principal provide advising support for students and families.

For specific academic concerns, the teachers are the best place to start for guidance. In addition, students can make good use of our Peer Tutors, selected students who have done well in a specific subject matter, or through the Upper School learning specialists.

**4.  Course Selection and Drop/ Add Guidelines**

In the winter, an Upper School Course of Study booklet is posted on the school website to all students who will be enrolled in Grades 9 through 12 the following fall. This booklet describes the courses available and provides a book list for each course. Students receive a recommended Course of Study from their advisors based on the recommendations of their current classroom teachers. After discussion with the Academic Counselor,  (for grades 9 -11) or the College Counseling Office (for rising juniors and seniors), the student and parents, the recommended Course of Study is signed by student and parent and returned to the advisor by the indicated deadline. Students share a significant responsibility in the process of their education and are expected to honor the commitment they make to their classes in terms of preparation, contribution, attendance, and completion. Course credit is contingent upon the successful completion of all required work. A student may NOT drop a course simply because of lack of interest, poor attendance, or declining grade. The purpose of the drop/add guideline is to ensure that students are enrolled in classes at the appropriate levels. Courses may be changed, dropped, or added in the first three weeks of the course for term courses. Thereafter, any course dropped appears as a "DROP" on the transcript, with no credit awarded.

**Adding or Dropping a Course; Procedure for Students:**
- Pick up a Drop/Add form (outside principal's office) OR print one out from Upper School section of website under Academic Resources
- Record your name and the course(s) you would like to add or drop (be sure to put them under the correct heading).
- Have your parent(s) sign the form, indicating his/her permission and approval for you to make this change.
- Have a conversation with your teacher(s) regarding the request for a change.  Be prepared to defend why this change makes sense for you.  Ask your teacher(s) to sign the form, indicating his/her approval of the change.  Your teacher may choose not to approve the change.  This may be due to the nature of the change or because a class is already too large or too small.   It is a teacher's prerogative to make a decision that is best for you as a student and best for the class as a whole.

- If you have approval from both parent and teacher, arrange a time to have a conversation with the Academic Counselor (9-11) or your College Guidance Counselor (12).  This is the final signature required to approve the schedule change.

If you are a senior, and if we have already sent your mid-year transcript to colleges, a copy of the transcript reflecting the dropped course (with no credit awarded) and a letter from the Director of College Counseling indicating the reason for the drop, may be sent to the colleges to which the student applied or received acceptance.

5.  **Quantitative and Qualitative Definition of Grades**

A+   (97-100%)         Performance demonstrating excellent understanding        A            (93-96%) and application of concepts, high skill level, thorough
A-    (90-92%)                        assimilation of detail, originality of thought, and keen insight into the subject.

B+   (87-89%)             Performance demonstrating good understanding and application        B            (83-86%) of concepts, good acquisition of skills, accurate application of        B-      (80-82%)        details, and some original insight into the subject.

C+   (77-79%)             Performance demonstrating basic understanding of the        C            (73-76%) fundamental concepts of the subject and a consistent attempt        C-      (70-72%)        to apply the details and skills taught.  In spite of occasional
conceptual misunderstanding,  or flawed or incomplete
knowledge, the performance indicates
satisfactory preparation to advance to the next level.

D     (65-69%)                       Performance demonstrating minimal understanding of the
fundamental concepts and a partial acquisition of the details and
skills taught.

F      (below 65%)     Performance that fails to demonstrate understanding of the
fundamental concepts of the subject and/or performance that
indicates pronounced lack of knowledge or skill.  Achievement is
inadequate to allow the student to advance to the next level.

INC  An "INCOMPLETE" will be given when the missing work in question                                    is deemed by the teacher to be an essential component in the term or                            course. (See below)

P    Indicates a "passing" or "having participated" grade.
     *We do not rank in class nor do we compute grade point averages.*

**Guidelines on Incompletes**
An "Incomplete" will be given when the missing work in question is deemed by the teacher to be an essential component in the course.  In the case of extenuating circumstances (extended illness, family emergency, etc.), the teacher and student, in consultation with the Upper School Principal and the department convener, will determine the deadline for completing the work. No penalty in grading would be applied in this case.  If a student has not turned in work and it is determined that there were no extenuating circumstances, the student is expected to complete the work within one week of the end of grading period. A penalty in grading will be applied. If a student does not complete the work within the expected time, the student will receive a failing grade on the missing work but is still expected to complete it. An Incomplete will remain on the transcript until the work is turned in. Once the work is turned in, the teacher will calculate the grade for the course and the Incomplete will be changed.  If by the end of the school year, the work has still not been turned in, the student will receive an Incomplete for the course and will not be able to return to Friends for the following school year.

6.  **Referral Process for Students with Academic Concerns**
A student who is experiencing difficulty in a course is encouraged to speak with his/her classroom teacher and/or advisor to determine a plan of action (i.e. extra help) that will enable the student to address the concern.  Any student who consistently performs below the "C" level in a course may be referred to the grade-level Class Deans and Academic Assistant Class Deans.  Along with the Principal, Academic Counselor, and/or the school counselor or learning specialist, this "academic studies team" will more

fully review the overall academic progress of the student and call a Round Table meeting to co-construct strategies with the student that will help the student to proactively meet his/her academic potential.

If the concern is not addressed after instituting the first steps, the academic studies team may recommend increasing the measures of support within the school. This may include: mandated attendance at extra help, a more structured daily schedule, meeting with the learning specialist and/or school counselor or classroom accommodations. The student's advisor and/or the classroom teacher may be asked to provide weekly feedback on student progress to the parent. The parent would be notified of any increased measures of support.

Following the first two steps, if the student continues to struggle, the academic studies team may recommend informal testing done by the school counselor or learning specialist to inform areas of support.

After the steps listed above have been adequately explored and the student continues to struggle, the plan of action moving forward would involve formalized evaluation of the student which might include the involvement of the local school district to provide support services or accommodations.

### 7. Academic Warning

A student whose semester and/or final grades reflect ongoing academic concern (two or more courses below the "C" level) will be placed on "academic warning". Placing a student on academic warning is an indication that the school is intending to ask the parents and the student to work closely with the Principal and members of the academic studies team to develop a formal plan of action that will help the student to reach his/her potential. It is important that the student along with the parents be fully involved and committed to the plan. After a designated period of time, if the student demonstrates consistent motivation and improvement, then s/he will be taken off "academic warning". However, if the student does not modify the academic performance and his/her academic work continues to decline, the student may be at risk for having re-enrollment withheld for the following school year.

### 8. Tutoring

The process of becoming an independent learner is one of the most valuable journeys a student will take at Friends. We expect students will encounter different challenges in their courses. Working through these challenges and developing coping strategies is crucial for the intellectual and academic growth of the student. Students who are supported on a regular basis through tutoring are denied the practice needed to develop important self-reliance skills. We would expect that students who are in need of academic support would seek this first from their classroom teacher or a teacher from the same department. Students who have missed work due to an extended absence from school due to illness may need the support of a short term tutor who would work cooperatively with the classroom teacher. In those cases where it is deemed that a student has demonstrated need for more support than what has been provided in extra help, the parent will be contacted by either the department head or principal to discuss possible tutoring options.

**Tutors and Writing** – The aim of the Friends Academy writing curriculum is to create independent writers. While students may get lessons on writing skills from tutors, parents, or other students, tutors and parents should not become part of the composition process – the writing itself – of a graded assignment. A parent, other student or tutor may help students get started on their assignments by reading directions, discussing requirements, serving as a sounding board for student ideas and posing questions, but the actual writing of the paper – the outlining and writing and hands-on revision of the paper – should be done in conference with the teacher. The classroom teacher is the single-most valuable resource in helping to develop independent writers. Every assignment submitted for academic credit must represent the individual student's own work and not the work of a tutor, family member or friend. **Any and all tutors must inform and work closely with the student's classroom teachers to ensure the integrity of the learning process and avoid plagiarism.**

### 9. Homework

The statements about Homework in the General Guidelines section (IX) apply to all Upper School students. While the amount of homework varies from grade to grade, parents should help establish a routine and make certain there is a quiet, well-lit place for students to study. Parents may help students get started by reading directions together or discussing a writing assignment but should avoid becoming too involved. Students need to learn to work independently, to "self-start" and, at times, to work through material slowly and with considerable effort. Parents who are concerned about a student should write the teacher a note or make an appointment to pursue solutions.

Please note that Upper School assignments generally increase in both time commitment and difficulty each year. A freshman can expect approximately 30 minutes of homework per subject per night. Many courses require projects and papers that challenge students to pull together large amounts of information. The habits of regular study, daily review, foresight, and organization are important to establish.

The purpose of homework is to provide students with an opportunity to practice newly acquired skills, to prepare students for a subsequent class meeting, and to extend student learning beyond the classroom through individual and creative endeavors. Homework should be directly related to the classroom instruction and consist of clear, purposeful, and engaging activities that are age and course level appropriate. Homework assignments will be evaluated or reviewed in class so students receive feedback on their work.

Assignments are expected to take students no more than an average 30 minutes/class/night, but could be shorter. Long-term projects assigned in addition to daily homework assignments should be included in this time frame.  AP and Honors courses will require longer homework assignments.

Teachers will post homework assignments, a weekly syllabus and dates of major assessments; papers, projects, and tests on the FA website teacher portal.  Although at times assignments may need to be modified based on the progress of the class or unexpected schedule changes, generally students should always have advanced notification for all assignments.

To help distribute major assessments and tests more evenly for students, teachers and students  follow a system where teachers will assign due dates and test dates at times in units when it is logical.  Students will have a limit of 2 major assessments on a day. When assigning the dates, teachers will ask students if anyone already has 2 major assessments on that date (major assessments include full-period tests, and papers and projects worth the equivalent of a unit test).  If there are students who already have that number, the date will need to be adjusted. Teachers who claim the date on a syllabus/assignment sheet/portal will have priority.  In order to evenly spread out major assessments at the end of marking periods, testing weeks as we have done in the past will be assigned for the two weeks before the end of the marking period. Requirements of this system are a willingness to talk to students and listen to their concerns about what is already on their calendars; being flexible in our scheduling in order to modify assessment dates based on student feedback; and proctoring support for students who may need to take an assessment on a different day than their classmates.

Teachers are expected to provide, at minimum, one-week notice for a major assessment. Quizzes that don't require extensive preparation are not considered major assignments.

Homework for weekends and vacations should be the equivalent of one night's homework, except for AP courses which may give longer assignments. Students should not be assigned projects, papers or lengthy assignments just before the vacation to be due the day or two after the vacation. If necessary, teachers can assign the equivalent of one night's homework over the Christmas/Holiday, Winter, and Spring vacations. English, History and other reading assignments that may or need exceed this standard limit for this period should be approved by the head(s) of department.

Teachers should make clear to students expectations regarding what resources may be used to complete assignments, whether collaboration is acceptable, and how the work will be assessed. *(Please refer to the Statement on Academic Honesty.)*

### 10.  Reports to Families

Upper School courses are either a full-year or semester in length (with the exception of physical education and 11th grade health which are trimester length courses). Grades and comments are published online through our secure My Backpack at approximately the mid-point and end of each semester for all academic courses. Written comments in all academic courses are available with the mid-semester grades in November and March. Final grades and comments are written for all semester courses in January and at the end of the year.  Academic course comments will also be written at the end of each grading period for students receiving grades lower than "C."

In addition, an Advisor comment is written by the student's advisor available through My Backpack with the March academic comment. The Advisor comment reflects progress on the student's academic goals, social growth, and citizenship.

 The advisors conduct periodic discussions with their advisees to determine which clubs and activities they participate in as well as review progress on academic goals that have been set during the first semester. Advisors speak with their advisee's teachers and coaches to better understand the student's overall motivation and commitment to their academics as well as their contributions to the community. Advisor comments also provide a framework from which the college counselors may begin to know and work with students.

Email is the most efficient method of communication and faculty email addresses can be found on the FA portal. (See Guidelines in Communication below). Parents may also call the Upper School office (ext. 215) to leave a message for a teacher. On occasion, parents and the student will be invited to meet with all the teachers and advisor to review student academic progress and create a plan of action that will help the student meet his/her potential. Grade-level parent-teacher conference nights in late November where parents can meet briefly with classroom teachers are also a good vehicle for communication. This year we are also including a late February advisor-student conference day, with student-led conferences and parents joining advisors to review the year at the outset of the second semester, a time to think about growth and self-reflection as part of our four year program. Please refer to the school calendar to determine the dates for these conferences.  We will send more details about each of these learning opportunities to build student understanding, community and partnership connections.  Parents receive a mailing that explains how to sign up to meet with a teacher for a conference each time.

### 11. Communication

Open communication regarding student academic progress is encouraged between classroom teachers, advisors, students, and parents.  A teacher or an advisor may email or call parents to inform them of any concerns and parents are also encouraged to communicate with the classroom teacher or advisor if there are any questions or concerns.

Email is the preferred form of initial communication with a teacher. email should be used to elicit responses to brief questions. Should the question be more substantive regarding student academic or social matters, the email should be used to establish a mutually convenient time for parent and teacher to speak by phone. All communication, either via email or by phone, should reflect the FA fundamental standard of kindness and respect.

For matters large and small, the proper channel to raise a concern or ask a question is to go to the most direct level first, that is, to the teacher, advisor, or coach most closely related to the issue and capable of addressing it. If not satisfied at that juncture, a parent should seek out the next level (department head, division head, or other administrator).

Parents should not hesitate to send an email or leave a message for any faculty member (ext. 215) for quick responses to routine questions, updates, or needs, but note that email is not a good mode of communication for substantive matters regarding a student's academic or social progress, personal or telephone conference is preferred. Faculty will make every effort to respond to emails or calls within a reasonable amount of time unless unavoidable circumstances make timely replies impossible; for example, calls that immediately precede a weekend, school holiday, or teacher absences.

**12.  ACES (Academic Coaching for Educational Success)**

Additional learning support services are provided to students through the ACES program. (Please read carefully the section VI on "Student Support Services" to understand the goals of the program.) In the Upper School, students who have demonstrated need, (through the referral process outlined in part 3 of this section), but do not necessarily qualify for support through their local school district, can be scheduled to work with the learning specialist one-on-one, or in small groups of no larger than three during an unscheduled block. The learning specialist is also available after-school on specified days for any student who would like to make an appointment for assistance.

**13.  Standardized Testing**

**a.  The PSAT (Preliminary Scholastic Aptitude Test)**

All sophomores and juniors take the PSAT at Friends Academy on a Wednesday morning in mid-October. The PSAT is a practice SAT test designed to predict students' SAT scores and help them prepare for the SAT. Friends Academy automatically registers all sophomores and juniors for the PSAT; there is no need for them to register on their own. Each sophomore and junior is given a comprehensive bulletin in the fall that contains a practice PSAT examination and advice about how to take the test.

**b.  The SAT I Reasoning Test**

The SAT I is a general reasoning test required by most colleges. This test contains a math and critical reading section and the new SAT exam includes a writing section that includes multiple choice questions on grammar and usage, as well as a short student-written essay. A typical junior will take the SAT in March or May. We recommend that juniors take the SAT I for the first time in March, especially if they want to have the option of applying Early Decision to a college in the fall of their senior year. The May SAT date often conflicts with athletics and the spring play. It is also a time when some students are preparing for AP exams. Students can retake the SAT exams in October, November, and December of the senior year.

Juniors should consult with their college counselors regarding which test dates to sign up for. Colleges will see all of the scores a student receives. Schools usually count only the highest verbal and highest math score, even if they are from different test dates. Most students should take the SAT twice, once in the spring of the junior year and once in the fall of the senior year. Please refer to the *Friends Academy College Counseling Manual* for further details. To view the dates the SAT is offered and for registration, log on to www.collegeboard.com  or pick up a registration bulletin in the college office. Please note that students will have an easier time finding a convenient place to take SATs if they register for them early.

**c.  The SAT Subject Tests**

The SAT II tests are a battery of one-hour tests designed to evaluate the knowledge a student has learned in a given subject and are usually required by the most selective colleges. In light that the new SAT contains a new section similar to the Writing SAT II, most selective colleges will require 2 SAT II Subject Tests. These tests are optional at all other colleges. It is wise to take the relevant SAT II test in June of the year you are studying that course, since students are already preparing for the final exam in that subject area. The preparation for SAT IIs at this time is further strengthened by juniors' preparing for finals. Like the SAT I, SAT II scores cannot be withheld after the test has been taken.

Ninth graders who are earning an A level grade in Biology, and who do well on standardized tests, should discuss with their teacher the option of taking the Biology SAT II.  Tenth graders enrolled in Sequential III Honors should consider taking the Math IC SAT II exam or the World History SAT II with the recommendation of their history teacher.  Juniors enrolled in AP or non-AP American History who are looking at colleges that would require SAT II exams should consider registering for these exams. Juniors might consider taking, with recommendation of the teacher, SAT IIs in English literature, Math IC or IIC, World Language, or Physics. The closing registration date for the June SAT II date is late in April or early May. It is the responsibility of the students to register for the SAT II exams on-line at www.collegeboard.com. Juniors should refer to the College Counseling portion of the Friends Academy website for further details or discuss with your college counselor. Friends Academy is not a test center for the SAT I or SAT II, so our students take these tests at a convenient local high school.

**d.  THE ACT (American College Test)**

The ACT Test is developed and administered by a competitor of the College Board. This is an alternate test that can be substituted for both the New SAT I and SAT II tests when applying to colleges. The ACT emphasizes content over reasoning skills and contains four sections: Reading, Writing, Math, and Science (including some physics), and is often considered to be closer to the SAT II tests. It is a test commonly used by students enrolling in public universities in the Mid-West and West. The most selective colleges

will accept either SAT or ACT tests when a student applies. Students who are more math/science oriented are encouraged to take the ACT in June of the junior year or September of the senior year. Results from ACT tests in the fall of the senior year cannot be released in time for students who are considering applying Early Decision. To register for the ACT, log on to www.act.org.

### 14. Student I.D. Cards

Friends Academy photo identification cards are issued to every Upper School student. Photographs for the cards are taken in September of each year. These cards are required as ID for all testing outside the school such as SAT I & II, and for the campus store. They can also be used for student discounts at theaters, museums, and other events.

The school provides one card per year to each student. Lost or damaged cards can be replaced for a fee.

## H. School Trips

Outdoor Education, the community service program, and special cultural events mean trips to locations off-campus. Whenever students leave campus, whether for a few hours or for a three day Outdoor Education experience, parents are asked to sign a permission slip that includes the date(s), times of departure and return, destination, and purpose of the excursion. Trips that involve overnight stays also include a parent orientation meeting. Major trips that occur each year are the Ninth Grade Outdoor Education Trip to Great Hollow Wilderness School, the Tenth Grade Youth Service Opportunity Program overnight "work camp" trip to Friends Seminary on East 13th Street in Manhattan, the Eleventh Grade trip to Washington, D.C, and the Twelfth Grade's Senior Retreat. Trips off campus are frequently accompanied by an additional charge. Parents will be billed accordingly.

## I. Communication and Music Devices

As a caring community we cannot permit devices such as cell phones and air pods/earbuds/headphones to distract us from living in the moment. Our public spaces are intended to foster community spirit and connection.  During the academic day, from 8:05 a.m. to 3:20 p.m., the school expects students to focus on the challenges of their classes, engage in their activities and help maintain a school culture where we are open to each other and not distracted by cell phone or music devices usage. We have a moderate approach to cell phone use outside of classes, with designated zones in US buildings (Kumar Wang Learning Commons, Dolan Center), where data usage is allowed, but audio/video calls are not. Students must use headphones rather than playing audio through device speakers.  Cell phones are not permitted to be used in classrooms except with the teacher's explicit permission.

*"Friends try to live lives in which activities and possessions do not get in the way of open and unencumbered communication with others and with one's own spirituality. "* –New York Yearly Meeting

### 1. Cell Phone Policy
- Permitted for school business (data purposes including checking email) in the            library, and classrooms with teacher permission. Cell phones are not permitted for            games, social media, texting, and other activities that are not educationally related in            the classroom. These activities are permitted in the Learning Commons so long as they are not disruptive. Violent games are not allowed.
- Phone calls are permitted in offices or classrooms with adult permission.

### 2. Music Devices (air pods, earbuds, headphones)
- Permitted in the library and in classrooms with teacher permission.
- The expectation is that students will not wear headphones or earbuds (in use or not            in use) in other spaces, including hallways, the Dolan Center and the quad.

## J. Discipline System

We expect students and their parents/guardians to willingly support and adhere to the philosophy, mission, and Fundamental Standards of the school. Parents/guardians are essential partners in all disciplinary matters.

Friends Academy seeks to nurture strong minds and kind hearts through the wisdom of the Quaker testimonies so that our students can make the world a better place through their good works. Ethical citizenship forms the foundation of all we do. As a member of the FA community, I strive to fulfill the mission of our school, and to:

### 1. Live with integrity, tell the truth, and act truthfully, regardless of what others
may do or say, and encourage integrity in others. Students are expected to show integrity.
Students are expected to be accountable for their choices.

Examples of violations (not all inclusive or of equal value):
- Theft, vandalism, or other abuse of school property
- Lying, covering the truth, cheating, plagiarism
- Misbehavior in class, including incessant disruption and improper language
- Possession or use of tobacco, alcohol, marijuana, or other non-prescription substances
- Disrespect in Meeting for Worship

2.  **Treat everyone with kindness,** compassion, and respect, and cultivate kindness in others.  Students are expected to respect individuals and their opinions. Students are expected to cooperate and collaborate as team players, both on and off the field. Students are expected to respect the classroom community and the overall learning environment of their classmates.

Examples of violations (not all inclusive or of equal value):
• Tardiness to class or unexcused absence from classes, study halls, lunch, Meeting for                    Worship, or athletics
• Running or making excessive noise in the hallways
• Violation of individual classroom rules and expectations
• Improper use of technology, including cell phones, as outlined by the required by the Acceptable Use Policy

3.  **Employ empathy and peaceful resolution of conflict** as key lenses and tools through which to see and interact with  the world.

Examples of violations (not all inclusive or of equal value):
• Use of disrespectful language towards or about another community member
• Physicality
• Use of technology – text, social media, etc as a hurtful or malicious tool

4.  **Help to build an inclusive community** by standing up to prejudice, bullying, and intimidation and stepping in when others need help.  Students are expected to identify and value the gifts, talents, and light in every member of the FA community.

Examples of violations (not all inclusive or of equal value):
• Bullying, in-person or online
• Intentional exclusive behavior towards an individual or a group of individuals
• Expressing opinions or making statements that are degrading or offensive to individuals or groups based on differences
 5.  **Care for our environment,** including our shared spaces and resources, and encourage others to do the same.

Examples of violations (not all inclusive or of equal value):
• Chewing gum
• Dress Code violation
• Improper behavior in the commons and lunchroom
• Creating disorder in shared community spaces

**Minor Offenses** are generally handled by a student's advisor and/or the Grade Level Dean of Students or Assistant Dean by implementing logical and timely consequences following a conversation to understand a student's intention and self-awareness. Minor offenses are tracked by the Grade Level Dean of Students and the Assistant Dean for Student Life and are reviewed throughout the year. Emerging patterns may call for a round table (a facilitated meeting used to empower the child with strategies to alter behavior moving forward with the support of caring adults), or other type of comprehensive support.  Students who do not respond to interventions put themselves at risk for more serious consequences, including disciplinary status, which can put their placement at Friends Academy at risk.

**Violation of Respect – when a student is uncooperative or disrespectful to another member of the community,**
• He/she will be asked to leave class, activity, or common area, and sent to the grade-level Dean, the Director of Student Affairs or another administrator.
• Possible consequences of meeting with Director of Student Affairs:
   o student returns to class/area following conference
   o student remains in reflection for rest of school day
   o student receives a day of reflection the next day
   o in cases of repeated disruptive behavior in social areas (social space, commons, library), the student may have their privilege to use the area                    rescinded
   o student's parents will be sent a confidential warning letter stating that a                    repeat of behavior may result in suspension or dismissal

**Restorative Meeting**

Students who serve a Day of Reflection or a suspension may not return to classes until they have a Restorative Meeting. The goal of the Restorative Meeting is for the student to meet with representatives from the community and have an opportunity to take responsibility for their actions, reflect and speak to how and whom has been adversely affected by their behavior, lessons learned, possible ways for students to make restitution for their actions, which may include an apology to those harmed or affected. The elders in the meeting are responsible for making sure the student is heard, held accountable for their actions and be subject to the appropriate punishment according to the disciplinary procedures of our school. The elders will typically include the Director of Student Affairs, Class Dean, Student Life Assistant Dean, student's advisor, and two student reps from Judicial Council. The Head Advisor may choose to ask a member of their team to stand in as an elder. In all cases the student will be required to submit a written reflection.

**Major Offenses** include those in which a student violates a Fundamental Standard of the school (See Section IV).  A student found to have violated a Fundamental Standard of the school will be referred to the Director of Student Affairs who will determine next appropriate steps, which could include a referral to the Judicial Council. When a student is referred to the Judicial Council, he or she will be accompanied by his or her advisor or class dean. Students who appear before the Judicial Council will have an opportunity to make a statement regarding the circumstances of the infraction. The advisor or class dean may also speak on the student's behalf.  In turn, the members of the Judicial Council will have an opportunity to ask questions about the student's behavior and to make statements regarding the impact of the infraction on the community. Further, the Judicial Council will recommend a penalty, which may include a restorative conference, a day of reflection, suspension, dismissal, or other responses the Council deems appropriate. The school reserves the right to make any suspension a matter of record reported to colleges.

All disciplinary recommendations pertaining to major offenses are presented to the Head of School, who will review and modify or approve the recommendations.

Examples of Additional Consequences:
- Teacher-student conference
- Facilitate a Round Table Meeting (used to empower the child with strategies to alter behavior moving forward with the support of caring adults).
- In-class disciplinary action including removal from class
- Parent/Advisory contact
- Counselor-student conference
- Loss of community free time
- In-school Day of Reflection or Suspension
- Out of school Suspension
- Disciplinary Warning* or Probation** (in accord with a disciplinary action plan)
- Expulsion

*Disciplinary Warning: A student would be placed on disciplinary warning, and parents notified in writing, for disregard of community norms, either through an egregious act or through an established low level pattern of behavior.  Disciplinary Warning is seen as both a motivation to improve behavior and a possible indication that a student's status at the School may be in jeopardy.

**Disciplinary Probation: A student would be placed on disciplinary probation when, in the opinion of the Student Life Team, s/he has not met the minimum behavioral requirements expected of them through the FA "Fundamental Standards." Disciplinary probation is seen as both a motivation to improve behavior and a clear indication that a student's status at the School is in jeopardy.

**K.  Counseling Response to Health**

**Mental Health and Wellness**

Any student who may have concerns about his or her mental health and wellness may seek confidential help through the School Psychologist.  The School Psychologist and other involved school personnel will maintain the confidentiality of conversations with students unless:
1) the student's life is in danger
2) the information makes the school personnel accessory to an illegal action
3) the information indicates that the safety of another individual is at risk.

In some cases, the School Psychologist may require an evaluation of the student be conducted by a professional provider approved by the school. Based on the internal and external assessment and conversations, an action plan will be put into place.  This may mean having ongoing outside support and/ or therapy to maintain functionality as a fully contributing member of the FA community.

**Substance Abuse Issues**

Friends Academy is a Drug, Tobacco (in any form), E-cigarette, Vaporizing devices and Alcohol free school.  Use and or possession of these substances/products/devices are prohibited anywhere on the campus or at student trips, events, or a function is a violation of school policy and may also constitute a crime.

Our policies are meant to ensure an environment free from addictive practices. The school understands that causes for substance use and addiction are varied and complicated. Therefore all school responses to such acts will contain steps designed to help students discontinue such harmful patterns of behavior.

**Drug and Alcohol Policy**

Any student who is found in possession of or under the influence of drugs or alcohol will be immediately separated from the community for a period of no less than one week. As a condition of continued enrollment the student will:
- Serve a suspension for a minimum of five days.
- Immediately meet with a certified professional referred by our school psychologist.
- The student will be required to undergo appropriate medical tests designed to detect the use of drugs or alcohol, with results going confidentially to the school psychologist and the student's family.
- Based on the evaluation and testing abide by an appropriate treatment plan that will include ongoing counseling and random testing paid for by the family.
- Student will be placed on Disciplinary Warning which means a second violation of this policy would most likely result in dismissal.

**If a family chooses not to abide by our Drug and Alcohol Policy, it will result in the student's dismissal.**
**Tobacco policy – Includes all forms of Tobacco, E-cigarette, and Vaporizing substances and devices**

The school recognizes the addictive and detrimental nature of nicotine.  Therefore any student found in possession or using **tobacco** will be given the following response:
- Immediate Day of Reflection.
- Parent conference
- Mandatory participation in a smoking education program or cessation program
- Discipline Warning or Probation stating that a repeat of this behavior would result in student going before Judicial Council and a one week suspension. A third violation could result in dismissal.

**Selling/Distributing/Buying**

A student found to be selling, distributing, buying, (giving away, offering or trading) alcohol/drugs, or anything passed off as drugs on the way to or from school, at school, before, during or after a school-sponsored event, the student will be dismissed immediately. The parents will be notified and the police may be contacted.

**Safe Harbor Policy**

A student, who believes they may have an alcohol or drug problem, or any student or staff member who believes a student may have an alcohol or drug problem, may seek confidential help through the School Psychologist/Director of Counseling.  The Safe Harbor Policy ensures access to support help without fear that the information shared in confidence will be used to pursue disciplinary action. The Director of Counseling and other involved school personnel will maintain the confidentiality of conversations with students unless:
1) the student's life is in danger
2) the information makes the school personnel accessory to an illegal action
3) the information indicates that the safety of another individual is at risk.

In all cases involving serious health risks the school psychologist will take the following steps:
- Immediately notify parents who will come in to school immediately to meet with                 the school psychologist and division principal.
- Student will be placed on medical leave for a period no less than three days and until the following has taken place:
   1. Student must be evaluated by a certified professional referred by our school psychologist.

   2. The student will be required to undergo appropriate medical tests designed to                 detect the use of drugs or alcohol, with results going confidentially to the school psychologist and the student's family.

   3. Based on the evaluation and testing abide by an appropriate treatment plan that                 will include ongoing

counseling and random testing paid for by the family.

    4.  The family (including the student) must sign off to agree to abide by the prescribed treatment plan including submitting to periodic drug or other appropriate testing to be monitored by the Director of Counseling.

**A family that chooses not to cooperate by refusing to abide by our Drug and Alcohol Policy may result in the student's dismissal.**

## APPENDIX A

### Academic Honesty Policy

Students inevitably encounter difficult challenges in their courses. Working through these challenges, developing effective study skills, learning how to learn: these are without a doubt the most important lifelong habits a child can learn at Friends Academy. The following guidelines pertain to all courses.

### Authorized Help

At times students may ask for help on take-home assignments, including homework. Students and families must be aware of each teacher's specific guidelines pertaining to outside support. A student and family should speak to the teacher if they have questions or concerns about work, or if the student needs additional assistance. If the teacher, student and family feel it is necessary for the student to receive more intensive outside help, the agreed upon tutor(s) (including family members who help their children with their assignments) must maintain regular communication with the teacher about specific skills addressed.

### Unauthorized help/ plagiarism

Unauthorized help occurs when a person other than the student directs the composition or completion of the assignment.  At no time may an assignment completed by someone other than the student be submitted.  A note about editing:  students may seek clarification of ideas; however, at no time should another person dictate prose or edit/correct work for the student. The complexity of ideas, style, syntax and vocabulary in a student's take-home work should be reasonably similar to a student's in-class work.

Definition of plagiarism: In an instructional setting, plagiarism occurs when a writer deliberately uses someone else's language, ideas, or other original (not common-knowledge) material without acknowledging its source (wpacouncil.org)

### Cheating

To cheat is to act dishonestly or unfairly in order to gain an advantage. This includes but is not limited to the following:

- Bringing in, having available, or using unauthorized material or electronic devices during an evaluation.
- Soliciting help from a fellow student during a quiz or exam.
- Looking at another student's paper during an exam.
- Copying evaluated homework.
- Collaborating with others on an assignment without the explicit permission from the teacher.
- Using any portion of someone's else's assignment and submitting it for credit.
- During an assessment, looking at one's own annotations in books without a teacher's permission.
- Making multiple submissions (submitting the same work to two instructors without their permission). This includes submitting the same work to instructors in different years.
- Fabricating or making up data, results, information, or numbers.
- Enabling academic dishonesty (helping others to violate a teacher's academic guidelines). Examples include, but are not limited to the following: sharing test questions or answers (without faculty permission), completing an assignment for someone else, providing written papers for others, and allowing or assisting others to copy answers.

Failure to abide by this policy constitutes a violation of academic honesty.

**APPENDIX B**

**Guidelines on Hazing, Bullying, and Harassment**

Friends Academy is committed to creating a school community where all members as well as visitors and guests are treated with kindness, respect, and courtesy. We take seriously our obligation to create an environment free from bullying, hazing, harassment or discrimination of any kind based on race, creed, religion, sex, age, marital status, national origin, sexual orientation, disability, veteran or citizenship status, genetic predisposition or carrier status or any other classification protected by law. Those who believe they have been subject to such harassment or discrimination should immediately inform the Head of School, Dean of Students, or any teacher or administrator to whom they feel comfortable reporting the matter.  You are encouraged to report your concerns informally without fear of reprisal.

Hazing is requiring something of a specific group or individual, even if they consent to be a party to it, that results in humiliation, embarrassment, degradation, or placing a student or students at emotional or physical risk.

Bullying is the deliberate abuse of power by one or more students to inflict physical, verbal, or emotional harm to another student, including but not limited to poking, teasing, taunting, name-calling, cyberbullying, social exclusion, and rejection.

Harassment is verbal, physical or online conduct that denigrates or shows hostility or aversion towards an individual because of his or her on race, creed, religion, sex, age, marital status, national origin, sexual orientation, disability, veteran or citizenship status, genetic predisposition or carrier status or any other classification protected by law, or that of persons with whom the individual associates.  For example, racial harassment includes, but is not limited to, harassment based on an immutable characteristic associated with race (e.g., skin color or facial features).

It is not easy to define exactly what will constitute harassment based on race, color, creed, religion, gender, sexual orientation, marital status, national origin, age, handicap, disability or any other  status or classification protected by law. Examples of behavior which violate these guidelines and may constitute harassing conduct include, but are not limited to:

- Epithets, slurs, quips, or negative stereotyping that relate to race, color, creed, religion, gender, national origin, sexual orientation, marital status, age, disability or other protected status or classification protected by law;
- Threatening, intimidating or hostile acts that relate to actual or perceived on the basis of  race, color, creed, religion, religious practice gender, national origin, ethnic group sexual orientation, marital status, family composition age, economic circumstance, disability, school performance,  physical characteristics, medical condition,   or any other status or classification  protected by law;
- Written or graphic material (including graffiti) that denigrates or shows hostility or aversion toward an individual or group because of religion, religious practice, race, color, creed, gender, national origin, ethnic group sexual orientation, marital status, family composition age, economic circumstance, disability, school performance, physical characteristics, medical condition, or any other status or classification protected by law and that is placed on walls, bulletin boards, or elsewhere, or circulated or displayed anywhere at Friends Academy; or
- "Jokes," "pranks" or other forms of "humor" that are demeaning or hostile with regard to actual or perceived race, color, creed, religion, religious practice, gender, national origin, ethnic group, sexual orientation, marital status, family composition, age, economic circumstance, disability, school performance,  physical characteristics, medical condition, or any other status or classification protected by law.

This type of behavior is unacceptable not only at Friends Academy, but also at any Friends Academy off-campus event.

It is also a violation of school guidelines for any student, faculty member, employee, or guest, male or female, to subject any other person to unwelcome sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature.

There is a variety of conduct which can be considered sexual harassment in certain circumstances.  Such behavior includes, but is not limited to, sexually suggestive remarks, objects or pictures, verbal harassment or abuse of a sexual nature, gesturing, off-color jokes, subtle or direct propositions for sexual favors, touching, patting or pinching. Sexual harassment by any student, faculty member, employee, or guest, regardless of the form it may take, will not be tolerated.

Harassment also occurs when a teacher, student, or any other person affiliated with the school (1) treats a student differently than he or she treats other students solely on the basis of race, color, national origin, etc. or any other status or classification protected by law or (2) engages in harassing conduct so severe, pervasive or persistent that it interferes with or limits the ability of a student to participate in, or benefit from the services or activities provided by the school. Such harassment can be committed by a person, be it a teacher, student or any other person, regardless of whether that person is affiliated with the school.

Everyone is expected to comply with these guidelines and appropriate disciplinary action will be taken against any individual who violates these guidelines. Based upon the seriousness of the conduct, disciplinary action may include dismissal.

Friends Academy also assures you that you will have support in reporting any type of harassment, discrimination or related inappropriate behavior. If you experience or witness such conduct, you should take the following actions:

(1) deal with the harassing or inappropriate conduct immediately, advising the person that you feel the behavior is inappropriate and that you want it to stop;

(2) if you prefer not to discuss the matter with the person behaving in that manner, or if the person fails to stop this conduct when asked, you should report the incident immediately to the Head of School, Dean of Students, or any teacher or administrator to whom you feel comfortable reporting the matter.

Everyone has the responsibility of being aware of what is happening at the school, in school vehicles and at school functions. You are encouraged to report your concerns informally without fear of retaliation.

All unresolved complaints will be handled promptly and fairly.  All complaints of discrimination or harassment, including sexual harassment, will be treated confidentially and will be investigated promptly and thoroughly.  The names of individuals associated with the complaint and all information relating to the complaint will be held in confidence as much as possible to protect victims and witnesses against retaliation, as well as to protect those who may be wrongfully accused. Such confidentiality will be maintained except to the extent that disclosure is required to conduct an investigation to determine the validity of the alleged complaint.  We encourage and expect you to utilize this internal complaint procedure to resolve complaints of harassment or discrimination.


## APPENDIX C

### Derogatory and Offensive Use of Language Guidelines

Derogatory language is comprised of words that tend or intend to detract, denigrate, disparage or belittle and can often be considered offensive.  Often derogatory language includes slurs, stereotypes and/or negative references to ethnicity, race, sexual orientation, gender/gender identity, class, religion, body size/type or disability.  Language that is used to denigrate, belittle, or offend; considered hurtful toward any one person or group of people; or in any way adversely affects the school and/or members of the school community, whether spoken, written or shared using text mobile devices and/or social media (e.g. private or public messages or postings on social networking sites like Facebook, Twitter, Instagram, Snapchat, etc.), will not be tolerated.  This includes reciting or singing published material (e.g. song lyrics) out loud that includes derogatory language.

Friends Academy will treat all suspected or confirmed violations of this policy as serious matters that deserve a prompt, firm and predictable response.  As a community, we are committed to ongoing conversation and education about the evolution and use of language.  However, hate speech of any kind will not be tolerated and violations will result in immediate disciplinary action, not excluding suspension or expulsion. This policy extends to and includes any such communication; image or illustration that is prepared or originates off school grounds and adversely impacts the educational environment at school.  As such, Friends Academy exercises its right to discipline students for acts near or related to the school, when a student's conduct has a detrimental effect on the health, safety or welfare of the student, of other students, of the school or of school personnel.


### APPENDIX D
### Guidelines on Technology Use

Friends Academy provides access to a computer network and the Internet to promote educational excellence by facilitating information exchange within the community and between the school and the global community. The network supports students, faculty, and staff through access to a variety of technology resources. Student use and access levels vary by grade.

Network resources are intended to be used by students for academic and school business purposes ONLY and network users must abide by all school rules of conduct.  Network users should have NO EXPECTATION OF PRIVACY.  Friends Academy reserves the right to access or monitor correspondence and/or files without notice and at any time.  Failure to follow the guidelines set forth in this policy will result in disciplinary response which could include the loss of network privileges, detentions, possible suspension from school, or, in severe cases, dismissal from Friends Academy.

Students must not access any obscene or pornographic material, violent material, bomb manufacturing materials, commercial solicitations, or other materials not within the prescribed curriculum. Friends Academy cannot guarantee what materials may be accessed by students.  For this reason, no guarantee can be made that students will not be exposed to material that may be offensive to some individuals.

Please be advised that use of Friends Academy email, voicemail, fax machines, internet access or computer systems to send offensive or inappropriate messages, including, but not limited to discriminatory or suggestive messages such as racial slurs, is strictly prohibited.

**Responsibilities of Network Users**

1. You are responsible for the use made of your network and email accounts. Set passwords that will protect your accounts from unauthorized use and will not be guessed easily.  If you discover that someone has made unauthorized use of your account, you should change the password and report the intrusion immediately to the Technology Department.  Change your password on a regular basis. Faculty members should not delegate account use to their students or colleagues.

2. You must not engage in any criminal conduct through use of the network.

3. You must not engage in any form of "hacking" such as breaking into the privacy of another's computer by impersonation, password stealing, or damaging another's computer in any way.

4. You must not intentionally seek information about, browse, obtain copies of, or modify files belonging to other people, whether at Friends Academy or elsewhere, unless specifically authorized to do so by those individuals.

5. You must not create, send, or forward electronic chain letters or unnecessary multiple recipient email.

6. Messages, sentiments, and declarations sent as electronic mail or electronic publishing must meet the same standards for distribution or display as if they were physical documents. You are free to publish your opinions, but they must be clearly and accurately identified as coming from you, or, if you are acting as the authorized agent of a group recognized by Friends Academy, as coming from the group you are authorized to represent.

7. You must adhere to the rules of copyright. Network users must respect all copyright issues regarding software, information, and authorship. All material on the network should be assumed to be copyrighted. No material is to be downloaded for the purposes of duplication.  (Refer to the Friends Academy Guidelines on Academic Honesty, Appendix A.)

8. If you create or maintain electronically stored information that is important to your work or to Friends Academy in general, you are responsible for making frequent backups of the information.

9. You must not attempt to decrypt or translate encrypted material, or obtain system privileges to which you are not entitled. Attempts to do any of these things will be considered serious transgressions.

10. If you encounter or observe a gap or weakness in system or network security, you must report the gap or weakness to the Technology Department. You must refrain from exploiting any such gaps or weaknesses in security.

11. You must be sensitive to the public nature of shared facilities and take care not to display on screens in such locations images, sounds, or messages that could create an atmosphere of discomfort or harassment for others. You must also refrain from transmitting to others in any location inappropriate images, sounds, or messages that might reasonably be considered inappropriate.

12. You must avoid tying up computing resources for game playing or other trivial applications and printing excessive copies of documents, files, images, or data. You must refrain from using unwarranted or excessive amounts of storage. You must be sensitive to special needs for software and services available in only one location (e.g. scanning and video editing), and cede your place to those whose work requires the special items.

13. You must not prevent others from using shared resources by running unattended processes or placing signs or devices to "reserve" them without authorization.  Your absence from a public computer or workstation should be no longer than warranted by a visit to the nearest restroom.  A device unattended for more than ten minutes may be assumed to be available for use and any process running on that device terminated.  You must not "lock" a workstation or computer in a way that restricts access to others.

14. You must not copy any programs or data that have been obtained under contracts or licenses by Friends Academy.

15. You should be aware that there are federal, state, and sometimes local laws that govern certain aspects of computer and telecommunications use.  Members of the Friends Academy community are expected to respect these laws, as well as to observe and respect Friends Academy rules and regulations.

**Personal Computers on Campus**

Students in grades 9 - 12 are required to bring personal computers (laptops, notebooks, or tablet computers) to campus for academic use.  It is fully expected that use of personal computers on campus will follow all rules spelled out in the above guidelines and will be respectful of all students, faculty, staff, and the school's Quaker principles.  The decision to allow a student to use a computer during class is at the discretion of the classroom teacher.

**Technology Use in the Library**

The Kumar-Wang Library is a place for academic study and interpersonal connection.  Students using computers in the Library, those provided by the school or their own, are expected to use good judgment about both content and time management.

**Use of Social Media**

Friends Academy respects the importance of online social media sites like Facebook, Twitter, Instagram, and others to students who use these sites as a means of communicating with friends.  Nonetheless, students and parents must understand the public nature of these sites, and the responsibility and accountability that they, as site manager, must assume. They also must understand that their names are linked with Friends Academy, and as a result, the school may monitor the content of these sites because of the impact this can have on school accountability, public image, and student safety.

Friends Academy reserves the right to monitor social media for language and images that are not consistent with school guidelines and philosophy.  Should a student have inappropriate material on his/her social media sites, the school will contact the parents and ask their help in removing the inappropriate material. It is also possible that the school may respond with a disciplinary response.

# Exhibit D

# FRIENDS ACADEMY

### Duck Pond Road, Locust Valley, New York

**Student ID:** ▮▮▮▮

## ENROLLMENT CONTRACT

The undersigned Parent(s)/Guardian(s) (the **"Parents"**) represent that they have the authority to enter into this Enrollment Contract for the enrollment of ▮▮▮▮▮▮▮▮ (the **"Student"**) as a student entering grade **10** in Friends Academy (the **"School"**) for the school year 2020-21 (the **"School Year"**). In consideration for the enrollment of the Student by the School, Parents acknowledge and agree to comply with and be bound by the terms and conditions stated herein.

**MATRICULATION FEE (Newly Enrolling Students Only)-** Parents of newly enrolling students agree to make a one-time, non-refundable payment of $300 (ECH), $400 (Grades K-5), $500 (Grades 6-8), $600 (Grades 9-12) (the **"Matriculation Fee"**). Parents must submit the Matriculation Fee, via personal check payable to Friends Academy, along with their Enrollment Deposit (as that term is defined below) and this executed Enrollment Contract.

**ENROLLMENT DEPOSIT -** Parents of newly enrolling and returning students agree to make a non-refundable payment of **$3,890 (the "Enrollment Deposit"),** which secures the enrollment of the Student for the School Year. The Enrollment Deposit and this Enrollment Contract must be submitted to the School on or before (the **"Enrollment Deadline")**. The Enrollment Deposit <u>is paid directly to the School</u> and will be applied against tuition charges, as that term is defined below. **<u>A student is officially enrolled only upon receipt of this Enrollment Contract, signed by both parents, together with the Matriculation Fee (if applicable) and the Enrollment Deposit.</u>** If this Enrollment Contract, the Matriculation Fee (if applicable) and the Enrollment Deposit are not received by the School by the Enrollment Deadline, the School, in its sole and exclusive discretion, may accept the Enrollment Contract after the Enrollment Deadline, but is not obligated to do so.

### Tuition and Other Fees, Costs and Expenses

Parents are financially responsible for the payment of tuition (the **"Tuition"**) and all other fees, expenses, incidental charges and costs (including but not limited to and by way of example, dining sales, books, clothing, driver's education, afterschool, and enrichment activities, etc.) (the **"Fees"**) as may be incurred during the course of the School Year and agree to pay the Tuition and Fees, as applicable, and as may come due and owing as billed. The Tuition for the School Year is **$38,900.** The enrollment of the Student is made for the full School Year and the School budgets based on the Student's enrollment and the financial obligations committed pursuant to this Enrollment Contract. **<u>Parents understand that they are responsible for the payment of the full Tuition and Fees and agree to pay the full Tuition and Fees, in accordance with the payment option selected below. No portion of the Tuition and Fees due under this Enrollment Contract may be applied to payment of another student's enrollment account. Under no circumstances will any portion of the Tuition and Fees be refunded, forgiven or reduced except as specifically established in this Enrollment Contract.</u>**

### TUITION PAYMENT PLAN

In signing this Enrollment Contract, Parents agree to pay Tuition consistent with the payment plan checked below.

**ANNUAL**       0   I/We will pay the **full year** tuition and fees **by August 1st.**

**SEMI-ANNUAL**      0   I/We will pay the **first term (60% of tuition)** and all fees for the year **by August 1st** and the **second term (40% of tuition) by January 1st.**

**MONTHLY PLAN**      @   I/We will make **ten (10) monthly payments through <u>Friends Academy Tuition Plan</u>** with the first payment deducted on June 1st, as explained in the accompanying brochure and application. A completed application and fee must be received in order to participate in this plan. In addition, Parents selecting this plan should review the TILA disclosure included in the Tuition Plan brochure.

*Parents understand that, if they submit this Enrollment Contract without indicating their preferred payment plan, Parents will be expected to meet the payment obligations of the Semi-Annual Plan.*

**FINANCIAL AID** – Parents understand that, if they apply for financial aid through the School, Parents must submit any and all forms the School may require, including tax returns, in accordance with submission dates established by the Financial Aid Committee. If the amount of financial aid awarded is insufficient, Parents may withdraw the Student, with no obligation to pay Tuition and Fees; however, notification of such withdrawal must be made in writing, directed to the Director of Admissions and Financial Aid within 10 business days after the School advises Parents of the amount of financial aid awarded. Absent such notification of withdrawal, Parents will be responsible for the payment of Tuition and Fees, less any financial aid awarded. Financial aid awards for the School Year are prorated and applied against August and January tuition billings. Unless the Friends Academy Tuition Plan is selected, 60% of the remaining Tuition will be due on or before August 1st and the final 40% will be due on or before January 1st.

**OBLIGATION TO PAY** – Parents understand that class size, space, and other factors limit the number of students the School may enroll for any school year. When the School makes admission decisions, it relies on the acceptances already received to determine whether an applicant can or should be admitted. When a student withdraws from the School, it is difficult, if not impossible, to find a suitable replacement without altering the student environment which the School carefully constructs to be dynamic and engaging. It is especially difficult to find suitable replacements after the established Cancellation Date of June 1, 2020 (the "**Cancellation Date**"), as replacements will have accepted positions at other institutions and will be otherwise bound to the obligations of those institutions. **Therefore, Parents understand that their obligation to pay the Tuition and Fees for the full academic year, or, in the event of a late enrollment, for that portion that remains after the date of enrollment, is unconditional and that no portion of such Tuition or Fees so paid or outstanding will be refunded or cancelled notwithstanding subsequent absence, withdrawal or dismissal of the Student from the School, regardless of whether such decision is made by the School or by the Parents.** The retention of sums paid and requirement to pay sums outstanding, if any, shall be deemed liquidated damages, it being impractical to fix actual damages at the time of making this Enrollment Contract. In the event the School must refer collection of an overdue account to an attorney, Parents agree to pay the School's cost of collection, including its reasonable attorney's fees and court costs.

**TUITION REFUND PLAN** – The School offers a **Tuition Refund Plan** (the "**TRP**"). The TRP protects Parents' Tuition investment by providing for the payment and/or reimbursement of Tuition in certain circumstances. Coverage extends to certain circumstances of withdrawal or dismissal, subject to TRP terms and conditions, including the requirement that the Student attend the School for the requisite number of days, all of which is more fully set forth in the TRP documentation, available at the Business Office. The TRP premium is not included in the Tuition. The cost of participation in the TRP is calculated at .75% of the Tuition and is included in the first billing statement of the School Year. Parents authorize the School to collect any payment to which they are entitled under the TRP and to credit it to the Student's account, paying any excess remaining to the Parents. In the event the TRP does not cover the outstanding balance on the Student's account, Parents agree to pay the School the outstanding balance within 30 days of Parents' receipt of a final, itemized bill. Parents understand further that they will be billed for the TRP and will be obligated to pay such amount unless they indicate below that they do not wish to participate in the TRP.

☑ I/We **DO NOT** wish to participate in the Tuition Refund Plan.

**NON PAYMENT AND LATE FEES** – The Student will not be permitted to attend classes; take examinations; attend or participate in School or extracurricular School activities, including but not limited to, athletics, school trips, school dances and other social functions, graduation, and/or visits by colleges and universities; have access to the portal; or be invited for re-enrollment if any installment for Tuition and Fees is past due. Nor will the School provide grades, transcripts, recommendations or other written or oral communications on behalf of the Student to any party, including but not limited to other private or public schools, colleges or universities or the Parents, except as required by law, if any installment for Tuition and Fees is past due. Parents understand that a **Late Fee** of 1.5%, which Parents agree to pay, is imposed on the balance due the School whenever Parents fail to pay for tuition, fees, and other charges on or before the applicable due date. This fee will be charged to the Student's account on a monthly basis until the past due balance is paid in full. The parties agree that such fee is a reasonable estimate of the expense the School will suffer in the event of a late payment.

**ADMISSION/RE-ENROLLMENT** – Admission and/or re-enrollment for the School Year shall be conditioned upon Student's satisfactory completion of the previous school year, the School's receipt of any legally required immunization documentation, and Parents' payment of any outstanding balances due to the School for the Student and/or any other students for which Parents have financial responsibility. Additionally, for a new student, Parents shall provide the School with proof directly from the school formerly attended that the Student has successfully completed the previous school year and was accepted in the grade corresponding to the one stipulated in this Enrollment Contract. If the report from the previous school recommends that the Student repeat the grade in which s/he is currently enrolled, the School, in the sole and exclusive discretion of its Head, may follow such recommendation, providing that the School has space in such grade. For returning students, successful completion of the school year shall be determined at the sole discretion of Friends Academy and is dependent in part but not exclusively upon the Student's school progress, general citizenship and other factors that may impact and/or affect the School and/or the Student. Parents further understand that current and/or past enrollment in the School does not ensure future enrollment and that the School reserves the right, in the sole and exclusive discretion of the Head, to deny an offer of enrollment to any student. The School is not required to provide notification in advance of the

denial of re-enrollment, and it is expressly agreed that, regardless of when the Parents are informed of the denial of re-enrollment, it shall neither be a breach of this Enrollment Contract nor a basis for re-enrollment.

**USE OF STUDENT IMAGES** – Friends Academy is cautious with the use of student images and will always keep the safety and security of members of the community in mind. Friends wishes to celebrate our community and consequently hopes that all members will grant permission for their student's image and name to be used. Please indicate below your preference for the use of your child's image. If option 1 or 2 is selected, Parents give the School permission to use the Student's name, written extractions, voice/video recordings, and photographs taken of the Student, without restriction or compensation, in the School's publications and on the School's website or social media sites for promotional and journalistic (storytelling) uses. Permission also is hereby given for the School to use statements, articles, names, music, art, photographs, audio recordings, films and videos created by the Student or originating from the School or from School-related activity. Parents also understand that the School reserves the right to grant use of these materials to any third parties in connection with their work with the School. Such authorization survives the term of this Enrollment Contract and serves as authority to use such material both during and after the Student is enrolled at the School.

Please check one choice below to indicate your preference:

○ **YES,** you may use my child's photo **with** his or her name.

◉ **YES,** you may use my child's photo **without** his or her name.

○ **NO,** you may not use my child's photo. (Child's photo will not appear in school slideshows, school calendar, website photos, etc.)

**TRUTHFULNESS OF INFORMATION** - Parents affirm that all of the information provided to the School in the Student's application for admission, in this Enrollment Contract, and throughout the application and enrollment processes is truthful, accurate, and complete in both content and representation, and that it is Parents' duty to update the School of any material changes to the information provided while the Student is enrolled at the School. Parents further understand and agree that if any such information is found to be false, misleading or inaccurate, the Student may be subject to dismissal.

**STUDENT COMPLIANCE WITH SCHOOL POLICIES** - By executing this Enrollment Contract, Parents agree that they and the Student will abide by Friends Academy's rules, regulations, policies, and codes of conduct and character, as may be adopted or amended from time to time, including but not limited to the School's immunization policy and any other health-related policies, its acceptable use policy, and its student and parent handbook. Parents acknowledge that the School reserves the right, in its sole and exclusive discretion, to dismiss or otherwise discipline any student who does not meet the behavioral and/or academic standards of the School, whose conduct at any time or place interferes with the School program or operations, or who otherwise brings discredit to the School. The administration, teachers and staff may take all action necessary to ensure the operation of the School in all matters as it may apply to the Student. The Parents agree that they and the Student will read carefully all written policy documents created by the School and agree to abide and support the requirements and guidelines outlined in any such publications. Parents can find links to select School policies in the parent portal on the Friends Academy website; however, the School reserves the right to change, alter, delete, amend, or add to these policies, from time to time, within its sole and exclusive discretion.

**PARENT COOPERATION** - A positive and constructive relationship between the School and Parents or other individuals interacting with the School and/or School community by virtue of their relationship with the Student (the "**Affiliated Individuals**") is essential to the mission of the School. Thus, if the behavior, communication, or interaction on-campus or off-campus (including during School-sponsored events) of Parents or Affiliated Individuals is disruptive, intimidating, overly aggressive, or reflects a loss of confidence or serious disagreement with the School, including but not limited to disagreement with its policies, procedures, responsibilities, personnel, leadership or standards, or imperils accomplishment of its educational purpose or program, Parents understand and agree that the School has the right to dismiss the Student from the School, the School property, a School event, or implement other such restrictions as determined in the School's sole and exclusive discretion. In addition, Parents understand and agree that the School has the right to place restrictions on the Parents' or Affiliated Individuals' involvement with or activity at the School, on School property, or at School-related events, if such Parents or Affiliated Individuals engage in behavior that the School determines to warrant such a restriction.

**STUDENT AGE OF MAJORITY** - It is the policy of the School that the School be able to communicate with the Parents regarding any and all matters relating to the Student, including but not limited to the Student's academic progress, disciplinary issues or behavioral concerns. In the event that the Student reaches the statutory age of majority during the course of the School Year and the Student refuses to permit the School to communicate with Parent regarding any and all matters relating to the Student, Parents and Student acknowledge and agree that the School may exercise its right to dismiss the Student for violation of this School policy. Parents acknowledge and agree that they will meet their payment obligations, regardless of whether the Student is dismissed pursuant to this paragraph.

**SCHOOL DIRECTORIES** - The School's directories, and any other personal, private, and/or non-public information about students and their families are all confidential and use is restricted for School purposes only. Any use of such information by

Parents or the Student for reasons not related to School purposes may result in Student's immediate dismissal from the School. This includes but is not limited to use of such directories or other private information about students by Parents for the purpose of financial gain.  Parents are responsible for maintaining updated contact information, including valid email address(es).  Contact information can be updated in the parent portal on the Friends Academy website in MyBackpack.

**REPORTING DISCIPLINARY OFFENSES TO COLLEGES AND UNIVERSITIES** - The School reserves the right to report to colleges and universities discipline that occurred in upper school prior to the application process, during the application process and after applications are submitted, including but not limited to after students are accepted to colleges and universities.  The School reserves the right to report infractions of school rules which lead to suspensions, and reserves the right to report other violations that the School in its sole and exclusive discretion believes warrants such reporting.

**EMERGENCY INFORMATION AND AUTHORIZATION** - In order to assist the School in attending to the health and safety the Student, Parents must provide the School with a full and complete description of any health condition(s) or medical restriction(s) that the Student may have. The School will make every reasonable attempt to contact the Parents in the event of a medical emergency; however, by executing this Enrollment Contract, Parents authorize the School, its employees, agents and chaperones to: (a) accompany the Student to a medical facility; (b) authorize treatment of the Student by licensed medical personnel; (c) authorize and permit a nurse or first responders (such as EMTs or paramedics) to administer first aid or other treatment to the Student; (d) take any other actions reasonably necessary to treat the Student in the event of a medical emergency; and/or (e) to use and/or disclose pertinent health information to appropriate School representatives charged with the supervision and care of the Student or other health care providers for the treatment of any injury or health condition that may arise at School or during School-related activities.  Parents agree that any medical insurance that covers the Student will be the primary insurance coverage for any such treatment.

**INFECTIOUS AND COMMUNICABLE DISEASES** - Parents agree to comply with the School's infectious and communicable disease policy and to follow and comply with instructions and other directions established by the School. Failure to follow and comply with the policy instructions and other directions established by the School may serve as grounds for removal of a Student.

**NAME, LOGO AND LIKENESS** - Parents agree that they and the Student are not authorized to use or give permission to use the School's name or any likeness of the School's name, crest or logo for any School or non-School related purpose or reason without the express written permission of the Head of School or other School personnel authorized to grant such permission. This applies in all situations including but not limited to cases of personal gain or benefit, when describing or publicizing an event, outing, club, sports team, group or other activity that the Parents or the Student may or may not organize, lead or participate in.

**REPRESENTING THE SCHOOL** - Parents understand and agree that neither the Parents nor the Student is authorized to speak on behalf of the School, represent the School or otherwise suggest that their statements, opinions or positions are those of the School, or encourage others to do so, without the express permission of the Head of School or other School personnel authorized to grant such permission. This includes, but is not limited to, making statements, either publicly or privately, whether for a School-related or non-School related purpose or reason, by any and all means of communication, including but not limited to posting on internet blogs, social media, or providing statements to the press.  Violations may result in the Student's dismissal from the School and or other consequences as deemed appropriate in the sole and exclusive discretion of the School.

**SCHOOL PROGRAMS AND STUDENT'S INDIVIDUALITY** - Parents acknowledge that their execution of this Enrollment Contract is not contingent upon any particular program, curriculum, employee, or enrollment level, and understand that the School retains the right to change the School's programs, curriculum, or workforce at its discretion.  Parents further understand that, while the School remains committed to the academic excellence and the personal growth of each of its students, the students have varying skills, talents, and capabilities.  By entering into this Enrollment Contract, Parents understand that the School cannot guarantee the academic success or social readiness of any individual student and that the School does not guarantee that the Student will succeed in meeting the School's minimum performance standards. While the School provides limited student support services, the Parents also understand that the School is not responsible for learning and social diagnostic services and evaluation, and that by entering into this agreement, the Parents hold the School harmless for any such services that it does provide to the Student.

**ACCOMMODATIONS** - The School reserves the right to make decisions, in its sole and exclusive discretion, related to the implementation of teaching and testing plans, methods, and schedules. Further, the School likewise reserves the right, in its sole and exclusive discretion, to determine whether any learning and/or testing accommodation requests will be granted, including but not limited to requests for extended test-taking time or other alternate test-taking procedures. Such decisions will be within the sole purview of the School and shall be made consistent with applicable law.

**AUTHORIZATION TO SEARCH AND RETAIN** - Parents authorize and give permission for the School to inspect and confiscate any and all technological devices, personal property and School-provided storage spaces, whether on or off of School grounds, during the School day or during School-related events.  This includes, but is not limited to, inspection and

confiscation of a student's cell phone or a cell phone in their possession; laptops and computers, whether School-issued or student owned; backpacks, bags, and or other personal property brought to campus or School-related; lockers and desks; and any vehicles used by the Student, whether on School property or brought to School-related events.

**FORCE MAJEURE** – A "*Force Majeure*" event shall mean an event that is beyond the control of the School, including, without limitation, lightning, floods, hurricanes, earthquakes, wind storms, tornadoes, act of terrorism, war, restrictive governmental laws or regulations, fire, strikes, lockouts, labor troubles, civil disorder or other events of a similar or different kind. If possible, the School will make every reasonable attempt to give prompt notice specifying the nature and extent of the circumstances giving rise to a *Force Majeure* event. In the event of a *Force Majeure* that prevents or delays the School's performance of any of its obligations, then performance of any such obligation shall be excused without penalty or liability to the School for the period of the delay and the period for the performance of any such obligation shall be extended for a period equivalent to the period of such delay. In the event the School's performance of any of its obligations is made inadvisable, impractical, illegal or impossible by reason of a *Force Majeure* event, then any such obligation may be terminated, without penalty or liability to the School. In any such instance, Parents' obligation to pay Tuition shall continue.

**HOLD HARMLESS AGREEMENT** – Parents authorize and give permission for the Student to participate in all School activities (the "**Activities**"), including sports and trips away from the School premises. Parents understand that the School will have adults participate in on-campus and off-campus Activities, who will attempt to exercise reasonable diligence to ensure the safety and well-being of Student during her/his participation; however, Parents also understand that it is not possible for the School to supervise all aspects of the Activities at all times. Parents also understand that all Activities of any nature carry certain elements of risk, including risks of serious personal injury and loss of or damage to personal property, some of which are obvious and some of which, although not obvious, are foreseeable. Parents understand that it is not possible herein to specifically identify all foreseeable risks inherent in all applicable Activities. Parents voluntarily assume and accept such risks arising from Student's participation in the Activities. Parents agree not to hold the School, its officers, directors, agents and employees responsible for any claims, demands, actions or causes of action which may result from the Student's participation and/or transportation to and from such activities, except any claims, demands or causes of action gross negligence and intentional acts. Further, this provision is not intended to release the School's insurers, if any, or non-agent third parties of any responsibility for any claims that may otherwise be asserted.

**COST OF PARTICIPATION IN COURT OR OTHER LEGAL PROCEEDINGS** - If, as a result of the School's relationship with the Student, the Parents, or Affiliated Individuals, the School or any member of its faculty or staff is required to testify, provide information for, or otherwise participate in a legal dispute to which the School is not a party, the School shall be entitled to recover from the Parents the School's attorneys' fees and costs incurred in such legal action and costs incurred by the School as a result of the collection of documents, coverage of faculty, staff or others absent from classrooms or other School responsibilities or other associated costs.

**MISCELLANEOUS** - This Enrollment Contract represents the full and complete agreement between the School and the Parent regarding the Student's enrollment at the School during the School Year. This Enrollment Contract supersedes all prior negotiations, agreements, terms, conditions, statements, or representations, whether written or oral, concerning the subject matter of this Enrollment Contract. This agreement may not be altered, amended, modified or otherwise changed except in writing, signed by the Head and the Parent. Invalidity or unenforceability of one or more provisions of this agreement shall not affect any other provision of this Enrollment Contract and the remainder of this agreement shall remain in full force and effect. Failure of either Party to enforce any provision of this Enrollment Contract does not prevent the Party from enforcing any other provision of this agreement. This Enrollment Contract is subject to the laws of the State of New York. The Parent consents that the courts located in the State of New York have the sole and exclusive jurisdiction in any action arising out of or relating to this Enrollment Contract.

## SIGNATURES

By signing this Enrollment Contract, each Parent agrees to be jointly and severally responsible for all payments due. Each Parent must sign this Enrollment Contract. Where two Parents are financially responsible for the Student, the School requests two signatures. However, where impossible or impracticable to secure both signatures, the Enrollment Contract may be signed by one Parent on behalf of both. The submission of the Enrollment Contract with the signature of a single Parent will constitute the representation of that Parent that s/he has the necessary authority and consent to sign on behalf of the other Parent.

By signing below, Parents are knowingly and voluntarily entering into this legal contract and agreeing to the Enrollment Contract's terms.

**ELECTRONIC SIGNATURE AGREEMENT** - By selecting the "I Accept" button, you are signing this Agreement electronically. You agree your electronic signature is the legal equivalent of your manual signature on this Agreement. By selecting "I Accept" you consent to be legally bound by this Agreement's terms and conditions.

I Accept the Electronic Signature Agreement

Your **full** names typed below are your electronic signatures.  Two parent/guardian signatures are required.  Single/Divorced individuals please type your initials in the second signature box.

Dated: 12/12/2020

(mm/dd/yyyy)

*Signature of Parent or Guardian:  Anthony Lodati

*Signature of Parent or Guardian:  Anthony Lodati

*Signature of Student (Grades 6-12)

**(Students entering Grades 6-12 must sign this contract)**

# Exhibit E

# FRIENDS ACADEMY

**Duck Pond Road, Locust Valley, New York**

**Student ID:** ███████

## ENROLLMENT CONTRACT

## For Returning Students

This Enrollment Contract is entered into by and between Friends Academy (**"Friends Academy"** or the **"School"**) and the undersigned Parent(s)/Guardian(s) (the **"Parents"**), who represent that they have the authority to enter into this Enrollment Contract for the enrollment of ███████ ███████ (the **"Student"**) as a student entering grade **K** for the 2021-2022 school year (the **"School Year"**). In consideration for the enrollment of the Student by the School, Parents acknowledge and agree to comply with and be bound by the terms and conditions stated herein.

**ENROLLMENT DEPOSIT -** Parents agree to make a non-refundable payment of **$2,860** (the **"Enrollment Deposit"**), which secures the enrollment of the Student for the School Year. The Enrollment Deposit and this Enrollment Contract must be submitted to the School on or before **March 11, 2021** (the **"Enrollment Deadline"**). The Enrollment Deposit **is paid directly to the School** and will be applied against tuition charges, as that term is defined below. **A student is officially enrolled only upon receipt of this Enrollment Contract, signed by both parents, together with the Enrollment Deposit.** If this Enrollment Contract and the Enrollment Deposit are not received by the School by the Enrollment Deadline, the School, in its sole and exclusive discretion, may accept the Enrollment Contract after the Enrollment Deadline, but is not obligated to do so. Further, should Parents submit this Enrollment Contract and this Enrollment Deposit after **April 1, 2021**, and if the School, in its sole and exclusive discretion, accepts the Enrollment Contract and the Enrollment Deposit after **April 1, 2021** , Parents will be charged an additional $500.00 late enrollment fee.

**Tuition and Other Fees, Costs and Expenses -** Parents are financially responsible for the payment of tuition (the **"Tuition"**) and all other fees, expenses, incidental charges and costs (including but not limited to and by way of example, dining sales, books, clothing, driver's education, afterschool, and enrichment activities, etc.) (the **"Fees"**) as may be incurred during the course of the School Year and agree to pay the Tuition and Fees, as applicable, and as may come due and owing as billed. The Tuition for the School Year is **$28,600**. The enrollment of the Student is made for the full School Year and the School budgets based on the Student's enrollment and the financial obligations committed pursuant to this Enrollment Contract. **Parents understand that they are responsible for the payment of the full Tuition and Fees (including the non-refundable Enrollment Deposit) and agree to pay the full Tuition and Fees, in accordance with the payment option selected below. No portion of the Tuition and Fees due under this Enrollment Contract may be applied to payment of another student's enrollment account. Under no circumstances will any portion of the Tuition and Fees be refunded, forgiven or reduced, except as specifically established in this Enrollment Contract.**

## TUITION PAYMENT PLAN

In signing this Enrollment Contract, Parents agree to pay Tuition consistent with the payment plan checked below.

**ANNUAL** ○ I/We will pay the **full year** tuition and fees **by August 1st**.

**SEMI-ANNUAL** ○ I/We will pay the **first term (60% of tuition)** and all fees for the year **by August 1st** and the **second term (40% of tuition) by January 1st**.

**MONTHLY PLAN** ◉ I/We will make **ten (10) monthly payments through Friends Academy Tuition Plan** with the first payment deducted on June 1st, as explained in the accompanying brochure and application. A completed application and fee must be received in order to participate in this plan. In addition, Parents selecting this plan should review the TILA disclosure included in the Tuition Plan brochure.

**Parents understand that, if they submit this Enrollment Contract without indicating their preferred payment plan, Parents will be expected to meet the payment obligations of the Semi-Annual Plan.**

**FINANCIAL AID –** Parents understand that, if they apply for financial aid through the School, Parents must submit any and all forms the School may require, including tax returns, in accordance with submission dates established by the Financial Aid Committee. If the amount of financial aid awarded is insufficient, Parents may withdraw the Student, with no obligation to pay Tuition and Fees; however, notification of such withdrawal must be made in writing, directed to the Director of Enrollment and Financial Aid within 10 business days after the School advises Parents of the amount of financial aid awarded. Absent such notification of withdrawal, Parents will be responsible for the payment of Tuition and Fees, less any financial aid awarded. Financial aid awards for the School Year are prorated and applied against August and January tuition billings. Unless the Friends Academy Tuition Plan is selected, 60% of the remaining Tuition will be due on or before August 1st and the final 40% will be due on or before January 1st.

**OBLIGATION TO PAY/WITHDRAWAL OR REMOVAL -** Parents understand that class size, space, and other factors limit the number of students the School may enroll for any school year. When the School makes admission decisions, it relies on the acceptances already received to determine whether an applicant can or should be admitted. When a student withdraws from the School, it is difficult, if not impossible, to find a suitable replacement without altering the student environment which the School carefully constructs to be dynamic and engaging. It is especially difficult to find suitable replacements after the established Cancellation Date of June 1, 2021 (the **"Cancellation Date"**), as replacements will have accepted positions at other institutions and will be otherwise bound to the obligations of those institutions. **Therefore, Parents understand that their obligation to pay the Tuition and Fees for**

**the full School Year, or, in the event of a late enrollment, for that portion that remains after the date of enrollment, is unconditional and that no portion of such Tuition or Fees so paid or outstanding will be refunded or cancelled notwithstanding subsequent absence, withdrawal or dismissal of the Student from the School, regardless of whether such decision is made by the School or by the Parents.** The retention of sums paid and requirement to pay sums outstanding, if any, shall be deemed liquidated damages, it being impractical to fix actual damages at the time of making this Enrollment Contract.

**TUITION REFUND PLAN** – The School offers a **Tuition Refund Plan** (the "**TRP**"). The TRP protects Parents' Tuition investment by providing for the payment and/or reimbursement of Tuition in certain circumstances. Coverage extends to certain circumstances of withdrawal or dismissal, subject to TRP terms and conditions, including the requirement that the Student attend the School for the requisite number of days, all of which is more fully set forth in the TRP documentation, available at the Business Office. The TRP premium is not included in the Tuition. The cost of participation in the TRP is calculated at .85% of the Tuition and is included in the first billing statement of the School Year. Parents authorize the School to collect any payment to which they are entitled under the TRP and to credit it to the Student's account, paying any excess remaining to the Parents. In the event the TRP does not cover the outstanding balance on the Student's account, Parents agree to pay the School the outstanding balance within 30 days of Parents' receipt of a final, itemized bill. Parents understand further that they will be billed for the TRP and will be obligated to pay such amount unless they indicate below that they do not wish to participate in the TRP.

☐ I/We **DO NOT** wish to participate in the Tuition Refund Plan.

**NON PAYMENT AND LATE FEES** – The Student will not be permitted to attend classes; take examinations; attend or participate in School or extracurricular School activities, including but not limited to, athletics, school trips, school dances and other social functions, graduation, and/or visits by colleges and universities; have access to the portal; or be invited for re-enrollment if any installment for Tuition and Fees is past due. Nor will the School provide grades, transcripts, recommendations or other written or oral communications on behalf of the Student to any party, including but not limited to other private or public schools, colleges or universities or the Parents, except as required by law, if any installment for Tuition and Fees is past due. Parents understand that a **Late Fee** of 1.5%, which Parents agree to pay, is imposed on the balance due the School whenever Parents fail to pay Tuition or Fees on or before the applicable due date. The Late Fee will be charged to the Student's account on a monthly basis until the past due balance is paid in full. The parties agree that such fee is a reasonable estimate of the expense the School will suffer in the event of a late payment.

**RE-ENROLLMENT** – Re-enrollment for the School Year shall be conditioned upon Student's satisfactory completion of the previous school year, the School's receipt of any legally required immunization documentation, and Parents' payment of any outstanding balances due to the School for the Student and/or any other students for which either or both Parents have financial responsibility. For returning students, successful completion of the school year shall be determined at the sole discretion of Friends Academy and is dependent in part, but not exclusively, upon the Student's school progress, general citizenship and other factors that may impact and/or affect the School and/or the Student. Parents further understand that current and/or past enrollment in the School does not ensure future enrollment and that the School reserves the right, in the sole and exclusive discretion of the Head, to deny an offer of enrollment to any student. The School is not required to provide notification in advance of the denial of re-enrollment, and it is expressly agreed that, regardless of when the Parents are informed of the denial of re-enrollment, it shall neither be a breach of this Enrollment Contract nor a basis for re-enrollment.

**USE OF STUDENT IMAGES -** While Friends Academy wishes to celebrate its community, it is also is cautious with the use of student images and will always keep the safety and security of members of the community in mind. By choosing either Option 1 or Option 2, below, and by executing this Enrollment Contract, Parents indicate their preferences for the School's use of the Student's name and likeness, and further give the School permission to use the Student's name, written extractions, voice/video recordings, and photographs taken of the Student, without restriction or compensation, in the School's publications and on the School's website or social media sites for promotional and journalistic (storytelling) uses. Permission also is hereby given for the School to use statements, articles, names, music, art, photographs, audio recordings, films and videos created by the Student or originating from the School or from School-related activity. Parents also understand that the School reserves the right to grant use of these materials to any third parties in connection with their work with the School. Such authorization survives the term of this Enrollment Contract and serves as authority to use such material both during and after the Student is enrolled at the School.

Please check one choice below to indicate your preference:

◉ **YES,** you may use my child's photo **with** his or her name.

○ **YES,** you may use my child's photo **without** his or her name.

○ **NO,** you may not use my child's photo. (Child's photo will not appear in school slideshows, school calendar, website photos, etc.)

**STUDENT DIGITAL PRIVACY -** From time to time, the School may hold classes remotely via distance-learning and/or may utilize various software applications and web-based services to deliver its program (the "**Online Services**"). In order to use the Online Services, students must often be registered in these systems using personally identifying information -- generally their name, School email address, and/or a student ID. During periods of distance-learning and when otherwise using the Online Services, School faculty, staff, administrators, and other employees or agents may communicate with students electronically through e-mail, instant messaging services through the various Online Services, or through videoconference. By signing this Enrollment Contract, Parents consent to the Student's participation in distance-learning and provide permission for School personnel to communicate with Parents and the Student via electronic communications. Parents further authorize the School to provide consent for the Student's use of the Online Services on Parents' behalf and to provide the Student's basic information to the Online Services when required to do so.

**TRUTHFULNESS OF INFORMATION -** Parents affirm that all of the information provided to the School in the Student's application for admission, in this Enrollment Contract, and throughout the application and enrollment processes is truthful, accurate, and complete in both content and representation, and that it is Parents' duty to update the School of any material changes to the information provided while the Student is enrolled at the School. Parents further understand and agree that if any such information is found to be false, misleading or inaccurate, the Student may be subject to dismissal.

**STUDENT COMPLIANCE WITH SCHOOL POLICIES -** By executing this Enrollment Contract, Parents agree that they and the Student will abide by Friends Academy's rules, regulations, policies, and codes of conduct and character, as may be adopted or amended from time to time, including but not limited to the School's immunization policy and any other health-related policies, its acceptable use policy, and its student and parent handbook. Parents acknowledge that the School reserves the right, in its sole and exclusive discretion, to dismiss or otherwise discipline any student who does not meet the behavioral and/or academic standards of the School, whose conduct at any time or place interferes with the School program or operations, or who

otherwise brings discredit to the School. The administration, teachers and staff may take all action necessary to ensure the operation of the School in all matters as it may apply to the Student. The Parents agree that they and the Student will read carefully all written policy documents created by the School and agree to abide and support the requirements and guidelines outlined in any such publications. Parents can find links to select School policies in the parent portal on the Friends Academy website; however, the School reserves the right to change, alter, delete, amend, or add to these policies, from time to time, within its sole and exclusive discretion.

**PARENT COOPERATION** - A positive, collaborative and constructive relationship between the School and Parents or other individuals interacting with the School and/or School community by virtue of their relationship with the Student (the **"Affiliated Individuals"**) is essential to the mission of the School. Thus, if the behavior, communication, or interaction on-campus, off-campus (including during School-sponsored events) or via digital or electronic means (including, but not limited to, on listservs or online forums) of Parents or Affiliated Individuals is disruptive; intimidating; overly aggressive; reflects a loss of confidence in or serious disagreement with the School, including but not limited to disagreement with its decisions, strategies, policies, procedures, responsibilities, delivery of its program, strategic initiatives, personnel, leadership or standards; imperils accomplishment of its educational purpose or program; threatens the health, safety or well-being of another member of the School community; or is otherwise inconsistent with commitments shared by members of the community, Parents understand and agree that the School has the right to dismiss the Student from the School, the School property, a School event, or implement other such restrictions as determined in the School's sole and exclusive discretion. In addition, Parents understand and agree that the School has the right to place restrictions on the Parents' or Affiliated Individuals' involvement with or activity at the School, on School property, or at School-related events, if such Parents or Affiliated Individuals engage in behavior the School determines to warrant such a restriction.

**STUDENT AGE OF MAJORITY** - It is the policy of the School that the School be able to communicate with the Parents regarding any and all matters relating to the Student, including but not limited to the Student's academic progress, disciplinary issues or behavioral concerns. In the event that the Student reaches the statutory age of majority during the course of the School Year and the Student refuses to permit the School to communicate with Parent regarding any and all matters relating to the Student, Parents and Student acknowledge and agree that the School may exercise its right to dismiss the Student for violation of this School policy. Parents acknowledge and agree that they will meet their payment obligations, regardless of whether the Student is dismissed pursuant to this paragraph.

**SCHOOL DIRECTORIES** - The School's directories, and any other personal, private, and/or non-public information about students and their families are all confidential and use is restricted for School purposes only. Any use of such information by Parents or the Student for reasons not related to School purposes may result in Student's immediate dismissal from the School. This includes but is not limited to use of such directories or other private information about students by Parents for the purpose of financial gain. Parents are responsible for maintaining updated contact information, including valid email address(es). Contact information can be updated in the parent portal on the Friends Academy website in MyBackpack.

**REPORTING DISCIPLINARY OFFENSES** - The School reserves the right to report to other schools (public and private), colleges and universities discipline that occurred prior to the application process, during the application process and after applications are submitted, including but not limited to after students are accepted to colleges and universities. The School reserves the right to report infractions of school rules which lead to suspensions, and reserves the right to report other violations that the School in its sole and exclusive discretion believes warrants such reporting.

**EMERGENCY INFORMATION AND AUTHORIZATION** - In order to assist the School in attending to the health and safety the Student, Parents must provide the School with a full and complete description of any health condition(s) or medical restriction(s) that the Student may have. The School will make every reasonable attempt to contact the Parents or another emergency contact in the event of a medical emergency; however, by executing this Enrollment Contract, Parents authorize the School, its employees, agents and chaperones to: (a) accompany the Student to a medical facility; (b) authorize treatment of the Student by licensed medical personnel; (c) authorize and permit a nurse or first responders (such as EMTs or paramedics) to administer first aid or other treatment to the Student; (d) take any other actions reasonably necessary to treat the Student in the event of a medical emergency; and/or (e) to use and/or disclose pertinent health information to appropriate School representatives charged with the supervision and care of the Student or other health care providers for the treatment of any injury or health condition that may arise at School or during School-related activities. Parents agree that any medical insurance that covers the Student will be the primary insurance coverage for any such treatment.

**IMMUNIZATIONS, INFECTIOUS AND COMMUNICABLE DISEASES** - Parents agree to comply with the School's infectious and communicable disease policy and to follow and comply with instructions and other directions established by the School. Parents understand that this includes, but is not necessarily limited to, compliance with the School's policy regarding required immunizations, vaccinations, testing for communicable diseases, as well as providing the School with required health records and other such documentation. Failure to follow and comply with the policy instructions and other directions established by the School may serve as grounds for removal of a Student.

**COMMUNITY HEALTH AND SAFETY** - Parents understand that the safety and security of all students is the School's highest priority. Parents understand and agree that the School reserves the right, in its sole and exclusive discretion, to implement any and all policies or procedures which it deems necessary to protect the health and safety of the School community. Examples of such policies or procedures may include, but are not necessarily limited to, modifying the method of delivery of its program, restricting or limiting access to campus, and/or requiring additional health screenings or immunizations Parents specifically agree to comply with any and all such policies or procedures as the School may implement.

**NAME, LOGO AND LIKENESS** - Parents agree that they and the Student are not authorized to use or give permission to use the School's name or any likeness of the School's name, crest or logo for any School or non-School related purpose or reason without the express written permission of the Head of School or other School personnel authorized to grant such permission. This applies in all situations including but not limited to cases of personal gain or benefit, when describing or publicizing an event, outing, club, sports team, group or other activity that the Parents or the Student may or may not organize, lead or participate in. The school reserves the right to take necessary and appropriate action in response to any unauthorized use.

**REPRESENTING THE SCHOOL** - Parents understand and agree that neither the Parents nor the Student is authorized to speak on behalf of the School, represent the School or otherwise suggest that their statements, opinions or positions are those of the School, or encourage others to do so, without the express permission of the Head of School or other School personnel authorized to grant such permission. This includes, but is not limited to, making statements or disseminating photos, either publicly or privately, whether fora School-related or non-School related purpose or reason, by any and all means of communication, including but not limited to posting on Internet blogs, social media, or providing statements to the press. Violations may result in the Student's dismissal from the School and or other consequences as deemed appropriate in the sole and exclusive discretion of the School.

**SCHOOL PROGRAMS AND STUDENT'S INDIVIDUALITY** - Parents acknowledge that their execution of this Enrollment Contract is not contingent upon any particular program, method of program delivery, curriculum, employee, or enrollment level, and understand that the School retains the right to

change the School's programs, curriculum, method of program delivery or workforce at its discretion. Parents further understand that, while the School remains committed to the academic excellence and the personal growth of each of its students, the students have varying skills, talents, and capabilities. By entering into this Enrollment Contract, Parents understand that the School cannot guarantee the academic success or social readiness of any individual student and that the School does not guarantee that the Student will succeed in meeting the School's minimum performance standards. While the School provides limited student support services, the Parents also understand that the School is not responsible for learning and social diagnostic services and evaluation, and that by entering into this Enrollment Contract, the Parents hold the School harmless for any such services that it does provide to the Student.

**ACCOMMODATIONS -** The School reserves the right to establish the required curriculum and make decisions, in its sole and exclusive discretion, related to the implementation of teaching and testing plans, methods, and schedules. Further, the School likewise reserves the right, in its sole and exclusive discretion, to determine whether any learning and/or testing accommodation requests will be granted, including but not limited to requests for extended test-taking time or other alternate test-taking procedures. Such decisions will be within the sole purview of the School and shall be made based on evaluation of necessary medical information, and assessing whether the accomodation constitutes an undue burden or fundamentally alters the educational program, consistent with applicable law.

**AUTHORIZATION TO SEARCH AND RETAIN -** Parents authorize and give permission for the School to inspect and confiscate any and all technological devices, personal property and School-provided storage spaces, whether on or off of School grounds, during the School day or during School-related events. This includes, but is not limited to, inspection and confiscation of a student's cell phone or a cell phone in their possession; laptops and computers, whether School-issued or student owned; backpacks, bags, and or other personal property brought to campus or School-related; lockers and desks; and any vehicles used by the Student, whether on School property or brought to School-related events.

**ACTIVITY PERMISSION, ASSUMPTION OF THE RISK AND RELEASE -** Parents authorize and give permission for the Student to participate in all aspect of the educational experience and School activities (the "**Activities**"), including on campus, distance learning and off campus activities (such as sports and trips away from the School premises). Parents understand that the School will have adults participate in the Activities, who will attempt to exercise reasonable diligence to ensure the safety and well-being of Student during their participation; however, Parents also understand that it is not possible for the School to supervise all aspects of the Activities at all times. Parents also understand that all Activities of any nature carry certain inherent elements of risk, including risks of illness, serious personal injury and loss of or damage to personal property, some of which are obvious and some of which, although not obvious, are foreseeable. Parents understand that it is not possible herein to specifically identify all risks inherent in all applicable Activities. Parents voluntarily assume and accept such risks arising from Student's participation in the Activities. Parents release the School, its officers, directors, agents and employees responsible for any claims, demands, actions or causes of action which may result from the Student's participation in the Activities. Parents agree that this release includes illness, personal injury or loss, theft or damage of personal property caused by or resulting from negligence, active or passive, of the School, its Trustees, employees and agents; however the release does not apply to liability for gross negligence, willful injury, or fraud. Further, this provision is not intended to release the School's insurers, if any, or non-agent third parties of any responsibility for any claims that may otherwise be asserted.

**COVID19 ASSUMPTION OF THE RISK, WAIVER AND RELEASE -** COVID-19 is extremely contagious and is believed to spread by person-to-person contact; and, as a result, federal and state health agencies recommend social distancing and various other measures to mitigate the risk of contracting the virus. The School has implemented reasonable preventative protocols, policies and procedures designed to reduce the spread of COVID-19. Students and their families are expected to adhere to these protocols in order to reduce the risks of contracting or spreading the virus at the School. Parents understand that the Student's presence on campus during the COVID-19 pandemic creates the risk that Parents and/or the Student could be exposed and or contract COVID-19.  By signing this Enrollment Contract, Parents release the School, its Trustees, employees, and agents, from all claims, liability and damages and that Parents or Student may have for personal injuries, illnesses, medical expenses, or other loss resulting from Student's presence on campus.  Parents agree that this relsease includes personal injury, illness, medical expenses, or other losses caused by or resulting from negligence, active or passive, of the School, its Trustees, employees and agents; however the release does not apply to liability for gross negligence, willful injury, or fraud, and is not intended to release any insurers, if any, or non-agent third parties of any responsibility for any claims that may otherwise be asserted.

**COST OF PARTICIPATION IN COURT OR OTHER LEGAL PROCEEDINGS -** If the Parents fail to make any payment under this Enrollment Contract when due, and the School undertakes collection efforts to collect the payment (including but not limited to efforts in-house, with the assistance of third parties, or through legal action), the Parents agree to pay all expenses incurred by the School, including collection costs and/or the School's attorneys' fees and any other related costs. If as a result of the School's relationship with the Student, the Parents, or Affiliated Individuals, the School or any member of its faculty or staff is required to testify, provide information for, or otherwise participate in a legal dispute to which the School is not a party, the School shall be entitled to recover from the Parents the School's attorneys' fees and costs incurred in such legal action and costs incurred by the School as a result of the collection of documents, coverage of faculty, staff or others absent from classrooms or other School responsibilities or other associated costs.

**MODIFICATION FOR ACTS BEYOND THE SCHOOL'S CONTROL -** Parents agree that in the event of any failure, delay, or modification in the School's performance or delivery of program under this Enrollment Contract resulting from causes beyond the School's reasonable control and occurring without its fault or negligence, including without limitation, acts of nature, fire, pandemic, U.S. government restrictions, wars, and insurrections, the Tuition obligations under this Enrollment Contract shall continue and the School shall not be liable for any such failure or delay in its performance. Parents understand that School schedules may be extended for a period of time due to any delay so caused and/or classes may be conducted via distance-learning basis and/or weekend classes may be scheduled, at the School's discretion.

**MISCELLANEOUS -** This Enrollment Contract represents the full and complete agreement between the School and the Parent regarding the Student's enrollment at the School during the School Year. This Enrollment Contract supersedes all prior negotiations, agreements, terms, conditions, statements, or representations, whether written or oral, concerning the subject matter of this Enrollment Contract. This agreement may not be altered, amended, modified or otherwise changed except in writing, signed by the Head and the Parent. Invalidity or unenforceability of one or more provisions of this agreement shall not affect any other provision of this Enrollment Contract and the remainder of this agreement shall remain in full force and effect. Failure of either Party to enforce any provision of this Enrollment Contract does not prevent the Party from enforcing any other provision of this agreement. This Enrollment Contract is subject to the laws of the State of New York. The Parent consents that the courts located in the State of New York have the sole and exclusive jurisdiction in any action arising out of or relating to this Enrollment Contract.

**SIGNATURES -** By signing this Enrollment Contract, each Parent agrees to be jointly and severally responsible for all payments due. Each Parent must sign this Enrollment Contract. Where two Parents are financially responsible for the Student, the School requests two signatures. However, where

impossible or impracticable to secure both signatures, the Enrollment Contract may be signed by one Parent on behalf of both. The submission of the Enrollment Contract with the signature of a single Parent will constitute the representation of that Parent that s/he has the necessary authority and consent to sign on behalf of the other Parent.

By signing below, Parents are knowingly and voluntarily entering into this legal contract and agreeing to the Enrollment Contract's terms.

**ELECTRONIC SIGNATURE AGREEMENT** - By selecting the "I Accept" button, you are signing this Agreement electronically. You agree your electronic signature is the legal equivalent of your manual signature on this Agreement. By selecting "I Accept" you consent to be legally bound by this Agreements terms and conditions.

☑ I Accept the Electronic Signature Agreement

Your full names typed below are your electronic signatures.  Two parent/guardian signatures are required.  Single/Divorced individuals please type your initials in the second signature box.

Dated:  03/2/21                    *Signature of Parent or Guardian:     william brown

                                   *Signature of Parent or Guardian:     william brown

# Exhibit F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

STEPHANIE LODATI, ET AL.,                    :
                                             :
                                             :    Civil Action No.
                          Plaintiffs,        :    21-cv-3875 (ENV) (AYS)
                                             :
              v.                             :    **AFFIDAVIT OF ANDREA KELLY**
                                             :    **IN SUPPORT OF DEFENDANTS'**
FRIENDS ACADEMY, ET AL.,                     :    **MOTION TO DISMISS THE**
                                             :    **AMENDED COMPLAINT**
                          Defendants.        :
                                             :

---------------------------------------------------------------x

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF NASSAU         )

**ANDREA KELLY** affirms the following under penalty of perjury:

1.      I have been at all times relevant to the above-captained matter (the "Action"), the

Head of School at Friends Academy.  I submit this affidavit in support of Defendants' motion

to dismiss the Amended Complaint.  The statements made herein are based on personal

knowledge.

2.      At all times relevant to the Action, Defendant Friends Academy has not received

federal financial assistance of any kind, including in the form of any grants, loans, contracts,

or any other arrangement by which the Federal government provides assistance in the form of

funds or services of federal personnel.

3.      At all times relevant to the Action, Defendant Friends Academy has not received

federal financial assistance in the form of real property or interest in such property, including

transfers or leases of such property for less than fair market value or for reduced

1

consideration, and proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal Government.

4.      At all times relevant to the Action, the officers of the Board of Trustees of Friends Academy were uncompensated volunteers and did not receive any remuneration from Friends Academy for their services.

5.      Friends Academy is a not-for-profit organization under Section 501(c)(3) of the internal revenue code (the "IRC").

6.      Attached hereto as **Exhibit A** is a true and accurate copy of Friends Academy's Form 990 for fiscal year ending June 2020, which confirms Friends Academy's tax-exempt status under Section 501(c)(3) of the IRC.

_____
ANDREA KELLY

Sworn to before me this
17 day of February 2022

_____
Notary Public

KATHRYN DINEEN
Notary Public, State of New York
No. 01DI6305766
Qualified in Nassau County
Commission Expires _____
10-16-2022

2

# Exhibit A

| Form **990** | **Return of Organization Exempt From Income Tax** | OMB No. 1545-0047 |
|---|---|---|
| | Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations) | **2019** |

▶ Do not enter social security numbers on this form as it may be made public.

Department of the Treasury
Internal Revenue Service

▶ **Go to** www.irs.gov/Form990 **for instructions and the latest information.**

**Open to Public Inspection**

**A For the 2019 calendar year, or tax year beginning** 07-01-2019 **, and ending** 06-30-2020

| B Check if applicable: | C Name of organization <br> FRIENDS ACADEMY | D Employer identification number |
|---|---|---|
| ☐ Address change | | 11-1633485 |
| ☐ Name change | Doing business as | |
| ☐ Initial return | | |
| ☐ Final return/terminated | Number and street (or P.O. box if mail is not delivered to street address) Room/suite <br> 270 DUCK POND ROAD | E Telephone number <br> (516) 676-0393 |
| ☐ Amended return | City or town, state or province, country, and ZIP or foreign postal code <br> LOCUST VALLEY, NY 11560 | |
| ☐ Application pending | | G Gross receipts $ 34,816,319 |

| F Name and address of principal officer: <br> ANN MARIE TIDONA <br> 270 DUCK POND ROAD <br> LOCUST VALLEY, NY 11560 | H(a) Is this a group return for subordinates? ☐ Yes ☒ No |
|---|---|
| | H(b) Are all subordinates included? ☐ Yes ☐ No |
| **I** Tax-exempt status: ☒ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no.) ☐ 4947(a)(1) or ☐ 527 | If "No," attach a list. (see instructions) |
| **J** Website: ▶ WWW.FA.ORG | H(c) Group exemption number ▶ |

| K Form of organization: ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ | L Year of formation: 1877 | M State of legal domicile: NY |
|---|---|---|

## Part I Summary

| | | |
|---|---|---|
| 1 | Briefly describe the organization's mission or most significant activities: <br> TO OPERATE AN INDEPENDENT ELEMENTARY AND SECONDARY EDUCATIONAL INSTITUTION. | |

Activities & Governance

| 2 | Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets. | | |
|---|---|---|---|
| 3 | Number of voting members of the governing body (Part VI, line 1a) | **3** | 13 |
| 4 | Number of independent voting members of the governing body (Part VI, line 1b) | **4** | 13 |
| 5 | Total number of individuals employed in calendar year 2019 (Part V, line 2a) | **5** | 369 |
| 6 | Total number of volunteers (estimate if necessary) | **6** | 215 |
| 7a | Total unrelated business revenue from Part VIII, column (C), line 12 | **7a** | 0 |
| b | Net unrelated business taxable income from Form 990-T, line 39 | **7b** | 0 |

| | | Prior Year | Current Year |
|---|---|---|---|
| Revenue | 8 | Contributions and grants (Part VIII, line 1h) | 2,628,916 | 3,047,511 |
| | 9 | Program service revenue (Part VIII, line 2g) | 27,271,388 | 26,681,954 |
| | 10 | Investment income (Part VIII, column (A), lines 3, 4, and 7d ) | 1,514,138 | 1,576,679 |
| | 11 | Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 559,482 | 164,327 |
| | 12 | Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 31,973,924 | 31,470,471 |
| Expenses | 13 | Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) | 2,114,266 | 2,137,621 |
| | 14 | Benefits paid to or for members (Part IX, column (A), line 4) | 0 | 0 |
| | 15 | Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 20,466,796 | 20,320,803 |
| | 16a | Professional fundraising fees (Part IX, column (A), line 11e) | 0 | 0 |
| | b | Total fundraising expenses (Part IX, column (D), line 25) ▶1,108,509 | | |
| | 17 | Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) | 9,275,692 | 7,958,389 |
| | 18 | Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | 31,856,754 | 30,416,813 |
| | 19 | Revenue less expenses. Subtract line 18 from line 12 | 117,170 | 1,053,658 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| Net Assets or Fund Balances | 20 | Total assets (Part X, line 16) | 108,742,707 | 109,741,355 |
| | 21 | Total liabilities (Part X, line 26) | 16,543,081 | 14,750,651 |
| | 22 | Net assets or fund balances. Subtract line 21 from line 20 | 92,199,626 | 94,990,704 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

| Sign Here | ****** <br> Signature of officer | 2021-02-23 <br> Date |
|---|---|---|
| | ANN MARIE TIDONA DIRECTOR OF FINANCE <br> Type or print name and title | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date <br> 2021-02-22 | Check ☐ if self-employed | PTIN <br> P00543209 |
|---|---|---|---|---|---|
| | Firm's name ▶ PKF O'CONNOR DAVIES LLP | | | Firm's EIN ▶ 27-1728945 | |
| | Firm's address ▶ 500 MAMARONECK AVENUE <br> HARRISON, NY 105281633 | | | Phone no. (914) 381-8900 | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . . . ☒ Yes ☐ No

**For Paperwork Reduction Act Notice, see the separate instructions.** Cat. No. 11282Y Form **990** (2019)

**Part III** **Statement of Program Service Accomplishments**

Case 24-cv-0875-EH-SeAVG Accomplishments-2   Filed 04/01/22   Page 128 of 189 PageID #: 300

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . . . ☑

**1** Briefly describe the organization's mission:

THE SCHOOL'S PHILOSOPHY IS BASED ON THE QUAKER PRINCIPAL OF INTEGRITY, SIMPLICITY, PATIENCE, MODERATION, AND PEACEFUL RESOLUTION OF CONFLICT, AND A BELIEF THAT THE SILENCE AND SIMPLE MINISTRY OF THE "GATHERED MEETING" BRINGS THE PRESENCE OF GOD INTO THE MIDST OF BUSY LIVES. FRIENDS ACADEMY IS COMMITTED TO DEVELOPING A DIVERSE COMMUNITY WHOSE MEMBERS VALUE EXCELLENCE IN LEARNING AND GROWTH IN KNOWLEDGE AND SKILL, A GENUINE COMMITMENT TO SERVICE AND ETHICAL ACTION, AND A REALIZATION THAT EVERY LIFE IS TO BE EXPLORED, CELEBRATED AND ENJOYED IN THE SPIRIT OF THE SOCIETY OF FRIENDS.

**2** Did the organization undertake any significant program services during the year which were not listed on

the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O.

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program

services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O.

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

**4a** (Code:               ) (Expenses $        24,840,370   including grants of $        1,847,730 ) (Revenue $        24,729,249 )
See Additional Data

**4b** (Code:               ) (Expenses $          506,947   including grants of $          289,891 ) (Revenue $         1,952,705 )
See Additional Data

**4c** (Code:               ) (Expenses $               including grants of $               ) (Revenue $               )

**4d** Other program services (Describe in Schedule O.)
(Expenses $               including grants of $               ) (Revenue $               )

**4e** **Total program service expenses ▶**        25,347,317

**Part IV Checklist of Required Schedules**

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* | **1** | Yes | |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? | **2** | Yes | |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* | **4** | | No |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* | **5** | | No |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* | **10** | | |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI.* | **11a** | Yes | |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | **11b** | | No |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* | **11d** | | No |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | | No |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | Yes | |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* | **12a** | Yes | |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | Yes | |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? | **14a** | | No |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* | **14b** | Yes | |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* | **15** | | No |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I* (see instructions) | **17** | | No |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* | **18** | Yes | |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* | **19** | | No |
| **20a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* | **21** | | No |

Case 2:15-cv-03075-ES-MAH   Document 25-2   Filed 04/01/22   Page 130 of 189 PageID #: 302

| Part IV | Checklist of Required Schedules *(continued)* | | | |
|---|---|---|---|---|
| | | | **Yes** | **No** |
| **22** | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . . . . . . | **22** | Yes | |
| **23** | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **23** | Yes | |
| **24a** | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . . . . . . . . . . . . . . . . . . . . | **24a** | Yes | |
| **b** | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | No |
| **c** | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . . . . . | **24c** | | No |
| **d** | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | No |
| **25a** | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . | **25a** | | No |
| **b** | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . . . . . . . | **25b** | | No |
| **26** | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* . . . . . . . . . . . | **26** | | No |
| **27** | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . . . . . . . . . . . . . . . . . . . . . . . | **27** | | No |
| **28** | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | |
| **a** | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . | **28a** | | No |
| **b** | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . . | **28b** | Yes | |
| **c** | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . | **28c** | | No |
| **29** | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | Yes | |
| **30** | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . . . . . . | **30** | | No |
| **31** | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** | | No |
| **32** | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **32** | | No |
| **33** | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . . . . . | **33** | | No |
| **34** | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **34** | | No |
| **35a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . . . | **35a** | | No |
| **b** | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . . | **35b** | | |
| **36** | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . . . | **36** | | No |
| **37** | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . . | **37** | | No |
| **38** | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O. . . . . . . . . . . . . . . . | **38** | Yes | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance | | | |
|---|---|---|---|---|
| | Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . ☐ | | | |
| | | | **Yes** | **No** |
| **1a** | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable . . | **1a** | 43 | | |
| **b** | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . | **1b** | 0 | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . . . . . . | **1c** | | | |

Case 3:22-cv-03875-EMC Document SRS Filings and Tax Compliance 04/01/22 Page 131 of 189 PageID #: 303

**Part V  Statements Regarding Other IRS Filings and Tax Compliance** *(continued)*

| | | | | |
|---|---|---|---|---|
| **2a** Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . | **2a** | 369 | | |
| **b** If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | **2b** | Yes |
| **3a** Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | | **3a** | No |
| **b** If "Yes," has it filed a Form 990-T for this year?*If "No" to line 3b, provide an explanation in Schedule O* . . . | | | **3b** | |
| **4a** At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | | **4a** | No |
| **b** If "Yes," enter the name of the foreign country: ▶_____ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | |
| **5a** Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | | **5a** | No |
| **b** Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | **5b** | No |
| **c** If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . | | | **5c** | |
| **6a** Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | | **6a** | No |
| **b** If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . | | | **6b** | |
| **7** Organizations that may receive deductible contributions under section 170(c). | | | | |
| **a** Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . | | | **7a** | No |
| **b** If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | | **7b** | |
| **c** Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . | | | **7c** | No |
| **d** If "Yes," indicate the number of Forms 8282 filed during the year . . . | **7d** | | | |
| **e** Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | **7e** | No |
| **f** Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | | **7f** | No |
| **g** If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . | | | **7g** | |
| **h** If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . | | | **7h** | |
| **8** **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . | | | **8** | |
| **9** **Sponsoring organizations maintaining donor advised funds.** | | | | |
| **a** Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . . | | | **9a** | |
| **b** Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | | **9b** | |
| **10** Section 501(c)(7) organizations. Enter: | | | | |
| **a** Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | |
| **b** Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | |
| **11** Section 501(c)(12) organizations. Enter: | | | | |
| **a** Gross income from members or shareholders . . . . . . . . | **11a** | | | |
| **b** Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . | **11b** | | | |
| **12a** Section 4947(a)(1) non-exempt charitable trusts. Is the organization filing Form 990 in lieu of Form 1041? | | | **12a** | |
| **b** If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | **12b** | | | |
| **13** Section 501(c)(29) qualified nonprofit health insurance issuers. | | | | |
| **a** Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . **Note.** See the instructions for additional information the organization must report on Schedule O. | | | **13a** | |
| **b** Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . . | **13b** | | | |
| **c** Enter the amount of reserves on hand . . . . . . . . | **13c** | | | |
| **14a** Did the organization receive any payments for indoor tanning services during the tax year? . . . . . . | | | **14a** | No |
| **b** If "Yes," has it filed a Form 720 to report these payments?*If "No," provide an explanation in Schedule O* . . | | | **14b** | |
| **15** Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . . . . . . . If "Yes," see instructions and file Form 4720, Schedule N. | | | **15** | No |
| **16** Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . . If "Yes," complete Form 4720, Schedule O. | | | **16** | No |

**Part VI** Governance, Management, and Disclosure *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions.*

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . ☑

## Section A. Governing Body and Management

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | **1a** | 13 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | **1b** | 13 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . | **2** | | Yes | |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . . | **5** | | | No |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . . . | **6** | | | No |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . | **7a** | | | No |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . | **7b** | | | No |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | |
| **a** | The governing body? . . . . . . . . . . . . . . . . . | **8a** | | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . . | **8b** | | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . . | **9** | | | No |

## Section B. Policies (*This Section B requests information about policies not required by the Internal Revenue Code.*)

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . . | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . | **11a** | | No |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990. | | | |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . | **12a** | Yes | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . | **12c** | Yes | |
| **13** | Did the organization have a written whistleblower policy? . . . . . . . . . . | **13** | Yes | |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . . | **14** | Yes | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . . | **15a** | Yes | |
| **b** | Other officers or key employees of the organization . . . . . . . . . . . | **15b** | Yes | |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . | **16a** | | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . | **16b** | | |

## Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed▶ _____

**18** Section 6104 requires an organization to make its Form 1023 (or 1024-A if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.

☐ Own website  ☑ Another's website  ☑ Upon request  ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
▶ANN MARIE TIDONA  270 DUCK POND ROAD  LOCUST VALLEY, NY 11560 (516) 676-0393

Use Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees page ID #:
305

| Part VII | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) ANDREA KELLY <br> HEAD OF SCHOOL | 40.00 | | | X | | | | 431,903 | 0 | 115,453 |
| (2) ANN MARIE TIDONA <br> DIRECTOR OF FINANCE | 40.00 | | | X | | | | 270,852 | 0 | 63,629 |
| (3) MARK SCHOEFFEL <br> UPPER SCHOOL PRINCIPAL | 40.00 | | | | | X | | 179,956 | 0 | 110,431 |
| (4) JENIFER HALLIDAY <br> ASSISTANT HEAD OF SCHOOL | 40.00 | | | | | X | | 206,721 | 0 | 82,692 |
| (5) RON BASKIND <br> DEAN OF STUDENTS | 40.00 | | | | | X | | 155,136 | 0 | 86,273 |
| (6) NINA WAECHTER <br> DIRECTOR OF ADMISSION | 40.00 | | | | | X | | 147,620 | 0 | 75,667 |
| (7) KEVIN BARRY <br> DIRECTOR OF ADVANCEMENT | 40.00 | | | | | X | | 197,609 | 0 | 9,672 |
| (8) DEBRA DEL VECCHIO <br> PRESIDENT | 0.30 | X | | X | | | | 0 | 0 | 0 |
| (9) FRANK INGRASSIA <br> VICE PRESIDENT | 0.30 | X | | X | | | | 0 | 0 | 0 |
| (10) ANDREW MENZIN <br> SECRETARY | 0.30 | X | | X | | | | 0 | 0 | 0 |
| (11) ISOBEL COLEMAN <br> TREASURER | 0.30 | X | | X | | | | 0 | 0 | 0 |
| (12) DAVID GELFAND <br> TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (13) ELIZABETH INGRASSIA <br> TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (14) GREGORY JASKE <br> TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (15) JEANNINE LOSTRITTO <br> TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (16) JED MOREY <br> TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (17) JOSEPH PODBELA <br> TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |

Part VII Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)*

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (18) DAVID SEELER<br>TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (19) RAJINDER SINGH<br>TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| (20) CRAIG WHITE<br>TRUSTEE | 0.30 | X | | | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . . ▶ | | | | | | | | 1,589,797 | 0 | 543,817 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 31

| | | Yes | No |
|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . . . **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? If "Yes," complete Schedule J for such individual . . . . . . . . . . . . . . . . . . . . . . . . . **4** | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization?If "Yes," complete Schedule J for such person . . . . . . . . . **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| FLIK INDEPENDENT SCHOOL DINING<br><br>PO BOX 417632<br>BOSTON, MA 02241 | FOOD SERVICES | 1,224,717 |
| LOYAL BUILDING SERVICES INC<br><br>41A DEGNON BLVD<br>BAY SHORE, NY 11706 | CUSTODIAL SERVICES | 508,979 |
| S L A M ARCHITECTS PC<br><br>80 GLASTONBURY BLVD<br>GLASTONBURY, CT 06033 | CONSTRUCTION | 231,487 |
| LITE-TROL SERVICES CO INC<br><br>485 W JOHN ST SUITE 1<br>HICKSVILLE, NY 11801 | EQUIPMENT REPAIR SERVICES | 160,973 |
| VENABLE LLP<br><br>1270 6TH AVE<br>NEW YORK, NY 10020 | LEGAL SERVICES | 147,003 |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 6

Part VIII Statement of Revenue

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . □

| | | | | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** Federated campaigns . . | **1a** | | | | | |
| | **b** Membership dues . . | **1b** | | | | | |
| | **c** Fundraising events . . | **1c** | 1,068 | | | | |
| | **d** Related organizations . | **1d** | | | | | |
| | **e** Government grants (contributions) | **1e** | 388,938 | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** | 2,657,505 | | | | |
| | **g** Noncash contributions included in lines 1a - 1f:$ | **1g** | 138,627 | | | | |
| | **h Total.** Add lines 1a-1f . . . . . . . ▶ | | | 3,047,511 | | | |
| **Program Service Revenue** | **2a** TUITION AND FEES | Business Code<br>611110 | | 24,729,249 | 24,729,249 | | |
| | **b** SUMMER AND AFTERSCHOOL PROGRAMS | 611110 | | 1,456,279 | 1,456,279 | | |
| | **c** AUXILIARY SERVICES | 611110 | | 496,426 | 496,426 | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** All other program service revenue. | | | | | | |
| | **g Total.** Add lines 2a–2f. . . . . ▶ | | 26,681,954 | | | | |

| | | (A)<br>Total revenue | (B) | (C) | (D) |
|---|---|---|---|---|---|
| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) . . . . . . . ▶ | 1,423,764 | | | 1,423,764 |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | | |
| | **5** Royalties . . . . . . . . . ▶ | | | | |

| | | | (i) Real | (ii) Personal | (A) | (B) | (C) | (D) |
|---|---|---|---|---|---|---|---|---|
| | **6a** Gross rents | **6a** | 238,728 | | | | | |
| | **b** Less: rental expenses | **6b** | 108,390 | | | | | |
| | **c** Rental income or (loss) | **6c** | 130,338 | | | | | |
| | **d** Net rental income or (loss) . . . . . . ▶ | | | | 130,338 | | | 130,338 |
| | | | (i) Securities | (ii) Other | | | | |
| | **7a** Gross amount from sales of assets other than inventory | **7a** | 3,301,018 | | | | | |
| | **b** Less: cost or other basis and sales expenses | **7b** | 3,148,103 | | | | | |
| | **c** Gain or (loss) | **7c** | 152,915 | | | | | |
| | **d** Net gain or (loss) . . . . . . . . ▶ | | | | 152,915 | | | 152,915 |
| | **8a** Gross income from fundraising events (not including $ 1,068 of contributions reported on line 1c). See Part IV, line 18 . . . . | **8a** | 119,220 | | | | | |
| | **b** Less: direct expenses . . . | **8b** | 89,355 | | | | | |
| | **c** Net income or (loss) from fundraising events . . ▶ | | | | 29,865 | | | 29,865 |
| | **9a** Gross income from gaming activities. See Part IV, line 19 . . . | **9a** | | | | | | |
| | **b** Less: direct expenses . . . | **9b** | | | | | | |
| | **c** Net income or (loss) from gaming activities . . ▶ | | | | | | | |
| | **10a** Gross sales of inventory, less returns and allowances . . | **10a** | | | | | | |
| | **b** Less: cost of goods sold . . | **10b** | | | | | | |
| | **c** Net income or (loss) from sales of inventory . . ▶ | | | | | | | |
| | Miscellaneous Revenue | Business Code | | | | | |
| | **11a** MISCELLANEOUS | 900099 | | 4,124 | | | 4,124 |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** All other revenue . . . . | | | | | | |
| | **e Total.** Add lines 11a–11d . . . . . ▶ | | | 4,124 | | | |
| | **12 Total revenue.** See instructions . . . . . ▶ | | | 31,470,471 | 26,681,954 | 0 | 1,741,006 |

Case 2:22-cv-00876-TC Document 25-2 Filed 04/01/22 Page 136 of 189 PageID #: 308

**Part IX** | **Statement of Functional Expenses**

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . □

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments. See Part IV, line 21 . . . . . | | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . . . . . . | 2,137,621 | 2,137,621 | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. . . . . . . . . . . . . | | | | |
| **4** Benefits paid to or for members . . . . . . . | | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . . . . . . . . | 918,139 | | 918,139 | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . . . . . . | 13,656 | | 13,656 | |
| **7** Other salaries and wages . . . . . . . . . | 14,001,800 | 12,154,195 | 1,200,700 | 646,905 |
| **8** Pension plan accruals and contributions (include section 401 (k) and 403(b) employer contributions) . . . . . | 716,252 | 614,180 | 67,313 | 34,759 |
| **9** Other employee benefits . . . . . . . . . | 3,644,483 | 3,159,057 | 358,837 | 126,589 |
| **10** Payroll taxes . . . . . . . . . . . . | 1,026,473 | 847,811 | 134,337 | 44,325 |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . . | | | | |
| **b** Legal . . . . . . . . . . . . | 74,492 | 74,492 | | |
| **c** Accounting . . . . . . . . . . . | 37,575 | | 37,575 | |
| **d** Lobbying . . . . . . . . . . . | | | | |
| **e** Professional fundraising services. See Part IV, line 17 | | | | |
| **f** Investment management fees . . . . . . . | 1,707 | | 1,707 | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 1,271,248 | 765,770 | 379,769 | 125,709 |
| **12** Advertising and promotion . . . . . | 74,178 | 7,546 | 64,964 | 1,668 |
| **13** Office expenses . . . . . . . . . | 572,421 | 368,293 | 143,426 | 60,702 |
| **14** Information technology . . . . . . . | 382,691 | 64,704 | 317,987 | |
| **15** Royalties . . | | | | |
| **16** Occupancy . . . . . . . . . . . | 895,285 | 854,874 | 30,308 | 10,103 |
| **17** Travel . . . . . . . . . . . . | 330,297 | 330,247 | 25 | 25 |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . | | | | |
| **19** Conferences, conventions, and meetings . . . . | 112,799 | 98,952 | 10,759 | 3,088 |
| **20** Interest . . . . . . . . . . . | | | | |
| **21** Payments to affiliates . . . . . . . . | | | | |
| **22** Depreciation, depletion, and amortization . . | 1,480,223 | 1,406,069 | 74,154 | |
| **23** Insurance . . . | 379,417 | 352,473 | 18,799 | 8,145 |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** STUDENT FOOD SERVICE | 863,679 | 734,365 | 88,606 | 40,708 |
| **b** CLASSROOM INSTRUCTIONS | 519,500 | 519,500 | | |
| **c** REPAIRS AND MAINTENANCE | 390,730 | 372,521 | 12,426 | 5,783 |
| **d** TRAINING AND DEVELOPMEN | 141,849 | 141,849 | | |
| **e** All other expenses | 430,298 | 342,798 | 87,500 | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 30,416,813 | 25,347,317 | 3,960,987 | 1,108,509 |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation. Check here ▶ □ if following SOP 98-2 (ASC 958-720). | | | | |

Case 2:21-cv-03875-ENV-AYS    Document 25-2    Filed 04/01/22    Page 137 of 189 PageID #: 309

**Part X** **Balance Sheet**

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . ☐

| | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| **1** | Cash–non-interest-bearing . . . . . . . . . | 2,849,029 | **1** | 4,514,108 |
| **2** | Savings and temporary cash investments . . . . . . . | 147,424 | **2** | 341 |
| **3** | Pledges and grants receivable, net . . . . . . | 48,372 | **3** | 313,808 |
| **4** | Accounts receivable, net . . . . . . . . . | 226,028 | **4** | 578,912 |
| **5** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . . . . . . | | **5** | |
| **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . . . . | | **6** | |
| **7** | Notes and loans receivable, net . . . . . . . . . | 1,221 | **7** | 4,653 |
| **8** | Inventories for sale or use . . . . . . . . . | 15,363 | **8** | 9,346 |
| **9** | Prepaid expenses and deferred charges . . . . . . | 217,098 | **9** | 148,889 |
| **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D  **10a** 67,642,843 | | | |
| **b** | Less: accumulated depreciation  **10b** 26,134,171 | 42,746,020 | **10c** | 41,508,672 |
| **11** | Investments—publicly traded securities . | 61,870,943 | **11** | 62,453,290 |
| **12** | Investments—other securities. See Part IV, line 11 . . . . . | 621,209 | **12** | 209,336 |
| **13** | Investments—program-related. See Part IV, line 11 . . | | **13** | |
| **14** | Intangible assets . . . . . . . . . . . . | | **14** | |
| **15** | Other assets. See Part IV, line 11 . . . . . . . . . | | **15** | |
| **16** | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . | 108,742,707 | **16** | 109,741,355 |
| **17** | Accounts payable and accrued expenses . . . . . . | 2,106,702 | **17** | 1,803,204 |
| **18** | Grants payable . . . | | **18** | |
| **19** | Deferred revenue . . . . . . . . . . . | 4,338,586 | **19** | 3,233,444 |
| **20** | Tax-exempt bond liabilities . . . . . . . . . | 10,097,793 | **20** | 9,714,003 |
| **21** | Escrow or custodial account liability. Complete Part IV of Schedule D | | **21** | |
| **22** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . . . . . . | | **22** | |
| **23** | Secured mortgages and notes payable to unrelated third parties . . | | **23** | |
| **24** | Unsecured notes and loans payable to unrelated third parties . . | | **24** | |
| **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | | **25** | |
| **26** | **Total liabilities.** Add lines 17 through 25 . . | 16,543,081 | **26** | 14,750,651 |
| | Organizations that follow FASB ASC 958, check here ▶ ☑ and complete lines 27, 28, 32, and 33. | | | |
| **27** | Net assets without donor restrictions . . . . . . . . . | 89,054,994 | **27** | 90,373,637 |
| **28** | Net assets with donor restrictions . . . . . . . . . | 3,144,632 | **28** | 4,617,067 |
| | Organizations that do not follow FASB ASC 958, check here ▶ ☐ and complete lines 29 through 33. | | | |
| **29** | Capital stock or trust principal, or current funds . . . . . | | **29** | |
| **30** | Paid-in or capital surplus, or land, building or equipment fund . . . | | **30** | |
| **31** | Retained earnings, endowment, accumulated income, or other funds . . | | **31** | |
| **32** | Total net assets or fund balances . . . . . . . . . | 92,199,626 | **32** | 94,990,704 |
| **33** | Total liabilities and net assets/fund balances . . . . . . . | 108,742,707 | **33** | 109,741,355 |

Assets — Liabilities — Net Assets or Fund Balances

Part XI Reconciliation of Net Assets

Case Redcellution-1875-NetAssets  Document 25-2  Filed 04/01/22  Page 138 of 189 PageID #:
310

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . ☐

| | | | |
|---|---|---|---|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . . | **1** | 31,470,471 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . . | **2** | 30,416,813 |
| **3** | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . . . . . | **3** | 1,053,658 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . | **4** | 92,199,626 |
| **5** | Net unrealized gains (losses) on investments . . . . . . . . . . . . . . | **5** | 1,737,420 |
| **6** | Donated services and use of facilities . . . . . . . . . . . . . . . | **6** | |
| **7** | Investment expenses . . . . . . . . . . . . . . . . . . . | **7** | |
| **8** | Prior period adjustments . . . . . . . . . . . . . . . . . . | **8** | |
| **9** | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . | **9** | 0 |
| **10** | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | **10** | 94,990,704 |

Part XII  **Financial Statements and Reporting**

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . ☑

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Accounting method used to prepare the Form 990: ☐ Cash ☑ Accrual ☐ Other _____ | | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | | |
| | ☐ Separate basis   ☐ Consolidated basis   ☐ Both consolidated and separate basis | | | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | Yes | |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | | |
| | ☑ Separate basis   ☐ Consolidated basis   ☐ Both consolidated and separate basis | | | |
| **c** | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | Yes | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | | No |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | **3b** | | |

**Additional Data**

**Software ID:**
**Software Version:**
**EIN:** 11-1633485
**Name:** FRIENDS ACADEMY

Form 990 (2019)

**Form 990, Part III, Line 4a:**

INSTRUCTION AND STUDENT ACTIVITIES - ACADEMICS: AS A QUAKER SCHOOL, FRIENDS ENDORSES THE PRINCIPLE THAT ALL STUDENTS HAVE WORTH AND ABILITY, AND OUR ACADEMIC PROGRAM PROVIDES FOR EACH STUDENT TO FIND HIS OR HER OWN VOICE AND ACHIEVE EXCELLENCE. CHARACTER EDUCATION: A CENTER PIECE OF OUR PROGRAM IS COMMUNITY SERVICE, ONE OF THE ESSENTIAL QUAKER TESTIMONIES. WE OFFER AGE APPROPRIATE SERVICE OPPORTUNITIES FOR ALL OUR STUDENTS AS WE TEACH THEM THAT INDIVIDUALS CAN MAKE A DIFFERENCE IN THE WORLD. COLLEGE PREPARATION: WE ARE COMMITTED TO PREPARING STUDENTS NOT ONLY FOR COLLEGE, BUT ALSO FOR RESPONSIBLE CITIZENSHIP. TO THAT END, BEYOND COMMUNITY SERVICE, WE NURTURE LEADERSHIP, CIVIC RESPONSIBILITY, AND COMMUNITY ESPECIALLY IN TERMS OF EQUALITY AND DIVERSITY. FRIENDS ACADEMY SERVED 720 STUDENTS DURING THE 2019-2020 SCHOOL YEAR.

## Form 990, Part III, Line 4b:

SUMMER PROGRAM. FRIENDS ACADEMY SUMMER CAMP PROGRAMS ARE BASED ON THE BELIEF IN THE UNIQUE WORTH OF EVERY CHILD. PROGRAM ACCOMPLISHMENTS INCLUDE DEVELOPING EACH CAMPER'S SELF-CONFIDENCE AS FULLY AS POSSIBLE BY PROVIDING A PLACE WHERE CHILDREN CAN HAVE FUN, MAKE FRIENDS, AND LEARN IN A SAFE AND FRIENDLY ENVIRONMENT, IMPLEMENTING AN ORGANIZED PROGRAM OF FUN AND EXCITING ACTIVITIES THAT PROVIDE MULTIPLE OPPORTUNITIES FOR CAMPERS TO LEARN, SUCCEED, AND DEVELOP CONFIDENCE. THE SUMMER CAMP CONSISTS OF OVER 30 DIVERSE PROGRAMS (SPORTS, ARTS, SCIENCE, COMPUTERS, ACADEMIC AND TRAVEL) FOR AGES 3-15YRS.

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 140 of 189 PageID #: 3012

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 141 of 189 PageID #: 5047

**SCHEDULE A**
**(Form 990 or 990EZ)**

Department of the Treasury
Internal Revenue Service

## Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.
▶ **Attach to Form 990 or Form 990-EZ.**
▶ **Go to** *www.irs.gov/Form990* **for instructions and the latest information.**

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| FRIENDS ACADEMY | 11-1633485 |

| **Part I** | **Reason for Public Charity Status** (All organizations must complete this part.) See instructions. |
|---|---|

The organization is not a private foundation because it is: (For lines 1 through 12, check only one box.)

**1** ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

**2** ☑ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ).)

**3** ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

**4** ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state:

**5** ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170 (b)(1)(A)(iv).** (Complete Part II.)

**6** ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

**7** ☐ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

**8** ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II.)

**9** ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture. See instructions. Enter the name, city, and state of the college or university:

**10** ☐ An organization that normally receives: (1) more than 331/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 331/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975. See **section 509(a)(2).** (Complete Part III.)

**11** ☐ An organization organized and operated exclusively to test for public safety. See **section 509(a)(4).**

**12** ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g.

**a** ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization. **You must complete Part IV, Sections A and B.**

**b** ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s). **You must complete Part IV, Sections A and C.**

**c** ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions). **You must complete Part IV, Sections A, D, and E.**

**d** ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated. The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions). **You must complete Part IV, Sections A and D, and Part V.**

**e** ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization.

**f** Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____

**g** Provide the following information about the supported organization(s).

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |

| **Total** | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat. No. 11285F    **Schedule A (Form 990 or 990-EZ) 2019**

**Part II** Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III.
If the organization failed to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grant.") . . | | | | | | |
| **2** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf. . . . | | | | | | |
| **3** The value of services or facilities furnished by a governmental unit to the organization without charge.. | | | | | | |
| **4** **Total.** Add lines 1 through 3 | | | | | | |
| **5** The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f). . | | | | | | |
| **6** **Public support.** Subtract line 5 from line 4. | | | | | | |

### Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| **7** Amounts from line 4. . . | | | | | | |
| **8** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . . | | | | | | |
| **9** Net income from unrelated business activities, whether or not the business is regularly carried on. . | | | | | | |
| **10** Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.). . | | | | | | |
| **11** **Total support.** Add lines 7 through 10 | | | | | | |

**12** Gross receipts from related activities, etc. (see instructions) . . . . . . . . . . . . | **12** | |

**13** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization,
check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **14** Public support percentage for 2019 (line 6, column (f) divided by line 11, column (f)) . . . . . . . . | **14** | |
| **15** Public support percentage for 2018 Schedule A, Part II, line 14 . . . . . . . . . . . . . | **15** | |

**16a** **33 1/3% support test—2019.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box
and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . ▶ ☐

**b** **33 1/3% support test—2018.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this
box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . ▶ ☐

**17a** **10%-facts-and-circumstances test—2019.** If the organization did not check a box on line 13, 16a, or 16b, and line 14
is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain
in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly supported
organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**b** **10%-facts-and-circumstances test—2018.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line
15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.**
Explain in Part VI how the organization meets the "facts-and-circumstances" test. The organization qualifies as a publicly
supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**18** **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see
instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

Part II: Schedule for Organizations Described in Section 509(a)(2)   Page 143 of 189 PageID #: 3013

**Part III** **Support Schedule for Organizations Described in Section 509(a)(2)**
(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received. (Do not include any "unusual grants.") . | | | | | | |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 . . . . . | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf. . . | | | | | | |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge . | | | | | | |
| **6** **Total.** Add lines 1 through 5 | | | | | | |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year. | | | | | | |
| **c** Add lines 7a and 7b. . | | | | | | |
| **8** **Public support.** (Subtract line 7c from line 6.) | | | | | | |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6. . . | | | | | | |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources. . | | | | | | |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975. | | | | | | |
| **c** Add lines 10a and 10b. | | | | | | |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on. | | | | | | |
| **12** Other income. Do not include gain or loss from the sale of capital assets (Explain in Part VI.) . . | | | | | | |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12.). . | | | | | | |

**14** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

## Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **15** Public support percentage for 2019 (line 8, column (f) divided by line 13, column (f)) . . . . . . . . . | **15** | |
| **16** Public support percentage from 2018 Schedule A, Part III, line 15 . . . . . . . . . . . . . . . . | **16** | |

## Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| **17** Investment income percentage for **2019** (line 10c, column (f) divided by line 13, column (f)) . . . . . . | **17** | |
| **18** Investment income percentage from **2018** Schedule A, Part III, line 17 . . . . . . . . . . . . . . | **18** | |

**19a** **331/3% support tests—2019.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . ▶ ☐

**b** **33 1/3% support tests—2018.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization . . . . ▶ ☐

**20** **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions . . . . ▶ ☐

Case 3:21-cv-00075-FDW-DAYS   Document 25-2   Filed 04/01/22   Page 144 of 189 PageID #: 810

**Part IV** Supporting Organizations *(continued)*

(Complete only if you checked a box in line 12 of Part I. If you checked 12a of Part I, complete Sections A and B. If you checked 12b of Part I, complete Sections A and C. If you checked 12c of Part I, complete Sections A, D, and E. If you checked 12d of Part I, complete Sections A and D, and complete Part V.)

### Section A. All Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated. If designated by class or purpose, describe the designation. If historic and continuing relationship, explain.* <br> **1** | | |
| **2** | Did the organization have any supported organization that does not have an IRS determination of status under section 509 (a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2).* <br> **2** | | |
| **3a** | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below.* <br> **3a** | | |
| **b** | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination.* <br> **3b** | | |
| **c** | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use.* <br> **3c** | | |
| **4a** | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 12a or 12b in Part I, answer (b) and (c) below.* <br> **4a** | | |
| **b** | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations.* <br> **4b** | | |
| **c** | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes.* <br> **4c** | | |
| **5a** | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable). Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed; (ii) the reasons for each such action; (iii) the authority under the organization's organizing document authorizing such action; and (iv) how the action was accomplished (such as by amendment to the organizing document).* <br> **5a** | | |
| **b** | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? <br> **5b** | | |
| **c** | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? <br> **5c** | | |
| **6** | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI.*** <br> **6** | | |
| **7** | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ) .* <br> **7** | | |
| **8** | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ).* <br> **8** | | |
| **9a** | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI.*** <br> **9a** | | |
| **b** | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI.*** <br> **9b** | | |
| **c** | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI.*** <br> **9c** | | |
| **10a** | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below.* <br> **10a** | | |
| **b** | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings).* <br> **10b** | | |

**Part IV** Supporting Organizations (continued)

|  |  | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? |  |  |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? | **11a** |  |  |
| **b** | A family member of a person described in (a) above? | **11b** |  |  |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in **Part VI**.* | **11c** |  |  |

### Section B. Type I Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| **1** | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in **Part VI** how the supported organization(s) effectively operated, supervised, or controlled the organization's activities. If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year.* | **1** |  |  |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in **Part VI** how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization.* | **2** |  |  |

### Section C. Type II Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in **Part VI** how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s).* | **1** |  |  |

### Section D. All Type III Supporting Organizations

|  |  | Yes | No |
|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** |  |  |
| **2** | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization (s) or (ii) serving on the governing body of a supported organization? *If "No," explain in **Part VI** how the organization maintained a close and continuous working relationship with the supported organization(s).* | **2** |  |  |
| **3** | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in **Part VI** the role the organization's supported organizations played in this regard.* | **3** |  |  |

### Section E. Type III Functionally-Integrated Supporting Organizations

**1**   Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**:

**a** ☐   The organization satisfied the Activities Test. Complete **line 2** below.

**b** ☐   The organization is the parent of each of its supported organizations. Complete **line 3** below.

**c** ☐   The organization supported a governmental entity. Describe in **Part VI** how you supported a government entity (see instructions)

**2**   Activities Test. **Answer (a) and (b) below.**

|  |  | Yes | No |
|---|---|---|---|
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in **Part VI identify those supported organizations and explain** how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities.* | **2a** |  |  |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in **Part VI** the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement.* | **2b** |  |  |
| **3** | Parent of Supported Organizations. **Answer (a) and (b) below.** |  |  |  |
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in **Part VI**.* | **3a** |  |  |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in **Part VI**. the role played by the organization in this regard.* | **3b** |  |  |

Case 2:21-cv-03576-FMO-AGR Document 35-1 Filed 04/01/22 Page 146 of 189 PageID #: 318

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

| 1 | ☐ | Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov. 20, 1970 (explain in Part VI). **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E. | | | |
|---|---|---|---|---|---|

| **Section A - Adjusted Net Income** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Net short-term capital gain | **1** | | |
| 2 | Recoveries of prior-year distributions | **2** | | |
| 3 | Other gross income (see instructions) | **3** | | |
| 4 | Add lines 1 through 3 | **4** | | |
| 5 | Depreciation and depletion | **5** | | |
| 6 | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | **6** | | |
| 7 | Other expenses (see instructions) | **7** | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | **8** | | |

| **Section B - Minimum Asset Amount** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year): | **1** | | |
| a | Average monthly value of securities | **1a** | | |
| b | Average monthly cash balances | **1b** | | |
| c | Fair market value of other non-exempt-use assets | **1c** | | |
| d | **Total** (add lines 1a, 1b, and 1c) | **1d** | | |
| e | **Discount** claimed for blockage or other factors (explain in detail in Part VI): | | | |
| 2 | Acquisition indebtedness applicable to non-exempt use assets | **2** | | |
| 3 | Subtract line 2 from line 1d | **3** | | |
| 4 | Cash deemed held for exempt use. Enter 1-1/2% of line 3 (for greater amount, see instructions). | **4** | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | **5** | | |
| 6 | Multiply line 5 by .035 | **6** | | |
| 7 | Recoveries of prior-year distributions | **7** | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | **8** | | |

| **Section C - Distributable Amount** | | Current Year |
|---|---|---|
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | **1** | |
| 2 | Enter 85% of line 1 | **2** | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | **3** | |
| 4 | Enter greater of line 2 or line 3 | **4** | |
| 5 | Income tax imposed in prior year | **5** | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | **6** | |

| 7 | ☐ | Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions) |
|---|---|---|

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations _(continued)_

| **Section D - Distributions** | | | **Current Year** |
|---|---|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | | | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | | | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | | | |
| **4** Amounts paid to acquire exempt-use assets | | | |
| **5** Qualified set-aside amounts (prior IRS approval required) | | | |
| **6** Other distributions (describe in **Part VI**). See instructions | | | |
| **7 Total annual distributions.** Add lines 1 through 6. | | | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**). See instructions | | | |
| **9** Distributable amount for 2019 from Section C, line 6 | | | |
| **10** Line 8 amount divided by Line 9 amount | | | |

| **Section E - Distribution Allocations** <br> (see instructions) | **(i)** <br> **Excess Distributions** | **(ii)** <br> **Underdistributions** <br> **Pre-2019** | **(iii)** <br> **Distributable** <br> **Amount for 2019** |
|---|---|---|---|
| **1** Distributable amount for 2019 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2019 (reasonable cause required-- explain in **Part VI**). See instructions. | | | |
| **3** Excess distributions carryover, if any, to 2019: | | | |
| **a** From 2014. . . . . . . . | | | |
| **b** From 2015. . . . . . . . | | | |
| **c** From 2016. . . . . . . . | | | |
| **d** From 2017. . . . . . . . | | | |
| **e** From 2018. . . . . . . . | | | |
| **f Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2019 distributable amount | | | |
| **i** Carryover from 2014 not applied (see instructions) | | | |
| **j** Remainder. Subtract lines 3g, 3h, and 3i from 3f. | | | |
| **4** Distributions for 2019 from Section D, line 7: <br> $ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2019 distributable amount | | | |
| **c** Remainder. Subtract lines 4a and 4b from 4. | | | |
| **5** Remaining underdistributions for years prior to 2019, if any. Subtract lines 3g and 4a from line 2. If the amount is greater than zero, explain in **Part VI**. See instructions. | | | |
| **6** Remaining underdistributions for 2019. Subtract lines 3h and 4b from line 1. If the amount is greater than zero, explain in **Part VI**. See instructions. | | | |
| **7 Excess distributions carryover to 2020.** Add lines 3j and 4c. | | | |
| **8** Breakdown of line 7: | | | |
| **a** Excess from 2015. . . . . . | | | |
| **b** Excess from 2016. . . . . . | | | |
| **c** Excess from 2017. . . . . . | | | |
| **d** Excess from 2018. . . . . . | | | |
| **e** Excess from 2019. . . . . . | | | |

Software ID:
Software Version:
**EIN:** 11-1633485
**Name:** FRIENDS ACADEMY

Schedule A (Form 990 or 990-EZ) 2019

Page **8**

**Part VI** **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b; Part III, line 12; Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2; Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V Section D, lines 5, 6, and 8; and Part V, Section E, lines 2, 5, and 6. Also complete this part for any additional information. (See instructions).

| Facts And Circumstances Test |
|---|
|  |
|  |

**SCHEDULE D**
**(Form 990)**

Department of the Treasury
Internal Revenue Service

## Supplemental Financial Statements

▶ **Complete if the organization answered "Yes," on Form 990,**
**Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.**
▶ **Attach to Form 990.**
▶ **Go to** *www.irs.gov/Form990* **for instructions and the latest information.**

OMB No. 1545-0047

# 2019

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| FRIENDS ACADEMY | 11-1633485 |

## Part I — Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | **(a)** Donor advised funds | **(b)** Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year . . . . . . . . | | |

5 Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control? . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

6 Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

## Part II — Conservation Easements.
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1 Purpose(s) of conservation easements held by the organization (check all that apply).
☐ Preservation of land for public use (e.g., recreation or education)  ☐ Preservation of an historically important land area
☐ Protection of natural habitat  ☐ Preservation of a certified historic structure
☐ Preservation of open space

2 Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | **Held at the End of the Year** |
|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . . . . . . | 2a | |
| b | Total acreage restricted by conservation easements . . . . . . . . . . . . . . | 2b | |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . . | 2c | |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register . . . | 2d | |

3 Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ▶

4 Number of states where property subject to conservation easement is located ▶

5 Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds? . . . . . . . . . . . ☐ **Yes** ☐ **No**

6 Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶

7 Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $

8 Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)? . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

9 In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

## Part III — Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.
Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

1a If the organization elected, as permitted under SFAS 116 (ASC 958), not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

b If the organization elected, as permitted under SFAS 116 (ASC 958), to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

(i) Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . ▶ $

(ii) Assets included in Form 990, Part X . . . . . . . . . . . . . . ▶ $

2 If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under SFAS 116 (ASC 958) relating to these items:

a Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . ▶ $

b Assets included in Form 990, Part X . . . . . . . . . . . . . . . ▶ $

Page **2**

| **Part III** | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)* |
|---|---|

**3**    Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

**a** ☐ Public exhibition      **d** ☐ Loan or exchange programs

**b** ☐ Scholarly research      **e** ☐ Other ........................................................................

**c** ☐ Preservation for future generations

**4**    Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5**    During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?. . .    ☐ **Yes**    ☐ **No**

| **Part IV** | **Escrow and Custodial Arrangements.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a**    Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes**    ☐ **No**

**b**    If "Yes," explain the arrangement in Part XIII and complete the following table:

| | | **Amount** |
|---|---|---|
| **c** Beginning balance . . . . . . . . . . . . . . . | **1c** | |
| **d** Additions during the year . . . . . . . . . . . . | **1d** | |
| **e** Distributions during the year . . . . . . . . . . | **1e** | |
| **f** Ending balance . . . . . . . . . . . . . . . . | **1f** | |

**2a**    Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? . . . ☐ **Yes**    ☐ **No**

**b**    If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII . . . . ☐

| **Part V** | **Endowment Funds.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

| | **(a)** Current year | **(b)** Prior year | **(c)** Two years back | **(d)** Three years back | **(e)** Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance . . . . | 61,953,559 | 59,435,422 | 53,378,344 | 45,554,378 | 48,017,528 |
| **b** Contributions . . . | 22,760 | 1,361,925 | 3,108,402 | 4,129,137 | 2,065,061 |
| **c** Net investment earnings, gains, and losses | 3,311,721 | 4,156,187 | 4,708,676 | 5,304,829 | -3,029,211 |
| **d** Grants or scholarships . . | | | | | |
| **e** Other expenditures for facilities and programs . . . | 2,615,000 | 2,999,975 | 1,760,000 | 1,610,000 | 1,499,000 |
| **f** Administrative expenses . . | | | | | |
| **g** End of year balance . . . . . | 62,673,040 | 61,953,559 | 59,435,422 | 53,378,344 | 45,554,378 |

**2**    Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

**a**    Board designated or quasi-endowment ▶    95.210 %

**b**    Permanent endowment ▶    3.070 %

**c**    Temporarily restricted endowment ▶    1.720 %

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a**    Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

| | | **Yes** | **No** |
|---|---|---|---|
| **(i)** unrelated organizations . . . . . . . . . . . . . . . . . . . . | **3a(i)** | | No |
| **(ii)** related organizations . . . . . . . . . . . . . . . . . . . . | **3a(ii)** | | No |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? . . . . . . . . . . | **3b** | | |

**4**    Describe in Part XIII the intended uses of the organization's endowment funds.

| **Part VI** | **Land, Buildings, and Equipment.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | **(a)** Cost or other basis (investment) | **(b)** Cost or other basis (other) | **(c)** Accumulated depreciation | **(d)** Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . | | 961,346 | | 961,346 |
| **b** Buildings . . . . . | | 59,918,434 | 21,718,846 | 38,199,588 |
| **c** Leasehold improvements | | 2,356,431 | 1,480,671 | 875,760 |
| **d** Equipment . . . . . | | 4,310,491 | 2,934,654 | 1,375,837 |
| **e** Other . . . . . . | | 96,141 | | 96,141 |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* . . . ▶ | | | | 41,508,672 |

**Part VII** **Investments—Other Securities.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11b.See Form 990, Part X, line 12.

| (a) Description of security or category (including name of security) | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives . . . . . . . . . | | |
| **(2)** Closely-held equity interests . . . . . . . . | | |
| **(3)** Other | | |
| (A) | | |
| (B) | | |
| (C) | | |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | | |

**Part VIII** **Investments—Program Related.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| (a) Description of investment | (b) Book value | (c) Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** | | |
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 13.)* ▶ | | |

**Part IX** **Other Assets.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| **(1)** | |
| **(2)** | |
| **(3)** | |
| **(4)** | |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)* . . . . . . . . . . . ▶ | |

**Part X** **Other Liabilities.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.See Form 990, Part X, line 25.

| **1.** (a) Description of liability | (b) Book value |
|---|---|
| **(1)** Federal income taxes | |
| **(2)** | |
| **(3)** | |
| **(4)** | |
| **(5)** | |
| **(6)** | |
| **(7)** | |
| **(8)** | |
| **(9)** | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▶ | |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☑

| Part XI | Reconciliation of Revenue per Audited Financial Statements With Revenue per Return. |
|---------|------------------------------------------------------------------------------------|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. |

| **1** | Total revenue, gains, and other support per audited financial statements . . . . . . . . . | | | **1** | 31,242,271 |
|---|---|---|---|---|---|
| **2** | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | | |
| **a** | Net unrealized gains (losses) on investments . . . . . | **2a** | 1,737,420 | | |
| **b** | Donated services and use of facilities . . . . . . . . . | **2b** | | | |
| **c** | Recoveries of prior year grants . . . . . . . . . . | **2c** | | | |
| **d** | Other (Describe in Part XIII.) . . . . . . . . . . . . . | **2d** | 197,745 | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **2e** | 1,935,165 |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **3** | 29,307,106 |
| **4** | Amounts included on Form 990, Part VIII, line 12, but not on line **1**: | | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | 1,707 | | |
| **b** | Other (Describe in Part XIII.) . . . . . . . . . . . . | **4b** | 2,161,658 | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **4c** | 2,163,365 |
| **5** | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) . . . . . . . | | | **5** | 31,470,471 |

| Part XII | Reconciliation of Expenses per Audited Financial Statements With Expenses per Return. |
|----------|---------------------------------------------------------------------------------------|
| | Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a. |

| **1** | Total expenses and losses per audited financial statements . . . . . . . . . . . . . | | | **1** | 28,451,193 |
|---|---|---|---|---|---|
| **2** | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | | |
| **a** | Donated services and use of facilities . . . . . . . . . . . | **2a** | | | |
| **b** | Prior year adjustments . . . . . . . . . . . . . . . | **2b** | | | |
| **c** | Other losses . . . . . . . . . . . . . . . . . . . | **2c** | | | |
| **d** | Other (Describe in Part XIII.) . . . . . . . . . . . . . . | **2d** | 197,745 | | |
| **e** | Add lines **2a** through **2d** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **2e** | 197,745 |
| **3** | Subtract line **2e** from line **1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **3** | 28,253,448 |
| **4** | Amounts included on Form 990, Part IX, line 25, but not on line **1**: | | | | |
| **a** | Investment expenses not included on Form 990, Part VIII, line 7b . . . | **4a** | 1,707 | | |
| **b** | Other (Describe in Part XIII.) . . . . . . . . . . . . . | **4b** | 2,161,658 | | |
| **c** | Add lines **4a** and **4b** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **4c** | 2,163,365 |
| **5** | Total expenses. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 18.) . . . . . . . | | | **5** | 30,416,813 |

| Part XIII | Supplemental Information |
|-----------|--------------------------|

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|------------------|-------------|
| See Additional Data Table | |
| | |
| | |
| | |
| | |
| | |

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 153 of 189 PageID #: 325

| Part XIII | Supplemental Information *(continued)* |
|---|---|
| Return Reference | Explanation |
| | |
| | |
| | |
| | |
| | |
| | |

# Additional Data

**Software ID:**
**Software Version:**
**EIN:** 11-1633485
**Name:** FRIENDS ACADEMY

**Supplemental Information**

| Return Reference | Explanation |
| --- | --- |
| PART V, LINE 4: | FRIENDS ACADEMY'S ENDOWMENT CONSISTS OF SEVERAL DONOR-RESTRICTED ENDOWMENT FUNDS ESTABLISH<br>ED FOR FACULTY SALARIES, PROFESSIONAL DEVELOPMENT AND STUDENT SCHOLARSHIPS. |

**Supplemental Information**

| Return Reference | Explanation |
|---|---|
| PART X, LINE 2: | FRIENDS ACADEMY RECOGNIZES THE EFFECT OF INCOME TAX POSITIONS ONLY IF THOSE POSITIONS ARE MORE LIKELY THAN NOT TO BE SUSTAINED. MANAGEMENT HAS DETERMINED THAT FRIENDS ACADEMY HAD NO UNCERTAIN TAX POSITIONS THAT WOULD REQUIRE FINANCIAL STATEMENT RECOGNITION OR DISCLOSURE. FRIENDS ACADEMY IS NO LONGER SUBJECT TO EXAMINATIONS BY THE APPLICABLE TAXING JURISDICTIONS FOR YEARS PRIOR TO JUNE 30, 2017. |

**Supplemental Information**

| Return Reference | Explanation |
|---|---|
| PART XI, LINE 2D - OTHER ADJUSTMENTS: | RENTAL EXPENSE REPORTED ON PART VIII, LINE 6B 108,390. SPECIAL EVENT EXPENSES REPORTED ON PART VIII, LINE 8B 89,355. |

## Supplemental Information

| Return Reference | Explanation |
|---|---|
| PART XI, LINE 4B - OTHER ADJUSTMENTS: | FINANCIAL AID REPORTED ON PART IX, LINE 2 2,137,621. CREDIT CARD PROCESSING FEES RECLASS 24,037. |

## Supplemental Information

| Return Reference | Explanation |
|---|---|
| PART XII, LINE 2D - OTHER ADJUSTMENTS: | RENTAL EXPENSE REPORTED ON PART VIII, LINE 6B 108,390. SPECIAL EVENT EXPENSES REPORTED ON PART VIII, LINE 8B 89,355. |

## Supplemental Information

| Return Reference | Explanation |
|---|---|
| PART XII, LINE 4B - OTHER ADJUSTMENTS: | FINANCIAL AID REPORTED ON PART IX, LINE 2 2,137,621. CREDIT CARD PROCESSING FEES RECLASS 24,037. |

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 160 of 189 PageID #: 932

| SCHEDULE E<br>(Form 990 or 990-EZ) | **Schools** | OMB No. 1545-0047 |
|---|---|---|

▶ Complete if the organization answered "Yes" on Form 990,
Part IV, line 13, or Form 990-EZ, Part VI, line 48.

▶ Attach to Form 990 or Form 990-EZ.

▶ Go to *www.irs.gov/Form990EZ* for the latest information.

**2019**

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

Name of the organization
FRIENDS ACADEMY

**Employer identification number**
11-1633485

## Part I

| | | | YES | NO |
|---|---|---|---|---|
| 1 | Does the organization have a racially nondiscriminatory policy toward students by statement in its charter, bylaws, other governing instrument, or in a resolution of its governing body? . . . . . . . . . . . . . . | **1** | Yes | |
| 2 | Does the organization include a statement of its racially nondiscriminatory policy toward students in all its brochures, catalogues, and other written communications with the public dealing with student admissions, programs, and scholarships? . . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | Yes | |
| 3 | Has the organization publicized its racially nondiscriminatory policy through newspaper or broadcast media during the period of solicitation for students, or during the registration period if it has no solicitation program, in a way that makes the policy known to all parts of the general community it serves? If "Yes," please describe. If "No," please explain. If you need more space use Part II. . . . . . . . . . . . . . . . . . | **3** | Yes | |
| 4 | Does the organization maintain the following? | | | |
| a | Records indicating the racial composition of the student body, faculty, and administrative staff? . . . . . . . . . . | **4a** | Yes | |
| b | Records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4b** | Yes | |
| c | Copies of all catalogues, brochures, announcements, and other written communications to the public dealing with student admissions, programs, and scholarships? . . . . . . . . . . . . . . . . . | **4c** | Yes | |
| d | Copies of all material used by the organization or on its behalf to solicit contributions? . . . . . . . . . . . | **4d** | Yes | |
| | If you answered "No" to any of the above, please explain. If you need more space, use Part II. | | | |
| 5 | Does the organization discriminate by race in any way with respect to: | | | |
| a | Students' rights or privileges? . . . . . . . . . . . . . . . . . . . . . . | **5a** | | No |
| b | Admissions policies? . . . . . . . . . . . . . . . . . . . . . . . | **5b** | | No |
| c | Employment of faculty or administrative staff? . . . . . . . . . . . . . . . . . | **5c** | | No |
| d | Scholarships or other financial assistance? . . . . . . . . . . . . . . . . . . . | **5d** | | No |
| e | Educational policies? . . . . . . . . . . . . . . . . . . . . . . . | **5e** | | No |
| f | Use of facilities? . . . . . . . . . . . . . . . . . . . . . . . . . | **5f** | | No |
| g | Athletic programs? . . . . . . . . . . . . . . . . . . . . . . . . | **5g** | | No |
| h | Other extracurricular activities? . . . . . . . . . . . . . . . . . . . . . | **5h** | | No |
| | If you answered "Yes" to any of the above, please explain. If you need more space, use Part II. | | | |
| 6a | Does the organization receive any financial aid or assistance from a governmental agency? . . . . . . . . . | **6a** | Yes | |
| b | Has the organization's right to such aid ever been revoked or suspended? . . . . . . . . . . . | **6b** | | No |
| | If you answered "Yes" to either line 6a or line 6b, explain on Part II. | | | |
| 7 | Does the organization certify that it has complied with the applicable requirements of sections 4.01 through 4.05 of Rev. Proc. 75-50, 1975-2 C.B. 587, covering racial nondiscrimination? If "No," explain on Part II. . . . . . | **7** | Yes | |

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 161 of 189 PageID #: 333

**Part II** Supplemental Information. Provide the explanations required by Part I, lines 3, 6, 5h, 6, and 7, as applicable. Also provide any other additional information. See instructions.

| Return Reference | Explanation |
|---|---|
| SCHEDULE E, PART I, LINE 3 | THE SCHOOL PUBLICIZES ITS NONDISCRIMINATORY POLICY THROUGH ITS WEBSITE. |
| SCHEDULE E, PART I, LINE 6 | THE SCHOOL RECEIVES FUNDS FROM THE NYS DEPARTMENT OF EDUCATION AS A REIMBURSEMENT FOR LIBRARY BOOKS AND COMPUTER SOFTWARE PURCHASES AS WELL AS AID MONIES FROM NEW YORK STATE FOR TAKING DAILY ATTENDANCE BASED ON THE NUMBER OF STUDENTS ENROLLED. |

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 162 of 189 PageID #: 394

**SCHEDULE F
(Form 990)**

Department of the Treasury
Internal Revenue Service

## Statement of Activities Outside the United States

OMB No. 1545-0047

▶ Complete if the organization answered "Yes" to Form 990, Part IV, line 14b, 15, or 16.

▶ Attach to Form 990.

▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

**2019**

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| FRIENDS ACADEMY | 11-1633485 |

| **Part I** | **General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b. |
|---|---|

**1** **For grantmakers.** Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**2** **For grantmakers.** Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

**3** Activites per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| CENTRAL AMERICA AND THE CARIBBEAN | | | INVESTMENTS | | 209,336 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **3a** Sub-total . . . . . | 0 | 0 | | | 209,336 |
| **b** Total from continuation sheets to Part I . . . . | 0 | 0 | | | 0 |
| **c Totals** (add lines 3a and 3b) | 0 | 0 | | | 209,336 |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.** Cat. No. 50082W **Schedule F (Form 990) 2019**

Case 1:21-cv-00052-ZNS Document 25-2 Filed 04/01/22 Page 160 of 185 PageID #: 335

| **Part II** | **Grants and Other Assistance to Organizations or Entities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 15, for any recipient who received more than $5,000. Part II can be duplicated if additional space is needed. |
|---|---|

| **1** | **(a)** Name of organization | **(b)** IRS code section and EIN (if applicable) | **(c)** Region | **(d)** Purpose of grant | **(e)** Amount of cash grant | **(f)** Manner of cash disbursement | **(g)** Amount of noncash assistance | **(h)** Description of noncash assistance | **(i)** Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |

**2** Enter total number of recipient organizations listed above that are recognized as charities by the foreign country, recognized as tax-exempt by the IRS, or for which the grantee or counsel has provided a section 501(c)(3) equivalency letter  .  .  .  .  .  .  .  .  ▶ _____

**3** Enter total number of other organizations or entities  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ▶ _____

**Part III** **Grants and Other Assistance to Individuals Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 16.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Region | (c) Number of recipients | (d) Amount of cash grant | (e) Manner of cash disbursement | (f) Amount of noncash assistance | (g) Description of noncash assistance | (h) Method of valuation (book, FMV, appraisal, other) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Case 2:21-cv-00875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 165 of 189 PageID #: 337

**Part IV   Foreign Forms**

1   Was the organization a U.S. transferor of property to a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 926, Return by a U.S. Transferor of Property to a Foreign Corporation (see Instructions for Form 926)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☑ Yes    ☐ No

2   Did the organization have an interest in a foreign trust during the tax year? *If "Yes," the organization may be required to separately file Form 3520, Annual Return to Report Transactions with Foreign Trusts and Receipt of Certain Foreign Gifts, and/or Form 3520-A, Annual Information Return of Foreign Trust With a U.S. Owner (see Instructions for Forms 3520 and 3520-A; don't file with Form 990)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☑ No

3   Did the organization have an ownership interest in a foreign corporation during the tax year? *If "Yes," the organization may be required to file Form 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations. (see Instructions for Form 5471)* . . . . . . . . . . . . . . . . . . . . . . . . ☑ Yes    ☐ No

4   Was the organization a direct or indirect shareholder of a passive foreign investment company or a qualified electing fund during the tax year? *If "Yes," the organization may be required to file Form 8621, Information Return by a Shareholder of a Passive Foreign Investment Company or Qualified Electing Fund. (see Instructions for Form 8621)* . ☐ Yes    ☑ No

5   Did the organization have an ownership interest in a foreign partnership during the tax year? *If "Yes," the organization may be required to file Form 8865, Return of U.S. Persons with Respect to Certain Foreign Partnerships (see Instructions for Form 8865)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☑ No

6   Did the organization have any operations in or related to any boycotting countries during the tax year? *If "Yes," the organization may be required to separately file Form 5713, International Boycott Report (see Instructions for Form 5713; don't file with Form 990).* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes    ☑ No

**Part V** **Supplemental Information**

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 166 of 189 PageID #: 338

Provide the information required by Part I, line 2 (monitoring of funds); Part I, line 3, column (f) (accounting method; amounts of investments vs. expenditures per region); Part II, line 1 (accounting method); Part III (accounting method); and Part III, column (c) (estimated number of recipients), as applicable. Also complete this part to provide any additional information. See instructions.

**990 Schedule F, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| PART III ACCOUNTING METHOD: | |

**990 Schedule F, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| PART IV, FOREIGN FORMS, LINE 1: | THE ORGANIZATION IS NOT REQUIRED TO FILE FORM 926 BECAUSE IT DOES NOT MEET THE APPLICABLE THRESHOLD OWNERSHIP REQUIREMENT. |

**990 Schedule F, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| PART IV, FOREIGN FORMS, LINE 3: | THE ORGANIZATION IS NOT REQUIRED TO FILE FORM 5471 BECAUSE IT DOES NOT MEET THE APPLICABLE THRESHOLD OWNERSHIP REQUIREMENT. |

**SCHEDULE G**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Supplemental Information Regarding Fundraising or Gaming Activities

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 169 of 189 PageID #: 341

Complete if the organization answered "Yes" on Form 990, Part IV, lines 17, 18, or 19, or if the
organization entered more than $15,000 on Form 990-EZ, line 6a.
▶Attach to Form 990 or Form 990-EZ.
▶Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

# 2019

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| FRIENDS ACADEMY | 11-1633485 |

**Part I**  **Fundraising Activities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 17.
Form 990-EZ filers are not required to complete this part.

**1**  Indicate whether the organization raised funds through any of the following activities. Check all that apply.

**a** ☐ Mail solicitations

**b** ☐ Internet and email solicitations

**c** ☐ Phone solicitations

**d** ☐ In-person solicitations

**e** ☐ Solicitation of non-government grants

**f** ☐ Solicitation of government grants

**g** ☐ Special fundraising events

**2a**  Did the organization have a written or oral agreement with any individual (including officers, directors, trustees
or key employees listed in Form 990, Part VII) or entity in connection with professional fundraising services?  ☐ **Yes** ☐ **No**

**b**  If "Yes," list the 10 highest paid individuals or entities (fundraisers) pursuant to agreements under which the fundraiser is
to be compensated at least $5,000 by the organization.

| (i) Name and address of individual or entity (fundraiser) | (ii) Activity | (iii) Did fundraiser have custody or control of contributions? | | (iv) Gross receipts from activity | (v) Amount paid to (or retained by) fundraiser listed in col. (i) | (vi) Amount paid to (or retained by) organization |
|---|---|---|---|---|---|---|
| | | Yes | No | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| **Total** . . . . . . . . . . . . . . . . . ▶ | | | | | | |

**3**  List all states in which the organization is registered or licensed to solicit contributions or has been notified it is exempt from registration or
licensing.

--------------------------------------------------------------------------------

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.**       Cat. No. 50083H       **Schedule G (Form 990 or 990-EZ) 2019**

Case 2:19-cv-05070-EK-ST Document 25-2 Filed 04/01/22 Page 170 of 189 PageID #: 342

**Part II**   **Fundraising Events.** Complete if the organization answered "Yes" on Form 990, Part IV, line 18, or reported more than $15,000 of fundraising event contributions and gross income on Form 990-EZ, lines 1 and 6b. List events with gross receipts greater than $5,000.

| | | (a) Event #1 FALL FAIR (event type) | (b) Event #2 VENDOR SHOW (event type) | (c) Other events 1 (total number) | (d) Total events (add col. (a) through col. (c)) |
|---|---|---|---|---|---|
| Revenue | 1 Gross receipts . . . . . | 104,194 | 10,849 | 5,245 | 120,288 |
| | 2 Less: Contributions . . . . | 1,068 | | | 1,068 |
| | 3 Gross income (line 1 minus line 2) | 103,126 | 10,849 | 5,245 | 119,220 |
| Direct Expenses | 4 Cash prizes . . . . . | | | | |
| | 5 Noncash prizes . . . . | | | | |
| | 6 Rent/facility costs . . . | | | | |
| | 7 Food and beverages . . . | | | | |
| | 8 Entertainment . . . . | | | | |
| | 9 Other direct expenses . . . | 86,425 | | 2,930 | 89,355 |
| | 10 Direct expense summary. Add lines 4 through 9 in column (d) . . . . . . . . ▶ | | | | 89,355 |
| | 11 Net income summary. Subtract line 10 from line 3, column (d) . . . . . . . . ▶ | | | | 29,865 |

**Part III**   **Gaming.** Complete if the organization answered "Yes" on Form 990, Part IV, line 19, or reported more than $15,000 on Form 990-EZ, line 6a.

| | | (a) Bingo | (b) Pull tabs/Instant bingo/progressive bingo | (c) Other gaming | (d) Total gaming (add col. (a) through col. (c)) |
|---|---|---|---|---|---|
| Revenue | 1 Gross revenue . . . . . | | | | |
| Direct Expenses | 2 Cash prizes . . . . . | | | | |
| | 3 Noncash prizes . . . . | | | | |
| | 4 Rent/facility costs . . . | | | | |
| | 5 Other direct expenses . . . | | | | |
| | 6 Volunteer labor . . . . | ☐ Yes _____% ☐ No | ☐ Yes _____% ☐ No | ☐ Yes _____% ☐ No | |
| | 7 Direct expense summary. Add lines 2 through 5 in column (d) . . . . . . . ▶ | | | | |
| | 8 Net gaming income summary. Subtract line 7 from line 1, column (d) . . . . . . ▶ | | | | |

9   Enter the state(s) in which the organization conducts gaming activities: _____

a   Is the organization licensed to conduct gaming activities in each of these states? . . . . . . . . ☐ Yes   ☐ No

b   If "No," explain: _____

10a   Were any of the organization's gaming licenses revoked, suspended or terminated during the tax year? . ☐ Yes   ☐ No

b   If "Yes," explain: _____

Case 2:21-cv-03875-FNV-AYS   Document 25-2   Filed 04/01/22   Page 171 of 189 PageID #: 343

**11**  Does the organization conduct gaming activities with nonmembers?  .  .  .  .  .  .  .  .  .  .  .  .  □ **Yes**  □ **No**

**12**  Is the organization a grantor, beneficiary or trustee of a trust or a member of a partnership or other entity
formed to administer charitable gaming?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  □ **Yes**  □ **No**

**13**  Indicate the percentage of gaming activity conducted in:

**a**  The organization's facility  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  | **13a** |  % |

**b**  An outside facility  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  | **13b** |  % |

**14**  Enter the name and address of the person who prepares the organization's gaming/special events books and records:

Name ▶  --------------------------------------------------------------------------------------------------------------------------------------

Address ▶  -----------------------------------------------------------------------------------------------------------------------------------

**15a**  Does the organization have a contract with a third party from whom the organization receives gaming
revenue?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  □ **Yes**  □ **No**

**b**  If "Yes," enter the amount of gaming revenue received by the organization ▶ $ _____ and the
amount of gaming revenue retained by the third party ▶ $ _____ .

**c**  If "Yes," enter name and address of the third party:

Name ▶  --------------------------------------------------------------------------------------------------------------------------------------

Address ▶  -----------------------------------------------------------------------------------------------------------------------------------

**16**  Gaming manager information:

Name ▶  --------------------------------------------------------------------------------------------------------------------------------------

Gaming manager compensation ▶ $ --------------------------------------------------

Description of services provided ▶  ------------------------------------------------------------------------------------------------------------

□ Director/officer          □ Employee          □ Independent contractor

**17**  Mandatory distributions:

**a**  Is the organization required under state law to make charitable distributions from the gaming proceeds to
retain the state gaming license?  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  □ **Yes**  □ **No**

**b**  Enter the amount of distributions required under state law distributed to other exempt organizations or spent
in the organization's own exempt activities during the tax year ▶ $

| **Part IV** | **Supplemental Information.** Provide the explanations required by Part I, line 2b, columns (iii) and (v); and Part III, lines 9, 9b, 10b, 15b, 15c, 16, and 17b, as applicable. Also provide any additional information. See instructions. |
|---|---|

| Return Reference | Explanation |
|---|---|
|  |  |

Note: To capture the full content of this document, please select landscape mode (11" 8.5") when printing.

| Schedule I<br>(Form 990) | **Grants and Other Assistance to Organizations,<br>Governments and Individuals in the United States**<br>Complete if the organization answered "Yes," on Form 990, Part IV, line 21 or 22.<br>▶ Attach to Form 990.<br>▶ Go to *www.irs.gov/Form990* for the latest information. | OMB No. 1545-0047<br>**2019**<br>Open to Public Inspection |
| --- | --- | --- |
| Department of the Treasury<br>Internal Revenue Service | | |

| Name of the organization<br>FRIENDS ACADEMY | Employer identification number<br>11-1633485 |
| --- | --- |

## Part I  General Information on Grants and Assistance

**1** Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . ☑ Yes ☐ No

**2** Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

## Part II  Grants and Other Assistance to Domestic Organizations and Domestic Governments. Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient that received more than $5,000. Part II can be duplicated if additional space is needed.

| **(a)** Name and address of organization or government | **(b)** EIN | **(c)** IRC section (if applicable) | **(d)** Amount of cash grant | **(e)** Amount of non-cash assistance | **(f)** Method of valuation (book, FMV, appraisal, other) | **(g)** Description of noncash assistance | **(h)** Purpose of grant or assistance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| (1) | | | | | | | |
| (2) | | | | | | | |
| (3) | | | | | | | |
| (4) | | | | | | | |
| (5) | | | | | | | |
| (6) | | | | | | | |
| (7) | | | | | | | |
| (8) | | | | | | | |
| (9) | | | | | | | |
| (10) | | | | | | | |
| (11) | | | | | | | |
| (12) | | | | | | | |

**2** Enter total number of section 501(c)(3) and government organizations listed in the line 1 table . . . . . . . . . . ▶ _____

**3** Enter total number of other organizations listed in the line 1 table . . . . . . . . . . . . . . . ▶ _____

For Paperwork Reduction Act Notice, see the Instructions for Form 990.  Cat. No. 50055P  Schedule I (Form 990) 2019

**Part III** | **Grants and Other Assistance to Domestic Individuals.** Complete if the organization answered "Yes" on Form 990, Part IV, line 22.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of noncash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
|---|---|---|---|---|---|
| (1) TUITION FINANCIAL AID | 77 | 1,826,230 | | | |
| (2) SUMMER AND AFTER-SCHOOL FINANCIAL AID | 25 | 289,891 | | | |
| (3) QUAKER DISCOUNTS | 6 | 21,500 | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |
| (7) | | | | | |

**Part IV** | **Supplemental Information.** Provide the information required in Part I, line 2; Part III, column (b); and any other additional information.

| Return Reference | Explanation |
|---|---|
| PART I, LINE 2: | ONCE A STUDENT HAS BEEN ACCEPTED FOR ADMISSION, THE FINANCIAL AID COMMITTEE DETERMINES AWARDS ON THE BASIS OF DEMONSTRATED FINANCIAL NEED WITHOUT REGARD TO GENDER, RACE, SEXUAL ORIENTATION, RELIGION, OR NATIONAL OR ETHNIC ORIGIN IN ACCORDANCE WITH STATE OR FEDERAL LAWS OR REGULATIONS. EACH AWARD IS A NEED-BASED GRANT AND REQUIRES NO DIRECT REPAYMENT. GRANTS ARE REVIEWED ANNUALLY AND ARE ONLY BASED ON FINANCIAL NEED AND NOT ON ACADEMIC, ATHLETIC OR ARTISTIC PERFORMANCE. FRIENDS ACADEMY USES THE NEED ANALYSIS SERVICE OF THE SCHOOL AND STUDENT SERVICE FOR FINANCIAL AID (SSS) TO DETERMINE A FAMILY'S CONTRIBUTION. PARENTS SUBMIT INFORMATION TO SSS ONLINE AND A COPY OF THE ONLINE FORM TO FRIENDS ACADEMY. IN TURN, SSS CONSIDERS FACTORS SUCH AS TOTAL INCOME, ASSETS, FAMILY SIZE, AGE OF PARENTS, NUMBER OF CHILDREN IN TUITION-CHARGING SCHOOLS, AND RETIREMENT NEEDS TO ESTABLISH THE FAMILY'S CONTRIBUTION. IN THE SITUATION OF DIVORCED PARENTS, FRIENDS ACADEMY REQUIRES BOTH PARENTS TO COMPLETE THE SSS FORMS. THE FINANCIAL AID COMMITTEE, COMPRISED OF REPRESENTATIVES FROM THE ADMISSIONS AND FINANCIAL AID OFFICE, THE BUSINESS OFFICE AND THE OFFICE OF THE HEAD OF SCHOOL, USES THE SSS RECOMMENDATION IN CONJUNCTION WITH INFORMATION PROVIDED BY A COPY OF A FAMILY'S FEDERAL TAX RETURN TO DETERMINE THE AMOUNT OF EACH AWARD. AS SSS IS A NATIONAL SERVICE, FRIENDS ACADEMY APPLIES A COST OF LIVING ADJUSTMENT TO THE CALCULATED FAMILY CONTRIBUTION. THE FINANCIAL AID COMMITTEE REVIEWS EACH APPLICATION AND GRANTS AWARDS BASED ON FAMILY NEED AND OVERALL REQUESTS. ALL FAMILIES' FINANCIAL INFORMATION IS CONFIDENTIAL. |

Case 2:21-cv-03875-ENV-AYS Document 25-2 Filed 04/01/22 Page 174 of 189 PageID #: 346

**Schedule J**
(Form 990)

OMB No. 1545-0047

# Compensation Information

**For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

▶ **Complete if the organization answered "Yes" on Form 990, Part IV, line 23.**
▶ **Attach to Form 990.**
▶ **Go to _www.irs.gov/Form990_ for instructions and the latest information.**

## 2019

Department of the Treasury
Internal Revenue Service

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| FRIENDS ACADEMY | 11-1633485 |

| **Part I** | **Questions Regarding Compensation** | | | | |
|---|---|---|---|---|---|

| | | | | Yes | No |
|---|---|---|---|---|---|

**1a** Check the appropiate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items.

| | |
|---|---|
| ☐ First-class or charter travel | ☑ Housing allowance or residence for personal use |
| ☐ Travel for companions | ☐ Payments for business use of personal residence |
| ☐ Tax idemnification and gross-up payments | ☐ Health or social club dues or initiation fees |
| ☐ Discretionary spending account | ☑ Personal services (e.g., maid, chauffeur, chef) |

**b** If any of the boxes on Line 1a are checked, did the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain | **1b** | Yes |

**2** Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? . . | **2** | Yes |

**3** Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III.

| | |
|---|---|
| ☑ Compensation committee | ☐ Written employment contract |
| ☐ Independent compensation consultant | ☑ Compensation survey or study |
| ☑ Form 990 of other organizations | ☑ Approval by the board or compensation committee |

**4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization:

**a** Receive a severance payment or change-of-control payment? . . . . . . . . . | **4a** | | No |

**b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . . . | **4b** | | No |

**c** Participate in, or receive payment from, an equity-based compensation arrangement? . . . . . | **4c** | | No |

If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III.

**Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.**

**5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of:

**a** The organization? . . . . . . . . . . . . . . . | **5a** | | No |

**b** Any related organization? . . . . . . . . . . . . . | **5b** | | No |

If "Yes," on line 5a or 5b, describe in Part III.

**6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of:

**a** The organization? . . . . . . . . . . . . . . . | **6a** | | No |

**b** Any related organization? . . . . . . . . . . . . . | **6b** | | No |

If "Yes," on line 6a or 6b, describe in Part III.

**7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III . . . . . . . . . | **7** | | No |

**8** Were any amounts reported on Form 990, Part VII, paid or accured pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III . . . . . . . . . . . . . . | **8** | | No |

**9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? . . . . . . . . . . . . . . . | **9** | | |

| For Paperwork Reduction Act Notice, see the Instructions for Form 990. | Cat. No. 50053T | **Schedule J (Form 990) 2019** |

**Part II**  **Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.

**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| **1** ANDREA KELLY HEAD OF SCHOOL | (i) | 416,835 | 0 | 15,068 | 30,200 | 85,253 | 547,356 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **2** ANN MARIE TIDONA DIRECTOR OF FINANCE | (i) | 270,203 | 0 | 649 | 27,085 | 36,544 | 334,481 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **3** MARK SCHOEFFEL UPPER SCHOOL PRINCIPAL | (i) | 179,574 | 0 | 382 | 7,007 | 103,424 | 290,387 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **4** JENIFER HALLIDAY ASSISTANT HEAD OF SCHOOL | (i) | 190,047 | 0 | 16,674 | 8,269 | 74,423 | 289,413 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **5** RON BASKIND DEAN OF STUDENTS | (i) | 154,224 | 0 | 912 | 15,514 | 70,759 | 241,409 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **6** NINA WAECHTER DIRECTOR OF ADMISSION | (i) | 147,324 | 0 | 296 | 5,905 | 69,762 | 223,287 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **7** KEVIN BARRY DIRECTOR OF ADVANCEMENT | (i) | 197,450 | 0 | 159 | 7,904 | 1,768 | 207,281 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

Case 3:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 176 of 189 PageID #: 3.48

## Part III　Supplemental Information

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| PART I, LINE 1A | AS A CONDITION OF EMPLOYMENT, ANDREA KELLY, THE HEAD OF SCHOOL, MAINTAINS HER PRINCIPAL RESIDENCE AT THE SCHOOL. THE SCHOOL WILL ALSO PROVIDE THE HEAD OF SCHOOL'S RESIDENCE WITH HOUSEHOLD SERVICES AND UPKEEP, INCLUDING UTILITIES, CLEANING, LANDSCAPING, LAWN MAINTENANCE, AND OTHER SIMILAR EXPENDITURES. THE HOUSING IS NON-TAXABLE TO THE INDIVIDUAL. JENIFER HALLIDAY, THE ASSISTANT HEAD OF SCHOOL, ALSO RECEIVED A TAXABLE HOUSING ALLOWANCE IN 2019. |

efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93493054000271

Note: To capture the full content of this document, please select landscape mode (11" x 8.5") when printing.

**Schedule K (Form 990)**

Department of the Treasury
Internal Revenue Service

OMB No. 1545-0047

**Supplemental Information on Tax-Exempt Bonds**

▶ Complete if the organization answered "Yes" to Form 990, Part VI, line 24a. Provide descriptions, explanations, and any additional information in Part VI.

▶ Attach to Form 990.

▶Go to *www.irs.gov/Form990* for instructions and the latest information.

**2019**

Open to Public Inspection

Name of the organization
FRIENDS ACADEMY

Employer identification number
11-1633485

## Part I Bond Issues

| | (a) Issuer name | (b) Issuer EIN | (c) CUSIP # | (d) Date issued | (e) Issue price | (f) Description of purpose | (g) Defeased | | (h) On behalf of issuer | | (i) Pool financing | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No | Yes | No | Yes | No |
| A | NASSAU COUNTY LOCAL ECONOMIC ASSISTANCE CORP | | | 09-26-2016 | 5,647,000 | RENOVATION OF THE MIDDLE SCHOOL | | X | | X | | X |
| B | NASSAU COUNTY LOCAL ECONOMIC ASSISTANCE CORP | | | 09-26-2016 | 6,218,000 | CONSTRUCTION/ACQUISITION/REHABILITATION/IMPROVEMENT | | X | | X | | X |

## Part II Proceeds

| | | A | B | C | D |
|---|---|---|---|---|---|
| 1 | Amount of bonds retired . . . . . . . . . . . . | 512,906 | 977,858 | | |
| 2 | Amount of bonds legally defeased . . . . . . . . . . | | | | |
| 3 | Total proceeds of issue . . . . . . . . . . . . | 5,647,000 | 6,218,000 | | |
| 4 | Gross proceeds in reserve funds . . . . . . . . . | | | | |
| 5 | Capitalized interest from proceeds . . . . . . . . . | | | | |
| 6 | Proceeds in refunding escrows . . . . . . . . . | | | | |
| 7 | Issuance costs from proceeds . . . . . . . . . | 109,175 | 120,215 | | |
| 8 | Credit enhancement from proceeds . . . . . . . . | | | | |
| 9 | Working capital expenditures from proceeds . . . . . . | | | | |
| 10 | Capital expenditures from proceeds . . . . . . . . | 5,537,825 | 6,097,785 | | |
| 11 | Other spent proceeds . . . . . . . . . . . | | | | |
| 12 | Other unspent proceeds . . . . . . . . . . . | | | | |
| 13 | Year of substantial completion . . . . . . . . . | 2016 | 2016 | | |

| | | Yes | No | Yes | No | Yes | No | Yes | No |
|---|---|---|---|---|---|---|---|---|---|
| 14 | Were the bonds issued as part of a current refunding issue of tax-exempt bonds (or, if issued prior to 2018, a current refunding issue)? . . . . . . . | | X | | X | | | | |
| 15 | Were the bonds issued as part of an advance refunding issue of taxable bonds (or, if issued prior to 2018, an advance refunding issue)? . . . . . . | | X | | X | | | | |
| 16 | Has the final allocation of proceeds been made? . . . . . . . . | X | | X | | | | | |
| 17 | Does the organization maintain adequate books and records to support the final allocation of proceeds? . . . . . . . . | X | | X | | | | | |

## Part III Private Business Use

| | | A | | B | | C | | D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Yes | No | Yes | No | Yes | No | Yes | No |
| 1 | Was the organization a partner in a partnership, or a member of an LLC, which owned property financed by tax-exempt bonds? . . . . . . . . | | X | | X | | | | |
| 2 | Are there any lease arrangements that may result in private business use of bond-financed property? . . . . . . | | X | | X | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.     Cat. No. 50193E     **Schedule K (Form 990) 2019**

| **Part III** | **Private Business Use** (continued) | A | | B | | C | | D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Yes | No | Yes | No | Yes | No | Yes | No |
| **3a** | Are there any management or service contracts that may result in private business use of bond-financed property? . . . . . . . . . . . . . . . . | | X | | X | | | | |
| **b** | If "Yes" to line 3a, does the organization routinely engage bond counsel or other outside counsel to review any management or service contracts relating to the financed property? | | | | | | | | |
| **c** | Are there any research agreements that may result in private business use of bond-financed property? . . . . . . . . . . . . . . . . | | X | | X | | | | |
| **d** | If "Yes" to line 3c, does the organization routinely engage bond counsel or other outside counsel to review any research agreements relating to the financed property? | | | | | | | | |
| **4** | Enter the percentage of financed property used in a private business use by entities other than a section 501(c)(3) organization or a state or local government . . . ▶ | | | | | | | | |
| **5** | Enter the percentage of financed property used in a private business use as a result of unrelated trade or business activity carried on by your organization, another section 501(c)(3) organization, or a state or local government . . . . . . . . . ▶ | | | | | | | | |
| **6** | Total of lines 4 and 5 . . . . . . . . . . . . . . . . | | | | | | | | |
| **7** | Does the bond issue meet the private security or payment test? . . . | | X | | X | | | | |
| **8a** | Has there been a sale or disposition of any of the bond-financed property to a nongovernmental person other than a 501(c)(3) organization since the bonds were issued? . . . . . . . . . . . . . . . . | | X | | X | | | | |
| **b** | If "Yes" to line 8a, enter the percentage of bond-financed property sold or disposed of. . | | | | | | | | |
| **c** | If "Yes" to line 8a, was any remedial action taken pursuant to Regulations sections 1.141-12 and 1.145-2? . . . . . . . . . . . . . . . . | | | | | | | | |
| **9** | Has the organization established written procedures to ensure that all nonqualified bonds of the issue are remediated in accordance with the requirements under Regulations sections 1.141-12 and 1.145-2? . . . . . . . . . | | X | | X | | | | |

| **Part IV** | **Arbitrage** | A | | B | | C | | D | |
|---|---|---|---|---|---|---|---|---|---|
| | | Yes | No | Yes | No | Yes | No | Yes | No |
| **1** | Has the issuer filed Form 8038-T, Arbitrage Rebate, Yield Reduction and Penalty in Lieu of Arbitrage Rebate? . . . | | X | | X | | | | |
| **2** | If "No" to line 1, did the following apply? . . . . | | | | | | | | |
| **a** | Rebate not due yet? . . . . . . . . | | X | | X | | | | |
| **b** | Exception to rebate? . . . . . . . . . | | X | | X | | | | |
| **c** | No rebate due? . . . . . . . . . . | X | | X | | | | | |
| | If "Yes" to line 2c, provide in Part VI the date the rebate computation was performed . . . . . . . | | | | | | | | |
| **3** | Is the bond issue a variable rate issue? . . . . . | | X | | X | | | | |
| **4a** | Has the organization or the governmental issuer entered into a qualified hedge with respect to the bond issue? | | X | | X | | | | |
| **b** | Name of provider . . . . . . . . . . . | | | | | | | | |
| **c** | Term of hedge . . . . . . . . . . . | | | | | | | | |
| **d** | Was the hedge superintegrated? . . . . . . . | | | | | | | | |
| **e** | Was the hedge terminated? . . . . . . . . . | | | | | | | | |

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 179 of 189 PageID #: 351

## Part IV    Arbitrage (Continued)

| | | A | | B | | C | | D | |
|---|---|---|---|---|---|---|---|---|---|
| | | **Yes** | **No** | **Yes** | **No** | **Yes** | **No** | **Yes** | **No** |
| **5a** | Were gross proceeds invested in a guaranteed investment contract (GIC)? | | X | | X | | | | |
| **b** | Name of provider . . . . . . . . . . | | | | | | | | |
| **c** | Term of GIC . . . . . . . . . . | | | | | | | | |
| **d** | Was the regulatory safe harbor for establishing the fair market value of the GIC satisfied? . . . . . . . . . | | | | | | | | |
| **6** | Were any gross proceeds invested beyond an available temporary period? | | X | | X | | | | |
| **7** | Has the organization established written procedures to monitor the requirements of section 148? . . . . | | X | | X | | | | |

## Part V    Procedures To Undertake Corrective Action

| | A | | B | | C | | D | |
|---|---|---|---|---|---|---|---|---|
| | **Yes** | **No** | **Yes** | **No** | **Yes** | **No** | **Yes** | **No** |
| Has the organization established written procedures to ensure that violations of federal tax requirements are timely identified and corrected through the voluntary closing agreement program if self-remediation is not available under applicable regulations? | X | | X | | | | | |

## Part VI    Supplemental Information. Provide additional information for responses to questions on Schedule K. (See instructions).

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 180 of 189 PageID #: 352

**SCHEDULE L**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Transactions with Interested Persons

▶ **Complete if the organization answered "Yes" on Form 990, Part IV, lines 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.**
▶ **Attach to Form 990 or Form 990-EZ.**
▶**Go to _www.irs.gov/Form990_ for instructions and the latest information.**

OMB No. 1545-0047

**2019**

**Open to Public Inspection**

Name of the organization
FRIENDS ACADEMY

Employer identification number

11-1633485

---

**Part I**  **Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | (a) Name of disqualified person | (b) Relationship between disqualified person and organization | (c) Description of transaction | (d) Corrected? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2** Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ $ _____

**3** Enter the amount of tax, if any, on line 2, above, reimbursed by the organization . . . . . . . . ▶ $ _____

---

**Part II**  **Loans to and/or From Interested Persons.**
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a, or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? | | (e) Original principal amount | (f) Balance due | (g) In default? | | (h) Approved by board or committee? | | (i) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total** | . . . . . . . . . . . . . . . . ▶ $ | | | | | | | | | | | |

---

**Part III**  **Grants or Assistance Benefiting Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.** Cat. No. 50056A **Schedule L (Form 990 or 990-EZ) 2019**

Case 2:21-cv-03825-ENV-AYS   Document 25-2   Filed 04/01/22   Page 181 of 189 PageID #: 393

| **Part IV** | **Business Transactions Involving Interested Persons.** |
|---|---|
| | Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c. |

| **(a)** Name of interested person | **(b)** Relationship between interested person and the organization | **(c)** Amount of transaction | **(d)** Description of transaction | **(e)** Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | **Yes** | **No** |
| (1) EDEN MOREY | WIFE OF TRUSTEE, JED MOREY | 10,854 | EMPLOYMENT AT THE ACADEMY | | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| **Part V** | **Supplemental Information** |
|---|---|
| | Provide additional information for responses to questions on Schedule L (see instructions). |

| **Return Reference** | **Explanation** |
|---|---|

| SCHEDULE M (Form 990) | Noncash Contributions | OMB No. 1545-0047 |
|---|---|---|

▶Complete if the organizations answered "Yes" on Form 990, Part IV, lines 29 or 30.

▶ Attach to Form 990.

▶Go to _www.irs.gov/Form990_ for the latest information.

**2019**

**Open to Public Inspection**

Department of the Treasury
Internal Revenue Service

Name of the organization
FRIENDS ACADEMY

**Employer identification number**

11-1633485

## Part I    Types of Property

| | | (a) Check if applicable | (b) Number of contributions or items contributed | (c) Noncash contribution amounts reported on Form 990, Part VIII, line 1g | (d) Method of determining noncash contribution amounts |
|---|---|---|---|---|---|
| 1 | Art—Works of art . . . . . | | | | |
| 2 | Art—Historical treasures . | | | | |
| 3 | Art—Fractional interests . . | | | | |
| 4 | Books and publications . . | | | | |
| 5 | Clothing and household goods . . . . . . . . | | | | |
| 6 | Cars and other vehicles . . | | | | |
| 7 | Boats and planes . . . . | | | | |
| 8 | Intellectual property . . . | | | | |
| 9 | Securities—Publicly traded . | | | | |
| 10 | Securities—Closely held stock . | X | 9 | 138,627 | AVG. SELLING PRICE |
| 11 | Securities—Partnership, LLC, or trust interests . . . . | | | | |
| 12 | Securities—Miscellaneous . . | | | | |
| 13 | Qualified conservation contribution—Historic structures . . . . . . | | | | |
| 14 | Qualified conservation contribution—Other . . . | | | | |
| 15 | Real estate—Residential . | | | | |
| 16 | Real estate—Commercial . . | | | | |
| 17 | Real estate—Other . . . | | | | |
| 18 | Collectibles . . . . . | | | | |
| 19 | Food inventory . . . | | | | |
| 20 | Drugs and medical supplies . | | | | |
| 21 | Taxidermy . . . . . . | | | | |
| 22 | Historical artifacts . . . . | | | | |
| 23 | Scientific specimens . . | | | | |
| 24 | Archeological artifacts . . . | | | | |
| 25 | Other ▶ ( _____ ) | | | | |
| 26 | Other ▶ ( _____ ) | | | | |
| 27 | Other ▶ ( _____ ) | | | | |
| 28 | Other ▶ ( _____ ) | | | | |

| 29 | Number of Forms 8283 received by the organization during the tax year for contributions for which the organization completed Form 8283, Part IV, Donee Acknowledgement | **29** | 0 |
|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 30a | During the year, did the organization receive by contribution any property reported in Part I, lines 1 through 28, that it must hold for at least three years from the date of the initial contribution, and which isn't required to be used for exempt purposes for the entire holding period? . . . . . . . . . . . . . . . . . . . . . . . . . . | **30a** | | No |
| b | If "Yes," describe the arrangement in Part II. | | | |
| 31 | Does the organization have a gift acceptance policy that requires the review of any nonstandard contributions? | **31** | Yes | |
| 32a | Does the organization hire or use third parties or related organizations to solicit, process, or sell noncash contributions? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **32a** | | No |
| b | If "Yes," describe in Part II. | | | |
| 33 | If the organization didn't report an amount in column (c) for a type of property for which column (a) is checked, describe in Part II. | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.        Cat. No. 51227J        **Schedule M (Form 990) (2019)**

Case 2:21-cv-03879-EAS-ALS Document 25-2 Filed 04/01/22 Page 183 of 189 PageID #: 355

| Part II | Supplemental Information. Provide the information required by Part I, lines 30b, 32b, and 33, and whether the organization is reporting in Part I, column (b), the number of contributions, the number of items received, or a combination of both. Also complete this part for any additional information. |
|---------|---|

| Return Reference | Explanation |
|------------------|-------------|
| PART I, COLUMN (B): | THE ORGANIZATION IS REPORTING THE NUMBER OF CONTRIBUTORS. |

Case 2:21-cv-03875-ENV-AYS   Document 25-2   Filed 04/01/22   Page 184 of 189 PageID #:

# SCHEDULE O
## (Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

**Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.**
► **Attach to Form 990 or 990-EZ.**
► **Go to** *www.irs.gov/Form990* **for the latest information.**

OMB No. 1545-0047

# 2019

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| FRIENDS ACADEMY | 11-1633485 |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION A, LINE 2 | FRANK INGRASSIA AND ELIZABETH INGRASSIA HAVE A FAMILY RELATIONSHIP. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 11B | THE BOARD OF TRUSTEES RECEIVE AN ELECTRONIC FORM OF THE FINAL 990 BEFORE IT IS FILED WITH THE IRS. IN ORDER TO PROTECT THE CONFIDENTIALITY OF THE DONORS, SCHEDULE B IS NOT PROVIDED TO THE TRUSTEES. THERE ARE NO FURTHER LIMITATIONS OF THE TRUSTEES' REVIEW. THE TRUSTEES REVIEW THE INFORMATION INDEPENDENTLY AND ARE ASKED TO DIRECT ANY QUESTIONS TO THE HEAD OF THE SCHOOL AND DIRECTOR OF FINANCE. THE 990 IS DISCUSSED AT A BOARD MEETING. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 12C | THE ACADEMY MONITORS AND ENFORCES A CONFLICT OF INTEREST POLICY. THE POLICY CLEARLY IDENTIFIES AREAS OF POTENTIAL CONFLICT, REVIEW PROCEDURES, AND DISCLOSURE RESPONSIBILITIES. THE POLICY IS REVIEWED ANNUALLY AND EACH TRUSTEE AND OFFICER IS REQUIRED TO SIGN AN ANNUAL CONFLICT OF INTEREST DISCLOSURE FORM. THE POLICY CLEARLY STATES THAT WHERE A POTENTIAL CONFLICT OF INTEREST EXISTS, IT SHALL BE THE RESPONSIBILITY OF THE PERSON INVOLVED TO NOTIFY THE BOARD OF TRUSTEES OF THE GUIDANCE AND TAKE APPROPRIATE ACTION. AN OFFICER OR TRUSTEE WHO HAS A POTENTIAL CONFLICT OF INTEREST IN A DECISION-MAKING PROCESS SHALL RECUSE HIMSELF OR HERSELF FROM THE DECISION-MAKING PROCESS. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 15 | THE COMMITTEE ON COMPENSATION AND CONFLICTS CONSISTING OF BOARD MEMBERS WHO HAVE NO CONFLICTS OF INTEREST DETERMINE THE COMPENSATION OF THE HEAD OF SCHOOL, THE SCHOOL'S CHIEF EXECUTIVE OFFICER. REASONABLE COMPENSATION IS DETERMINED BASED UPON PERFORMANCE AND COMPARISON TO COMPARABLE INSTITUTIONS. COMPARABLE INSTITUTIONS INCLUDE RELEVANT BENCHMARKS FROM THE NATIONAL ASSOCIATION OF INDEPENDENT SCHOOLS (NAIS), PARTICIPATION IN THE INDEPENDENT SCHOOL DATA EXCHANGE (INDEX) AND OTHER RELEVANT DATA. THE HEAD OF SCHOOL DETERMINES THE COMPENSATION FOR ALL OTHER KEY ADMINISTRATORS BASED ON THE SAME BENCHMARKS USED TO DETERMINE THE HEAD OF SCHOOL'S COMPENSATION. THE COMMITTEE ON COMPENSATION AND CONFLICTS RECEIVES A REPORT ON THE SALARIES FOR ALL KEY ADMINISTRATORS OF THE SCHOOL AND REVIEWS IT TO CONFIRM REASONABLE COMPENSATION. THE AFOREMENTIONED PROCESS WAS COMPLETED IN 2019 FOR 2020 SALARIES. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
| --- | --- |
| FORM 990, PART VI, SECTION C, LINE 19 | THE SCHOOL MAKES ITS FORM 990 AVAILABLE FOR PUBLIC INSPECTION AS REQUIRED UNDER SECTION 6104 OF THE INTERNAL REVENUE CODE. THE RETURN IS ALSO POSTED ON GUIDESTAR.ORG AND OTHER SIMILAR TYPES OF WEBSITES. IN ADDITION, THE FORM 1023, FINANCIAL STATEMENTS, CONFLICT OF INTEREST POLICY, ARTICLES OF INCORPORATION, AND BY-LAWS ARE ALSO AVAILABLE UPON WRITTEN REQUEST OR BY CALLING THE ORGANIZATION DIRECTLY. |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PART XII, LINE 2C: | THE ORGANIZATION HAS A COMMITTEE THAT IS RESPONSIBLE FOR THE OVERSIGHT OF THE AUDIT OF ITS FINANCIAL STATEMENTS AND SELECTION OF AN INDEPENDENT ACCOUNTANT. THE PROCESS HAS NOT CHANGED FROM THE PRIOR YEAR. |